**Page 74**

1  not prepare by myself. I had some input into it, but we
2  had a team working on that.
3       The earlier version, honestly, I don't even
4  remember who put it together.
5       MR. DOYLE: Why don't we mark as the next
6  exhibit for today's deposition the operator's
7  manual that we're referring to.
8       (Enegren Exhibit No. 4 was marked for
9  identification.)
10 BY MR. DOYLE:
11      Q. Shortly after the company sold the water
12 blaster to Hillside, did it receive a letter from a
13 lawyer writing on behalf of Hillside?
14      A. Well, based on the document you've given me, I
15 would have to say yes.
16      MR. DOYLE: Let me mark this as the next
17 exhibit, and this will be the following one.
18      (Enegren Exhibit Nos. 5 and 6 were marked for
19 identification.)
20 BY MR. DOYLE:
21      Q. I'll just ask you questions about the initial
22 letter from the lawyer to the company I believe in
23 October of 1992.
24      As a result of what was taking place at this
25 point in time, approximately September, October of 1992

**Page 75**

1  involving Hillside and Viking, did Viking make
2  arrangements to get certification so that Hillside could
3  use the machine, perhaps sent Howard out at about this
4  time to visit Hillside?
5       Did it attempt to address the concerns that
6  the customer, Hillside, had?
7       A. Yes.
8       Q. As part of good business practice, trying to
9  stay on good terms with Hillside, did you write and send
10 to Hillside a, basically a thank you letter thanking
11 them for purchasing the machine, seeing if there were
12 any other interests or anybody else that might be a
13 potential customer?
14      A. Yes. You've marked that Exhibit 6.
15      Q. Okay. Was Mr. Renzella basically a pain in
16 the neck?
17      MR. FLEMING: Objection.
18      THE WITNESS: Yes.
19 BY MR. DOYLE:
20      Q. You got a number of calls to the company
21 following the delivery of the machine to Hillside?
22      A. Yes. Well, from Hillside.
23      Q. From Hillside. Generally Mr. Renzella calling
24 Viking because of issues or concerns or problems that he
25 was having with the machine that he had purchased?

**Page 76**

1       A. Yes.
2       Q. At some point in time did you start to
3  document the calls or the, what was taking place between
4  Hillside and Viking?
5       A. Yes.
6       Q. Do you remember when you first started to
7  document these calls?
8       A. No.
9       Q. Let me show you a collection of pages that
10 I'll have marked as the next exhibit, and it's a total
11 of six pages, and ask if you are generally familiar with
12 those documents, those six pages.
13      A. Yes.
14      Q. And what are those, sir?
15      A. They appear to be day date time stamped with
16 an identifier using my initials and a memo of a phone
17 call. I don't recognize the form I'm seeing it here,
18 but it would be consistent with recording of my notes of
19 a telephone conversation I had with various people.
20      We used to contact management software.
21 Perhaps the software has been updated to a later version
22 and that may be the reason I don't recognize the format,
23 but it's consistent with the way I would type notes that
24 would record any given conversation with a client.
25      MR. DOYLE: Just before I lose track, if we

**Page 77**

1  could just have it marked as the next exhibit, I
2  believe 7.
3       (Enegren Exhibit No. 7 was marked for
4  identification.)
5  BY MR. DOYLE:
6       Q. The earliest note that's part of Exhibit 7
7  appears to be July of '03, correct, sir? I just ask you
8  to look at the six pages. I'm sorry, July of '93?
9       A. July 22nd, 1993, yes.
10      Q. Do you remember if that's the first time you
11 started to document notes or conversations with Hillside
12 regarding their purchase of the water blaster?
13      A. I do not recall.
14      Q. Would you have documented all of your
15 conversations with Hillside of any substance other than
16 the hi, how are you, Merry Christmas type of
17 conversations?
18      If there was anything of any significant
19 substance, business issue, would you have documented it?
20      A. As a general rule of thumb, whether I made the
21 call or any of our salespeople made the call, the call
22 would be recorded in our contact management software.
23 We used auto dialers tied into the software so we could
24 even record the time of the call and, if used properly,
25 we could even record the duration of the call.

Page 122

1  control panel one time.
2      Q.  Okay.  Is that the same electrical control
3  panel you testified earlier that got UL approval?
4      A.  No.
5      Q.  Okay.  So you remember hiring engineers to
6  work on the electric control panel?
7      A.  We hired an electrical engineer I think out of
8  necessity, because one of the control panels we
9  manufactured incorporated a computer and a piece of
10 computer software that required an electrical engineer's
11 assistance.
12     Q.  Do you recall any other time hiring outside
13 engineers?
14     A.  No.
15     Q.  If you had hired an engineer to do an
16 engineering analysis of the evaporator, what type of
17 engineer would you hire?
18     A.  I'm not sure where I would even look.
19     Q.  As you understand it, what does an engineering
20 analysis involve?
21     A.  Well, not having used one, I don't know that I
22 can address it.
23     Q.  Okay.
24     A.  I just don't know.
25     Q.  I think you also testified that the evaporator

Page 123

1  was reverse engineered.
2      A.  Yes.
3      Q.  What do you mean by that?
4      A.  We had a request to develop an application,
5  and so we backed into the design, given the end product
6  that a customer had specified, we built to a
7  specification.
8      Q.  So did this customer specify the actual
9  dimensions and whatnot?
10     A.  No.  It was more of a conceptual
11 specification.
12     Q.  Do you remember ever having any conversations
13 with Paul Renzella or anyone else at Hillside -- and
14 this is just you personally -- regarding the use of
15 caustic in the machine?
16     A.  Yes.
17     Q.  And what do you remember about those
18 conversations?
19     A.  Well, it was one of the very first
20 conversations we had when Paul told me he had a leak in
21 the fire tube, because as a part of our quality control,
22 when we test a machine and run a machine for a period of
23 hours in the plant, we check for leaks and ensure that
24 there are absolutely no leaks in the machine, including
25 pressure testing of the fire tube under pressure with

Page 124

1  air at about 200 pounds a square inch.
2          So we know we shipped the machine without
3  leaks in the fire tube.  One of the ways to create a
4  leak in a fire tube is to use a very hot caustic that
5  might corrode the fire tube and cause a leak.
6          So that was one, would be one of the very
7  first conversations we had within the first 30 or 60
8  days, I believe, that came up as an issue.
9      Q.  And did you tell Paul Renzella not to use
10 caustic in the machine?
11     A.  Absolutely.
12     Q.  And what was his response to that?
13     A.  Well, Paul -- I'm going to have to speculate
14 about Paul's attitude and disposition here, so forgive
15 me if I'm wrong, but I believe Paul fancied himself to
16 be a very capable designer, builder, owner, operator of
17 equipment, and I do know that his initial reaction was
18 that it was unreasonable that he could not use a caustic
19 in the machine.  Regardless, we pointed out that it was
20 in the manual.
21         There was some discussion I believe even that
22 the sales agent had suggested a caustic, and we had I
23 believe a discussion with John Zanetti --
24     Q.  By the sales agent, you mean John Zanetti?
25     A.  Yes, sir, that we absolutely don't use caustic

Page 125

1  in those machines, that caustic at its core is unsafe.
2  It's caustic.  Beyond that, it's a ferrous metal
3  machine, not a stainless steel machine.
4      Q.  And you testified that at some point Howard
5  Whitetree visited Hillside?
6      A.  I believe that's correct, yes.
7      Q.  And you believe that during that visit he saw,
8  he discovered there was caustic in the machine?
9      A.  Again, I believe that's my recollection.
10     Q.  And would that, was that subsequent to that
11 phone conversation with Paul Renzella regarding the leak
12 in the fire tube?
13     A.  I don't know the timing.
14     Q.  Do you know whether --
15     A.  Let me back up.
16     Q.  Go ahead.
17     A.  I would presume my conversation about use of
18 caustic stemmed from Paul's complaint that there was a
19 leak in the fire tube, and I would presume it was prior
20 to Howard's visit out there, but I don't know that for a
21 fact.
22     Q.  Do you know whether Howard Whitetree ever
23 created a report or anything in writing as a result of
24 his visit to Hillside?
25     A.  I don't recall.