Page 110

1  N-a-m-e-e.
2      Q. But you have no memory whether or not you
3  showed this release to them?
4      A. I don't recall.
5      Q. And as part of being president of Viking back
6  in 1993, I assume you had reviewed numerous business
7  documents?
8          MR. POWERS: Objection.
9          THE WITNESS: Yes.
10 BY MR. FLEMING:
11     Q. Did you feel competent to review documents and
12 understand them --
13         MR. POWERS: Objection.
14 BY MR. FLEMING:
15     Q. -- as president of Viking?
16         THE WITNESS: Can we go off record a minute?
17         MR. FLEMING: Sure.
18     (Discussion held off the record.)
19         MR. FLEMING: Can you repeat the question?
20     (A portion of the record was read by the
21 reporter.)
22         THE WITNESS: Generally, yes.
23 BY MR. FLEMING:
24     Q. And in 1993, if I do my math correctly, you
25 had been president of Viking for 15 years, since 1978?

Page 111

1      A. Approximately.
2      Q. And during those 15 years, had you had the
3  chance to review numerous contracts and other business
4  documents?
5      A. Yes.
6      Q. Had you ever reviewed indemnification
7  agreements?
8      A. No.
9      Q. And I apologize if this has already been
10 asked. What's the last level of education that you
11 completed?
12     A. I went to Wichita State University for about
13 three and a half years and had a major in geology,
14 petroleum geology specifically.
15         MR. DOYLE: Why am I paying so much for gas?
16         THE WITNESS: Because I'm not running it.
17 BY MR. FLEMING:
18     Q. Now after had you a chance to look at this
19 August 13, 1993, letter and the enclosed release back in
20 1993, did you contact Paul Renzella or Mr. Favaloro?
21     A. I don't believe I ever spoke with Mr. Favaloro
22 or Mr. Schreiber. I'm sure I had conversations with
23 Paul Renzella by telephone.
24     Q. So do you believe that after reviewing this,
25 you would have called Mr. Renzella?

Page 112

1      A. Sure.
2      Q. And was the purpose of that call to tell him
3  that the form of this release is acceptable?
4      A. Yes.
5      Q. If you look in Exhibit 7, I don't see any
6  record of a call on August 13.
7         Is it possible that some calls didn't get put
8  into this case management system?
9      A. It's possible, but I would say it's highly
10 unlikely, given the contentious nature of the
11 relationship with Hillside.
12     Q. Do you ever remember telling Renzella after
13 reviewing the release that you wanted to add language to
14 it or change it in any way?
15     A. I don't recall.
16     Q. After reviewing the release, do you remember
17 having any conversations with Mr. Renzella about
18 indemnification for future accidents with the machine?
19     A. I do not recall that.
20     Q. Now you've had a chance to review the terms of
21 that release today, have you not?
22     A. Yes.
23     Q. Reading that, do you believe that that release
24 entitled Viking to indemnification by Hillside for the
25 present suit brought by Edward Steffen?

Page 113

1      A. Yes.
2      Q. And why do you believe that?
3      A. This is a release from all claims arising out
4  of their purchase of the product.
5      Q. It's a release of all claims by Hillside?
6      A. Correct.
7         MR. POWERS: Objection to the form.
8  BY MR. FLEMING:
9      Q. Do you understand this release to release all
10 claims that Hillside has against Viking regarding this
11 machine?
12         MR. POWERS: Objection.
13         THE WITNESS: Yes.
14 BY MR. FLEMING:
15     Q. Do you know whether Hillside has asserted a
16 claim against Viking arising out of this machine?
17     A. I don't know that.
18     Q. I'm going to turn to one of the manuals that
19 have already been marked as an exhibit, Exhibit
20 Number 4, if you could take a look at that.
21         And also I'll show you -- this I think was not
22 marked as an exhibit, but this was -- why don't we mark
23 that as an exhibit, that letter. That already has been
24 marked as Exhibit 8. Okay, we'll use that then.
25         If you look at the operating manual part of

29 (Pages 110 to 113)

Page 134

1    Corporation would have reduced their general liability
2    insurance coverage after you sold the business to the
3    present owners from whatever the level was down to
4    $500,000?
5        A.  I don't know of a reason.  I was unaware that
6    they had done it.  I assume it's a cost-driven maneuver,
7    but I don't know that.
8        MR. DOYLE:  Sure.  Thanks very much.  That's
9    all I have.
10       THE WITNESS:  You're welcome.
11       MR. DOYLE:  Mr. Powers has an hour or two.
12       MR. POWERS:  Not an hour.  Just a question or
13   two.
14                 CROSS (GUS ENEGREN)
15   BY MR. POWERS:
16       Q.  During the conversations that you had with
17   Mr. Renzella, did he ever make or suggest proposed
18   modifications of the machine?
19       A.  Yes.
20       Q.  Could you tell us some of the things that he
21   proposed to modify on the machine.
22       A.  It escapes me at the moment, but his
23   attorney's letter is marked as an exhibit and details
24   some of the changes that were proposed by Mr. Renzella.
25   And I just, I don't recall them off the top of my head.

Page 135

1        Thank you.  Something about correcting pipes
2    in the manifold, a low water shutdown, water temperature
3    gauge, friction brake on the door.
4        Q.  At the time that Mr. Renzella proposed that
5    you return the money that he paid for the machine, was
6    it your expectation that you were going to get the
7    machine back in exchange for the payment of the money?
8        A.  Initially I believe I proposed that he return
9    the machine.  We would refund his money.
10       Somewhere in the course of that conversation
11   or subsequent conversations, he informed me that he
12   either had retained or would retain an attorney and that
13   he wanted to keep the machine.
14       He also wanted to be reimbursed the money he
15   paid for the machine.  And I believe I then suggested to
16   him the only way I would be willing to consider
17   something of that nature would be if I had a full and
18   complete release from all liability related to that
19   machine.
20       Q.  By the time this conversation occurred, were
21   you concerned with the manner in which Mr. Renzella was
22   utilizing the machine?
23       A.  Yes.
24       Q.  Did you believe that he was utilizing it in an
25   unsafe manner?

Page 136

1        MR. FLEMING:  Objection.
2        THE WITNESS:  I felt Mr. Renzella lacked the
3    experience to modify the machine, first of all, and
4    he had informed me that he would be making
5    modifications.
6        And second, if memory serves correctly, he had
7    either a need or a desire to want to use caustic in
8    the machine, and I had an objection to that.
9    BY MR. POWERS:
10       Q.  When he proposed keeping the machine and you
11   requested the release and indemnity from him, it was
12   within your contemplation that he was offering the
13   protection not only from any further claims from him,
14   but from any further claims that might arise out of his
15   continued use of the machine?
16       MR. FLEMING:  Objection.
17       THE WITNESS:  Yes.
18   BY MR. POWERS:
19       Q.  And you made that clear to Mr. Renzella in
20   your conversations?
21       MR. FLEMING:  Objection.
22       THE WITNESS:  Yes.
23   BY MR. POWERS:
24       Q.  And Mr. Renzella agreed to provide that type
25   of assurance protection to you?

Page 137

1        A.  I believe he said to me, "You will never hear
2    from me again."
3        Q.  Now when you received from Mr. Renzella's
4    attorney the document that was marked earlier, it was
5    your understanding that that document represented the
6    agreement that you had reached with Mr. Renzella that he
7    would protect you from any other claims that might arise
8    out of the use of this machine?
9        MR. FLEMING:  Objection.
10       THE WITNESS:  Yes.
11       MR. POWERS:  I have no further questions.
12       MR. DOYLE:  I have nothing else.  Thanks very
13   much.
14       MR. FLEMING:  Thank you.
15       THE WITNESS:  You're welcome, gentlemen.
16       MR. POWERS:  No more questions.
17       MR. DOYLE:  You can put on the record that
18   plaintiffs' attorney has kept the exhibits, and we
19   will circulate the copies when I get back to
20   Massachusetts.
21       MR. POWERS:  Thank you.
22       (Witness excused.)
23
24
25

35 (Pages 134 to 137)