# Transcript of the Testimony of **DERON LOCK**

**Date:** December 6, 2005
**Volume:** I

**Case:** EDWARD STEFFEN and MARSHA STEFFEN v. VIKING CORPORATION

HARPER COURT REPORTING
316.265.1534

**Page 1**

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

EDWARD STEFFEN and
MARSHA STEFFEN         PLAINTIFFS

vs.                    C.A. NUMBER
                       04-10592-RBC

VIKING CORPORATION     DEFENDANT

------------------------------------------------

D E P O S I T I O N

The Deposition of DERON LOCK was taken
on behalf of the Plaintiffs pursuant to the
Federal Rules of Civil Procedure before Norma
Underwood, a Certified Shorthand Reporter of
Kansas, at Wichita, Kansas, on the 6th day of
December, 2005, at 8:45 o'clock a.m.

A P P E A R A N C E S

The Plaintiffs appeared by their
attorney, Mr. William J. Doyle, Jr. of Leavis and
Rest, P.C., Attorneys at Law, 83 Central Street,
Boston, Massachusetts 02109.

HARPER COURT REPORTING
316.265.1534

**Page 2**

The Defendant appeared by its attorney,
Mr. Robert P. Powers, Esquire, of Melick, Porter &
Shea, LLP, Attorneys at Law, 28 State Street,
Boston, Massachusetts 02109.

Hillside Automotive appeared by its
attorney, Mr. Kevin J. Fleming, of Davis, White &
Sullivan, P.C., Attorneys at Law, One Longfellow
Place, Suite 3609, Boston, Massachusetts 02114.

HARPER COURT REPORTING
316.265.1534

**Page 3**

I N D E X

DERON LOCK

Direct Examination by Mr. Doyle          6

Cross Examination by Mr. Fleming         77

Redirect Examination by Mr. Doyle        83

SIGNATURE OF WITNESS                      101

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER   102

HARPER COURT REPORTING
316.265.1534

**Page 4**

E X H I B I T S

LOCK DEPOSITION EXHIBIT 1
    Marked for Identification          17
LOCK DEPOSITION EXHIBIT 2
    Marked for Identification          20
LOCK DEPOSITION EXHIBIT 3
    Marked for Identification          27
LOCK DEPOSITION EXHIBIT 4
    Marked for Identification          38
LOCK DEPOSITION EXHIBIT 5
    Marked for Identification          38
LOCK DEPOSITION EXHIBIT 6
    Marked for Identification          39
LOCK DEPOSITION EXHIBIT 7
    Marked for Identification          62
LOCK DEPOSITION EXHIBIT 8
    Marked for Identification          66
LOCK DEPOSITION EXHIBIT 9
    Marked for Identification          73
LOCK DEPOSITION EXHIBIT 10
    Marked for Identification          79
LOCK DEPOSITION EXHIBIT 11
    Marked for Identification          81

HARPER COURT REPORTING
316.265.1534

---

**[Page 5]**

```
1   LOCK DEPOSITION EXHIBIT 12
2         Marked for Identification          89
3   LOCK DEPOSITION EXHIBIT 13A, B, C, D, E
4         Marked for Identification         100
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

HARPER COURT REPORTING
316.265.1534

---

**[Page 6]**

```
                DERON LOCK,
of lawful age, having been first duly sworn on
oath to state the truth, the whole truth, and
nothing but the truth, deposes and says:
```

MR. DOYLE:   Before we went on the
record, Counsel had agreed that Mr. Lock will
have the option of reading and signing the
deposition transcript, waiving any
requirement for the notary and signing under
the pains and penalties of perjury.  Counsel
have also agreed to the usual stipulations,
which in Massachusetts all objections except
as to form and motions to strike will be
reserved until the time of trial.  Can we
agree that an objection of one attorney is an
objection for any attorney?

MR. POWERS:   Agreed.

MR. FLEMING:   Agreed.

MR. DOYLE:   All right, great.

DIRECT EXAMINATION

BY MR. DOYLE:

Q.   Mr. Lock, my name is William Doyle, I
represent a husband and wife by the name of
Mr. and Mrs. Steffen.  It's my understanding
you have been designated to appear here today

HARPER COURT REPORTING
316.265.1534

---

**[Page 7]**

on behalf of Viking Corporation in the matter
that is currently pending in the court system
in Massachusetts.  I'm going to be asking you
some questions this morning.  If at any time
you want to take a break for any reason, you
have to make a phone call, somebody has to
talk to you about this, this, anything comes
up for any reason at all, just let somebody
know and we'll take a break and we'll do
whatever we can to accommodate you.  At any
time you want to talk to your attorney, just
let us know and we'll take a break so you can
talk to your attorney.  The only caveat with
that would be if there's a question pending
that is on the table, the attorneys would ask
you to answer the question and then consult
with your attorney.  But any problems at all,
just let us know.  I know you have been
deposed at least once on one other prior
occasion several years ago, many years ago.
The format will follow that same general
format.  In essence, I'll try to ask a verbal
question; you're expected or you should give
a verbal answer, nods of the head and hand
gestures cannot always be accurately

HARPER COURT REPORTING
316.265.1534

---

**[Page 8]**

recorded.  If you don't hear the question,
you don't understand the question, you're
confused in any way by the question, if I
happen to use an inappropriate term or
terminology, recognizing you know a lot more
about your business than I ever will, just
let us know if there are any problems at all
with the questions, otherwise we'll just try
to get going and get you back to business.

A.   Okay.

Q.   What is your name, sir?

A.   Deron J. Lock.

Q.   Do you live in the greater Wichita area?

A.   Yes, I do.

Q.   Do you have any plans to move to
Massachusetts?

A.   No, I don't.

Q.   Do you travel to Massachusetts at all for
business purposes during the last, say, three
years?

A.   No.

Q.   All right.  Have you ever vacationed in
Massachusetts?

A.   Yes.

Q.   Whereabouts?

HARPER COURT REPORTING
316.265.1534

**9**

1  A.  Nantucket.
2  Q.  Did you spend much time on Nantucket or just
3     time during the summer months?
4  A.  Two days.
5  Q.  Do you have any plans to travel to
6     Massachusetts at the present time in the
7     foreseeable future?
8  A.  No.
9  Q.  How old are you today?
10  A.  Forty.
11  Q.  Are you married with children?
12  A.  Yes.
13  Q.  Did you go to Wichita State University?
14  A.  No.
15  Q.  Where did you go to school?
16  A.  Kansas State.
17  Q.  With the new football coach?
18  A.  Yes, with the new football coach, that's
19     correct.
20  Q.  I know the people in Virginia loved him, so
21     --
22  A.  Good.
23  Q.  -- hopefully everybody will be happy here.
24     Just briefly, could you tell us your
25     professional background, what you did before

HARPER COURT REPORTING
316.265.1534

**11**

1     along with trucking operations. Viking is a
2     business that has many similar functions to
3     my previous job. It involved managing an
4     overall self-contained business unit, as
5     Viking is an overall self-contained business
6     unit, so there are some similarities in the
7     tasks, the jobs, and the knowledge that I had
8     to have.
9  Q.  What is your present position with Viking?
10  A.  President and general manager.
11  Q.  And have you always been president and
12     general manager since you became associated
13     with the company?
14  A.  Yes.
15  Q.  Were you involved in the purchase of Viking
16     Corporation from a gentleman named
17     Mr. Engren? E-N-G-R-E-N.
18  A.  Yes.
19  Q.  Would it be fair to say that at the time of
20     that transaction that -- strike that. Would
21     it be fair to say that the corporation has
22     continued from when Mr. Engren was involved
23     in it to the present time?
24  A.  Yes.
25  Q.  The company hasn't been re-incorporated?

HARPER COURT REPORTING
316.265.1534

**10**

1     becoming involved with Viking Corporation?
2  A.  Yeah, I worked for a privately held oil
3     company called Koch Industries, K-O-C-H, at
4     the time, the second largest privately owned
5     company in America. They're just four or
6     five miles down the road from us here. And I
7     was the general manager of ore and mineral
8     trading in Lexington, Kentucky. I was in
9     Europe for a while and then Chicago for a
10     little while, and I have been here seven
11     years.
12  Q.  And Europe and Chicago was all working for
13     Koch --
14  A.  All working for Koch; I had been with Koch
15     almost 11 years.
16  Q.  And your degree from Kansas State?
17  A.  Agricultural economics.
18  Q.  And how do you make the transition from
19     agricultural economics and Koch Industries to
20     working for Viking Corp?
21  A.  Ag economics is basically a business oriented
22     degree; and at Koch I was involved in trading
23     and sales and management. And in my previous
24     job at Koch, I was the manager of three
25     distribution and manufacturing facilities,

HARPER COURT REPORTING
316.265.1534

**12**

1  A.  No.
2  Q.  All right. When you became involved with --
3     I'll call it a purchase -- but when you
4     became involved with the Viking Corporation,
5     it wasn't a question of just purchasing the
6     assets?
7  A.  Correct, we purchased the corporation.
8  Q.  Okay. The corporation has continued on at
9     its same location from when Mr. Engren was
10     involved up to the present time?
11  A.  That's correct.
12  Q.  In general, what is the business at the
13     present time of Viking Corporation?
14  A.  We are a manufacturing company. We
15     manufacture industrial cleaning equipment,
16     the bulk of that being shotblasters.
17     Shotblasters are used for cleaning metal of
18     some sort, often in foundries, cylinder
19     refurbishing, aircraft, and other
20     manufacturing operations.
21  Q.  And at the time of the transfer from Mr.
22     Engren to yourself and the current owners of
23     the corporation, what was the business then?
24     Was it the same, was it different, has the
25     company expanded?

HARPER COURT REPORTING
316.265.1534

**Page 13**

```
 1   A.   It's approximately the same in terms of the
 2        markets that we serve, and it's approximately
 3        the same in terms of revenue.  At that time,
 4        we are -- we probably have a larger market
 5        segment in industrial than we used to have,
 6        but it's still roughly the same business.
 7   Q.   When you say industrial, does the company
 8        also at least at the present time have a
 9        market outside of the industrial area, say in
10        commercial or residential?
11   A.   No, we sell to -- we sell shotblast machines
12        to gas cylinder manufacturers, and gas
13        cylinder refurbishers, air gas, air products,
14        Praxair, people who distribute industrial
15        gases have to clean their cylinders.  That's
16        a large part of our market, and I would call
17        that not industrial.  That's a market that
18        was started for us back in the early '80s and
19        has matured, and so it's not as prolific as
20        it once was, so our focus has switched a
21        little bit more to industrial.  That's kind
22        of what I meant by that.
23   Q.   When did you become president, approximately?
24   A.   January 1, '99.
25   Q.   And at that point in time, say the end of
```

**Page 14**

```
 1        '98, the beginning of '99 when you became
 2        involved, did Viking Corporation manufacture
 3        and sell tumble washers, swedebrator basket
 4        washers -- swedebrator is spelled
 5        S-W-E-D-E-B-R-A-T-O-R, and rotary washers?
 6   A.   Yes, we did.
 7   Q.   And does the company still sell those three
 8        types of washers?
 9   A.   We still sell those three types of washers,
10        yes.
11   Q.   And does the company still manufacture those
12        types of washers?
13   A.   We don't manufacture the rotary washers; we
14        purchase those out, we subcontract those.
15   Q.   All right.  So arrangements have been made in
16        the last five or six years to subcontract out
17        --
18   A.   In the last --
19   Q.   -- the rotary washers?
20   A.   Yeah, in the last year or two, we subcontract
21        out.  The volume of those is quite small, and
22        we don't have the economist's scale to make
23        them as cost effectively as we once did, and
24        so we'll often, when we get an order for
25        those from our typical and historical
```

**Page 15**

```
 1        markets, we'll subcontract those and have
 2        those built elsewhere.
 3   Q.   All right.  So from a business analysis point
 4        of view, a decision was made rather than
 5        continue manufacturing the rotary washers to
 6        subcontract it out to some other entity --
 7   A.   Uh-huh.
 8   Q.   -- who would make it, put the Viking name on
 9        it, and it's then sold to the customer that
10        placed the order with Viking?
11   A.   That's correct.
12   Q.   Okay.  Am I correct in my understanding that
13        Viking Corporation sold a rotary washer to
14        Hillside Machine sometime in the early
15        1990's?
16   A.   Yes.
17   Q.   And so that the type of machine that is
18        involved in this matter is a rotary washer
19        with an evaporator?
20   A.   Yes.
21   Q.   Okay.  Does the company still sell any
22        machines with evaporator units?
23   A.   No.
24   Q.   In January of 1999, when you became involved,
25        actively involved in the corporation, did the
```

**Page 16**

```
 1        company sell any machines under the Viking
 2        label with evaporator units?
 3   A.   No, we didn't, not since I've been around.
 4        They're custom pieces that are by request,
 5        and there hasn't been any request for them in
 6        my tenure.
 7   Q.   If requested, would the company
 8        hypothetically -- I'm just trying to get a
 9        general sense -- customer calls up, wants to
10        replace an old machine or buy a new machine,
11        an additional machine, and wants one with an
12        evaporator, will the company still
13        manufacture and sell them?
14   A.   I don't know.  We would have to evaluate.  I
15        don't know.  I don't know enough about the
16        evaporators to know what the costs are to
17        produce, and -- or how they work
18        specifically, so I don't know.  I would have
19        to evaluate it.
20   Q.   And the issue has never come up since January
21        1, 1999 when you became involved in the
22        company?
23   A.   No.
24   Q.   Am I correct in my understanding that you
25        have been designated to appear here today on
```

17

```
 1      behalf of the corporation in response to a
 2      Notice of Deposition?
 3   A. Yes.
 4   Q. All right. Did you designate yourself in
 5      essence?
 6   A. Yes.
 7   Q. Okay. We have marked as Exhibit 1 a
 8      Deposition Notice.
 9               (At this time, the Court Reporter
10          Marked Lock Deposition Exhibit Number 1
11          for Identification.)
12   Q. In anticipation of appearing here today at
13      the deposition, did you review any documents,
14      any paperwork at all?
15   A. Yes.
16   Q. All right. What documents did you review in
17      anticipation of appearing here today?
18   A. I reviewed the historical documents that you
19      have seen before relative to the sale and the
20      documents relative to the machine; I also
21      reviewed the summons and the other paperwork
22      that you have served on us, so that's the
23      bulk of it.
24   Q. And when you say the historical documents,
25      those are documents that earlier on in this
```

18

```
 1      case have been produced to counsel, and it's
 2      your understanding has been produced to the
 3      parties in the case?
 4   A. That's correct, yes.
 5   Q. That would include correspondence to and from
 6      Hillside Machine?
 7   A. Yes.
 8   Q. Okay. It would include order forms or
 9      purchase documents regarding the sale of a
10      rotary washer in the early '90s to Hillside
11      Machine?
12   A. That's correct, yes.
13   Q. Would it include telephone records, records
14      of calls between Viking and Hillside
15      involving their machine?
16   A. No telephone records.
17   Q. At the present time, does Viking Corporation
18      have some sort of a recordkeeping system
19      involving telephone calls where it will make
20      a record to document a call between a
21      customer and itself?
22   A. We have a contact database where a sales
23      representative internally would type out
24      phone records currently, but it was not in
25      place at that time back in '92. But we do
```

19

```
 1      have something now that tracks some of that.
 2   Q. When you became involved in the company
 3      January 1, 1999, did the company have some
 4      sort of system in place to record calls
 5      between itself and customers?
 6   A. Not electronically. It was typed in by the
 7      sales rep into the contact, into that
 8      individual contact database.
 9   Q. And were there computer records of some sort
10      kept involving Viking Corp and Hillside and
11      contact between the two companies back in the
12      early 1990's all on the sale of rotary
13      washers?
14   A. Not to my knowledge.
15   Q. All right, let me show you a copy of a
16      picture that I think I got off the Internet.
17      It's fair to say that Viking Corporation has
18      a Web site on the Internet?
19   A. Yeah -- yes.
20   Q. And it gives general background information
21      about the corporation, --
22   A. Uh-huh.
23   Q. -- about the products, services --
24   A. Uh-huh.
25   Q. -- associated with the corporation?
```

20

```
 1   A. Yes, that's correct.
 2   Q. Would that be a copy of a photograph of a
 3      rotary washer similar to the one involved in
 4      this case?
 5   A. Yes.
 6            MR. DOYLE:  Okay. Could we have
 7      that marked as Exhibit 2?
 8               (At this time, the Court Reporter
 9          Marked Luck Deposition Exhibit Number 2
10          for Identification.)
11   Q. Was a Web site set up for the corporation in
12      January 1, 1999 when you became involved in
13      the corporation?
14   A. It was already in place, yes.
15   Q. According to some identifying marks that the
16      printer made, this picture would have been
17      printed out January of 2004. Do you know if
18      the corporation, Viking Corp, updated its Web
19      site once you became involved in January of
20      1999?
21   A. Yes, we have.
22   Q. Would this type rotary washer still be listed
23      on the Web site as something that could be
24      purchased through Viking Corp, if you know?
25   A. I'm not sure if that picture is still on the
```

**21**

```
 1              Web site.
 2    Q.   Amongst the historical documents that you
 3         reviewed today -- that you reviewed in
 4         anticipation of being here today, was there a
 5         copy of a sales order form that was marked as
 6         Exhibit 15 in Mr. Engren's deposition between
 7         Viking Corp and Hillside Automotive Machine?
 8    A.   Yes, this looks like the same.
 9    Q.   Was there also an operator's manual within
10         the historical documents that you reviewed?
11         And I'm showing you Exhibit 14 from Mr.
12         Engren's deposition, a three page document.
13    A.   Yes, I've seen this document.
14    Q.   If you know, was that format operator's
15         manual for a water blaster being used in
16         January of 1999 when you became president of
17         the corporation?
18    A.   No, it was not.
19    Q.   At some point in time, did the Viking
20         Corporation switch to a different style
21         operator's manual for the use with the rotary
22         washer or a water blaster?
23    A.   Yes, it's different.
24    Q.   Let me show you a document that was marked as
25         Exhibit 4 at Mr. Engren's deposition.  Was
```

**22**

```
 1         that the type of style operating manual that
 2         was being used when you became involved in
 3         the company in January of 1999?
 4    A.   I don't know.
 5    Q.   At some point in time after you became
 6         president in January of 1999, was that style
 7         manual being used for rotary washers?
 8    A.   This style of manual?
 9    Q.   Yes.
10    A.   Something similar to this, I do recognize it
11         as having some similarity.  I don't know
12         exactly what goes out.
13    Q.   Based on your having been associated with the
14         company for the last six years or so, is
15         there any way that you can determine when an
16         owner's manual first was put into use or
17         first became available?  Is there an edition
18         date, some sort of a date that would tell you
19         that we started using this manual as early as
20         X date?
21    A.   Not to my knowledge.  There are drawing
22         dates.
23    Q.   And the drawings within the manual that was
24         marked as Exhibit 4 at Mr. Engren's
25         deposition would have revision dates or
```

**23**

```
 1         origination dates on the drawings, correct?
 2    A.   On the drawings.
 3    Q.   But that doesn't indicate when the manual
 4         went into effect --
 5    A.   No.
 6    Q.   -- or was first used?
 7    A.   No, it doesn't.
 8    Q.   Let me show you what was marked as Exhibit 7
 9         at Mr. Engren's deposition, and across the
10         top page it's notes for Paul Rinzella of
11         Hillside Automotive Machine.  Do you
12         recognize that as the type and style of phone
13         records that the company has for contacts
14         between itself and customers?
15    A.   Yes. Yes, it does.
16    Q.   Recognizing the company doesn't -- or has not
17         sold any -- strike that.  Has the company
18         sold any rotary washers in the last six years
19         since you have been here?
20    A.   Yes.
21    Q.   Okay.  Are you familiar, at least in a
22         general sense, with the design, the features
23         of the rotary washer that the company sold?
24    A.   Yes.
25    Q.   Showing you Exhibit 8 from Mr. Engren's
```

**24**

```
 1         deposition, on the second page is a Jet Spray
 2         Degreaser Priceless.  Are you familiar
 3         with -- recognizing prices may have changed,
 4         but are you familiar with that document, a
 5         Jet Spray Degreaser Priceless?
 6    A.   I'm familiar with this document, yes.
 7    Q.   Okay.  In looking at the first description
 8         for a 24-by-34 Jet Spray Degreaser, the
 9         middle of the page for that size washer has a
10         description of the features of the machine,
11         correct?
12    A.   Yes.
13    Q.   Right, that first paragraph.
14    A.   Yes.
15    Q.   It talks about a one-to-three horsepower
16         pump?
17    A.   It's actually one three-horsepower pump.
18    Q.   In the middle of that description, I believe
19         there's a term "safety switch use"?
20    A.   Uh-huh.
21    Q.   And that's correct?
22    A.   That's correct, yeah.
23    Q.   What is the safety switch?
24    A.   The safety switch is an interlock on the
25         door.  So if the door to the front of the
```

25

1  washer is opened while it's running, it shuts
2  the pump down automatically.
3  Q.  So as far as the washing unit, where the pots
4  are placed to be washed and degreased, --
5  A.  Uh-huh.
6  Q.  -- if that door is opened during the washing
7  cycle, there is an interlock that shuts down
8  the process?
9  A.  Shuts down the pump.
10  Q.  All right.  So in either picture marked as
11  Exhibit 2 of your deposition --
12  A.  Uh-huh.
13  Q.  -- or, you know -- let me just stick with
14  that picture.  In this picture with the door
15  opened, if it had been operational, if it had
16  been washing, the fact that the door has been
17  broken -- or has been opened up, the
18  interlock shuts down the operation?
19  A.  That's correct.
20  Q.  Okay.  Is that the only safety switch on a
21  rotary washer under the present design
22  specifications?
23  A.  Yes.
24  Q.  At any point in time since you have become
25  associated with the company in January of

27

1  that locks out the doorway so we have
2  position.
3  Q.  Okay.  So a different type of washer serves
4  the same general purpose of degreasing
5  equipment?
6  A.  Parts, yes, uh-huh.
7  Q.  The tumble washer is not a rotary washer?
8  A.  Not in industrial terminology that they're
9  used in, no.
10  Q.  The tumble washer has a door that appears to
11  open up or slide up?
12  A.  It goes up or it swings out like the rotary,
13  either way.
14  Q.  Okay.  And for the tumble washer, there was
15  also a safety switch, an interlock that will
16  shut down the operation if the door was
17  opened?
18  A.  Yes, correct.
19      MR. DOYLE:  Okay.  Why don't we,
20  just so it's clear what we're talking about
21  or referring to, this is the next exhibit.
22      (At this time, the Court Reporter
23  Marked Lock Deposition Exhibit Number 3
24  for Identification.)
25  Q.  Other than these two washers that we've

26

1  1999, has the company built a rotary washer
2  with additional safety switches other than
3  this interlock for the washing compartment?
4  A.  Only one other.  We did a vertical pneumatic
5  door with another safety interlock on the
6  front door.
7  Q.  All right.  Was it still a rotary washer?
8  A.  Uh-huh.
9  Q.  And you're going to have to back up, because
10  I lost you on your description of what you
11  were building.
12  A.  This door swing open.
13  Q.  Right.
14  A.  We also made one with a door that raises up
15  vertically.  You won't see one.  There you
16  are.
17  Q.  Let me show you --
18  A.  That would be similar.
19  Q.  Let me show you a picture of a tumble washer
20  that I found on the Internet back in January
21  of 2004, and it's entitled "Tumble Washer
22  Endless Belt 300, 600 and 1200."  Is that a
23  rotary washer with a vertical door?
24  A.  That's a tumble washer with a vertical door,
25  yeah; and there's a safety switch behind here

28

1  referred to in Exhibit 2 and Exhibit 3, do
2  you know during the six years or so you have
3  been associated with the corporation, have
4  they built any washers with other safety
5  switches?
6  A.  Not to my knowledge.
7  Q.  Okay.  Putting aside washers, does the
8  company build other equipment with interlocks
9  or safety switches?
10  A.  Yes.
11  Q.  Okay.  In general, can you tell me what other
12  equipment the company builds at the present
13  time that would have an interlock on it or a
14  safety switch on it?
15  A.  Yeah, the shotblasters with doors that open
16  into a cabinet.  This (indicating)
17  configuration could also be a shotblaster;
18  this (indicating) configuration could also be
19  a shotblaster.
20  Q.  And just so the record is clear, you're
21  referring to the --
22  A.  The tumble washer.
23  Q.  And the rotary washer --
24  A.  Rotary washer.
25  Q.  -- that is shown in Exhibits 2 and 3 of your

29

1  deposition?
2  A.  Uh-huh.  The same interlocks apply for
3     blasters as for washers.
4  Q.  In reviewing -- strike that.  Does the
5     company at the present time have plans or
6     designs for evaporator units in its
7     historical records?
8  A.  We don't have -- we don't have CAD drawings
9     on such a device.  The records that -- I mean
10    what you've already seen is all the
11    documentation we have relative to the
12    manufacture and design of those.
13 Q.  And in reviewing all those documents, are
14    there documents maybe on graph paper that
15    give the general design of an evaporator
16    unit?
17 A.  Nothing more than what we've already seen.
18 Q.  Now, have you reviewed at any point in time,
19    either when getting ready to make the
20    transition into the company or during the six
21    years that you have been associated with the
22    company, plans, specifications, drawings,
23    descriptions of evaporator units that were
24    made or could be made by the company?
25 A.  No.

31

1  Q.  At any point in time during the last six
2     years for any reason at all, have you
3     educated yourself about the use, the
4     feasibility of evaporator units on rotary
5     washers?
6  A.  No.
7  Q.  Are you aware of any competitors in the
8     business who sell washing equipment with
9     evaporator units?
10 A.  No.
11 Q.  Does Viking Corporation have a competitor
12    here in the Wichita area by the name of L S?
13 A.  Yes, we do.
14 Q.  All right.  Do you know if L S sells any
15    equipment, washers, degreasers with
16    evaporator units?
17 A.  I don't know.
18 Q.  Do you know of a company out of, I believe,
19    Oklahoma, Goff's?
20 A.  Yeah, I know them.
21 Q.  Do you know if they sell washing, degreasing
22    equipment with an evaporator unit?
23 A.  I don't know.
24     MR. DOYLE:  Goff is G-O-F-F.
25 Q.  Do you know what was involved in the original

30

1  Q.  Have you seen any equipment, Viking
2     Corporation equipment that had an evaporator
3     unit?
4  A.  No.
5  Q.  Have you seen pictures of the machine sold by
6     Viking Corporation to Hillside with the
7     evaporator unit that's part of the machine?
8  A.  All I've seen are hand drawings.
9  Q.  Do you know who made those hand drawings?
10 A.  No.
11 Q.  Do you know where they came from?
12 A.  They came out of the files, and we don't have
13    any other records of that.
14 Q.  When you say they came out of the files, are
15    you talking about Viking Corporation files?
16 A.  Yeah.
17 Q.  That there would have been hand drawings
18    within the Viking Corporation files that
19    included the evaporator unit for the rotary
20    washer that was sold to Hillside?
21 A.  I don't recall the actual drawing of the
22    evaporator unit.
23 Q.  You remember hand drawings for the rotary
24    washer that was sold to Hillside?
25 A.  Yeah -- yes.

32

1     design of the rotary washer when it was
2     initially sold by Viking Corporation?
3  A.  With respect to how it was designed or who
4     designed it?
5  Q.  Both actually.
6  A.  I don't know who designed it.  It is a -- the
7     design itself is a common industry design as
8     in Exhibit 2 here; and there are many, many
9     factories that do that, so I don't know where
10    the design came from.  But it's probable that
11    it was in some form a copy or a knockoff of a
12    previous design by a previous company.
13 Q.  Okay.  And do you know when Viking
14    Corporation first started to sell rotary
15    units?
16 A.  I don't know when, not exactly.
17 Q.  Was Viking Corporation -- I'm trying to
18    remember what Mr. Engren said, but I think
19    it's -- was it '78 or '79?
20 A.  '78.
21 Q.  When the company was first established in
22    1978, do you know if the company sold rotary
23    washing units similar to the one that was
24    sold to Hillside in early 1990's?
25 A.  I don't know when Viking began building

35

| | | |
|---|---|---|
| 1 | | rotary washers. |
| 2 | Q. | Do you know when Viking Corporation -- well, |
| 3 | | strike it -- strike that. Do you understand |
| 4 | | that at some point in time Viking Corporation |
| 5 | | sold equipment with evaporator units as part |
| 6 | | of the unit? |
| 7 | A. | Yes, I do. |
| 8 | Q. | Do you know when Viking Corporation first |
| 9 | | started to sell equipment with evaporator |
| 10 | | units? |
| 11 | A. | No, I don't. |
| 12 | Q. | Do you know how long Viking Corporation sold |
| 13 | | equipment with evaporator units? |
| 14 | A. | No, I don't. |
| 15 | Q. | Do you know why the company stopped selling |
| 16 | | equipment with evaporator units? |
| 17 | | No customer requests for those units. |
| 18 | Q. | Do you know how many pieces of equipment |
| 19 | | Viking Corporation sold with evaporator |
| 20 | | units? |
| 21 | A. | No, I don't. |
| 22 | Q. | Do you know if Viking Corporation has ever |
| 23 | | had to service evaporator units on any of the |
| 24 | | equipment it sold to any of its customers at |
| 25 | | any point in time? |

| | | |
|---|---|---|
| 1 | Q. | All right. Other than that case, are you |
| 2 | | aware -- and this case itself, are you aware |
| 3 | | of any other claims by people against Viking |
| 4 | | Corporation for accidents involving its |
| 5 | | equipment? |
| 6 | A. | Not involving washers. There was -- there's |
| 7 | | one other in the history that I'm aware of |
| 8 | | involving a blaster, a shotblaster. |
| 9 | Q. | And that's also not the Georgia case, because |
| 10 | | the Georgia case was a washer with propane |
| 11 | | tanks? |
| 12 | A. | Right, right. |
| 13 | Q. | What is your general understanding regarding |
| 14 | | the shotblaster and that claim? |
| 15 | A. | It was -- it was a shotblaster used for |
| 16 | | cleaning truck rims. And maintenance went |
| 17 | | into the machine, put a broom stick over the |
| 18 | | safety switch, propped open the door, so it |
| 19 | | had to override two safeties, got in the |
| 20 | | machine and the door came down and it killed |
| 21 | | him. This was at a Goodyear store probably |
| 22 | | back in the '80s. |
| 23 | Q. | So the -- |
| 24 | A. | Those are the three that I'm aware of in the |
| 25 | | 27 years. |

34

| | | |
|---|---|---|
| 1 | A. | No, I don't know. |
| 2 | Q. | All right. During this past six years that |
| 3 | | you have been associated with the company, |
| 4 | | has Viking Corporation ever been called upon |
| 5 | | to service an evaporator unit on any of the |
| 6 | | equipment it sold at any point in time to any |
| 7 | | of its customers? |
| 8 | A. | I don't know. |
| 9 | Q. | Would it be fair to say that you have no |
| 10 | | memory of Viking Corporation being called |
| 11 | | upon to service evaporator units on any of |
| 12 | | the equipment that it sold at any point in |
| 13 | | time to any of its customers? |
| 14 | A. | Yes, it would be fair to say. |
| 15 | Q. | Are you aware of any accidents involving a |
| 16 | | Viking Corporation piece of equipment that |
| 17 | | had an evaporator unit that was involved in |
| 18 | | an accident at any point in time, putting |
| 19 | | aside this incident involving Mr. Steffen? |
| 20 | A. | None that I'm aware of. |
| 21 | Q. | You had to testify in another case, I think |
| 22 | | probably in this same room at some point in |
| 23 | | time, involving some people out of Georgia, I |
| 24 | | believe? |
| 25 | A. | Yes, correct. |

36

| | | |
|---|---|---|
| 1 | Q. | And the shotblaster basically is designed to |
| 2 | | clean metal through a different process, |
| 3 | | different than the washers? |
| 4 | A. | Yes, the shotblaster throws carbon steel |
| 5 | | abrasive at high velocity. It's like an |
| 6 | | industrial sandblaster. |
| 7 | Q. | And your understanding is that they covered |
| 8 | | up the safety switch to bypass the safety |
| 9 | | switch on that? |
| 10 | A. | Uh-huh. |
| 11 | Q. | And that's a yes? |
| 12 | A. | Yes, sorry. |
| 13 | Q. | And that they propped the door open, they |
| 14 | | used something to hold the door open? |
| 15 | A. | Yeah. |
| 16 | Q. | While they went into -- |
| 17 | A. | Into the -- |
| 18 | Q. | -- the working -- |
| 19 | A. | -- into the cabinet, yes. |
| 20 | Q. | And while somebody was doing that, bypassing |
| 21 | | the safety and propping the door open, was |
| 22 | | the machine running? |
| 23 | A. | No. |
| 24 | Q. | So bypassing the safety probably didn't have |
| 25 | | anything to do with the accident per se, did |

37

1     it?
2 A.  **I don't know.**
3 Q.  Propping the door open definitely had
4     something to do with the accident?
5 A.  **(Witness indicates, but no audible answer).**
6 Q.  Correct?
7 A.  **Yes, of course.**
8 Q.  Because whatever happened, the door came
9     slamming down, somebody seriously hurt and
10     killed?
11 A.  **That's all I know. That was long before my**
12     **time.**
13         MR. DOYLE:  Why don't we just --
14     can we go off the record for a second?
15         (THEREUPON, a short recess was held
16     from 9:30 until 9:39 a.m.)
17 BY MR. DOYLE:  (Continuing)
18 Q.  Why don't we go back on the record. Earlier
19     this morning, Mr. Lock, we were looking at
20     this document that was Exhibit 4 at Mr.
21     Engren's deposition that is entitled "Model
22     3648 Rotary Jet Spray Washer Operating
23     Manual," and I asked you some questions about
24     the dates and the time period when this would
25     have been used. Correct?

39

1 Q.  Do you know when that document would have
2     been used as an operating manual for the
3     water blaster?
4 A.  **No.**
5 Q.  Is the water blaster also a rotary jet spray
6     washer?
7 A.  **Yes, it's the same.**
8 Q.  All right. Water blaster is the trademark
9     name; rotary jet spray washer is the generic
10     description of the product?
11 A.  **Yes.**
12         MR. DOYLE:  Why don't we have that
13     marked the next exhibit.
14         (At this time, the Court Reporter
15     Marked Lock Deposition Exhibit Number 6
16     for Identification.)
17 Q.  The third page of the operator's manual for
18     the water blaster, Exhibit 6 of your
19     deposition, Exhibit 4 from Mr. Engren's
20     deposition, has two sentences -- or one
21     sentence paragraphs that start off "never."
22     I ask you to take a look at the second one.
23 A.  **Uh-huh.**
24 Q.  That basically says never use caustic -- I
25     forget, caustic something?

38

1 A.  **Yes.**
2         MR. DOYLE:  Why don't we have that
3     marked as the next exhibit today.
4         (At this time, the Court Reporter
5     Marked Lock Deposition Exhibit Number 4
6     for Identification.)
7 Q.  I also asked you some questions about the Jet
8     Spray Degreaser Priceless and the entry that
9     dealt with a safety switch.
10 A.  **Yes.**
11 Q.  And that was exhibit -- part of Exhibit 8
12     from Mr. Engren's deposition, correct?
13 A.  **Yes.**
14         MR. DOYLE:  Why don't we mark that
15     as the next exhibit today.
16         (At this time, the Court Reporter
17     Marked Lock Deposition Exhibit Number 5
18     for Identification.)
19 Q.  Was one of the historical documents that you
20     reviewed at some point in time a copy of this
21     three page document, Exhibit 14 from Mr.
22     Engren's deposition, entitled "Operator's
23     Manual Water Blaster or Hot Water Jet Spray
24     Washers"?
25 A.  **Yes.**

40

1 A.  **Caustic detergents.**
2 Q.  Could you read that for a second and then
3     I'll ask you a question. What is a caustic
4     detergent?
5 A.  **It's a detergent that is of an aggressive or**
6     **caustic nature that will cause accelerated**
7     **wear in a washer.**
8 Q.  At the present time, does Viking Corporation
9     make any recommendations regarding the use of
10     detergents for its washers?
11 A.  **We recommend that customers talk to a local**
12     **chemical supplier for their industrial**
13     **detergents.**
14 Q.  And that's at the present time?
15 A.  **It's here too.**
16 Q.  Right, I understand that, but --
17 A.  **Yes, at the present time too, yes.**
18 Q.  At the present time, does the company make
19     any recommendations regarding the use of a
20     caustic detergent recommendation one way or
21     the another, or is it silent on the point?
22 A.  **We discourage use of caustic detergents.**
23 Q.  And at the present time, how does the company
24     discourage the use of caustic detergents with
25     its equipment when operating its equipment?

**43**

1  A.  It's verbal, verbal recommendations.
2  Q.  At the present time, does the company include
3      any information regarding the use of caustic
4      detergents or recommendation not to use
5      caustic detergent in any of its written
6      documents?
7  A.  I don't know.
8  Q.  At the present time, does the operator's
9      manual for a rotary washer contain any
10     information regarding the use or nonuse of a
11     caustic detergent?
12 A.  I don't know.
13 Q.  The operating manual that was marked as
14     Exhibit 4 to your deposition, is that manual
15     still in use at the present time?
16 A.  I don't know.
17         Did somebody provide this to me --
18         MR. DOYLE:  Why don't we go off the
19     record a second.
20         (At this time, an off-the-record
21         discussion was held, after which the
22         following continued:)
23 A.  I don't -- I don't know when this was used.
24 Q.  Okay.
25 A.  I don't recognize when this would have been

HARPER COURT REPORTING
316.265.1534

1      ever used, that's true.
2  Q.  Would it be fair to say that among the
3      historical documents maintained by the
4      company, that this document, Exhibit 4 for
5      your deposition, is one of the documents that
6      has been located?
7  A.  Yes.
8  Q.  Looking at page 2 of Roman numeral Section IV
9      that's entitled "Installation," and then page
10     2, the last paragraph of that section -- I
11     believe it's the last paragraph -- yeah.
12     It's entitled "extremely important," correct?
13 A.  Uh-huh.
14 Q.  And would it be fair to say that that
15     paragraph includes a reference that this
16     machine is not for use with caustic soaps?
17 A.  Yes.
18 Q.  And that sentence, that short paragraph would
19     contain information similar to the entry on
20     page 3 of the Water Blaster Operating Manual
21     that's entitled "never use caustic
22     detergent"?
23 A.  Yes.
24 Q.  All right.  But at the present time, you're
25     not sure if the operating manual for washers

HARPER COURT REPORTING
316.265.1534

**42**

1      used.
2  Q.  Let me just ask questions, because I
3      didn't -- while you were talking --
4  A.  Sorry.
5  Q.  Do you have a general understanding that
6      communications between yourself, the
7      corporation, and its attorneys are protected,
8      and doesn't have to be disclosed?
9  A.  Understood, sure.
10 Q.  Do you understand that if at any point in
11     time you want to talk with your counsel at
12     all about anything that, you know, just let
13     us know and we'll leave the room?
14 A.  Sure.
15 Q.  All right.
16 A.  Okay.
17 Q.  Getting back to Exhibit 4 from your
18     deposition, the operating manual that is
19     entitled "Model 3648-R Rotary Jet Spray
20     Washer," just to try to put into context what
21     you were saying as we were coming out of the
22     break, is it fair to say you don't know when
23     this operating manual would have been used or
24     if in fact it was ever used by the company?
25 A.  I don't know when it was used or if it was

HARPER COURT REPORTING
316.265.1534

**44**

1      manufactured by Viking contain an entry that
2      deals with not using caustic detergent?
3  A.  No, I'm not sure.
4  Q.  All right.  But it's your understanding that
5      oral representations would be made by the
6      company to customers or people that inquire
7      that caustic detergents, caustic soaps should
8      not be used?
9  A.  Yes.
10 Q.  And is that because they have a corrosive
11     effect on metal that it comes in contact with
12     during the washing process?
13 A.  Yes, that's correct.
14 Q.  What are the alternatives for use in the
15     washing process if you're not going to use a
16     caustic detergent, solvents, or something
17     else?
18 A.  No, solvents are not permitted. Industrial
19     detergents of various kinds.
20 Q.  Something a little stronger than the Tide
21     that I'll use at home to wash my own clothes?
22 A.  I don't know. I don't know. We're not --
23     we're not chemical sales people; we defer
24     that to people who sell chemicals for
25     industrial uses, so we're -- we're not expert

HARPER COURT REPORTING
316.265.1534

45

```
 1        in that; we don't make significant
 2        recommendations as to what people should use
 3        or shouldn't use.
 4   Q.   You refer them to somebody who does deal with
 5        detergents or cleaning agents?
 6   A.   Yes.
 7   Q.   Part of Exhibit 5 for your deposition
 8        includes a page entitled "Degreaser Options
 9        Priceless." Correct?
10   A.   Yes.
11   Q.   And I believe item 13 is something called
12        ecology package?
13   A.   Yes.
14   Q.   All right.
15   A.   Yes.
16   Q.   What is the ecology package?
17   A.   Other than what I read here, I don't know. I
18        see here that it's a sludge drag or a sludge
19        trap, and it says sludge evaporator.
20   Q.   And I believe on this document there's a
21        price for that degreaser option of $239?
22   A.   Yeah, I see that.
23   Q.   Does the company still offer an ecology
24        package as an option for use with degreasers
25        or washers?
```

HARPER COURT REPORTING
316.265.1534

47

```
 1        priceless, what, if any, of the 13 options
 2        listed on that page are still offered as
 3        options by the company?
 4   A.   Number 3, the seven-day timer, manual timer.
 5   Q.   Number 6 and 7?
 6   A.   Yes. Number 6, not number 7. 9 has been
 7        made standard; various horsepowers are
 8        offered on some -- on some models as options,
 9        which would be 11 and/or 12 periodically.
10        Those are the ones that are still offered
11        today on the current quote.
12   Q.   Are there any additional options for a
13        degreaser or washer that are offered
14        currently as options that are not listed on
15        this page, the degreaser options priceless?
16   A.   Yes.
17   Q.   What are they?
18   A.   There is a secondary basket. You saw the
19        picture with the lower basket and the middle
20        basket; that's an option. Stainless steel
21        nozzles are an option. Let's see, stainless
22        steel tank and stainless steel construction
23        is an option. Those are the only ones that I
24        can remember that are not on here
25        (indicating).
```

HARPER COURT REPORTING
316.265.1534

46

```
 1   A.   No.
 2   Q.   Does it still offer various options for the
 3        customer when buying a washer or a degreaser?
 4   A.   Yes.
 5   Q.   Would it still include a steam vent with
 6        exhaust blower?
 7   A.   Yes.
 8   Q.   Automatic float valve with slave tank and
 9        double safety switches?
10   A.   No.
11   Q.   Why is that no longer offered as an option?
12   A.   There are some options that there was no
13        call in -- call for in the market; and
14        options that were not purchased on a regular
15        basis were deemed to be not desired by the
16        customer so they were dropped off the offer.
17        Not that they're not viable and still
18        potential options, we just don't offer them
19        in the current offering.
20   Q.   A business analysis was made, and those that
21        were not economically feasible were
22        eliminated as potential options that a
23        customer could purchase?
24   A.   Yes.
25   Q.   Looking at that page, the degreaser options
```

HARPER COURT REPORTING
316.265.1534

48

```
 1   Q.   Does the company only subcontract out the
 2        construction of rotary washers to one outside
 3        vender?
 4   A.   Right now it's just one.
 5   Q.   Okay, who is that?
 6   A.   A company called Peterson Machine Tool.
 7   Q.   Located where?
 8   A.   Council Grove, Kansas.
 9   Q.   And have you contracted with other vendors
10        other than Peterson in the past for the
11        manufacture of rotary washers?
12   A.   One.
13   Q.   And who is that?
14   A.   Intercont Products in Springfield, Missouri,
15        but they're no longer in business.
16        I-N-T-E-R-C-O-N-T. We bought two washers
17        from them back in, I don't know, 2001, 2002,
18        something like that.
19   Q.   And at the present time, how many rotary
20        washers, say, during this calendar year 2005
21        has the company sold?
22   A.   I don't know. Somewhere approximately eight.
23   Q.   And would the price of the rotary washers at
24        the present time vary, depending upon size,
25        options, whether it's gas or electric fired?
```

HARPER COURT REPORTING
316.265.1534

**49**

1    A.    Yes.
2    Q.    Have you ever been to Hillside Machine?
3    A.    No.
4    Q.    Since you have been involved in the company,
5          January 1 of 1999, do you know if anyone from
6          Viking Corp has been to Hillside Machine?
7    A.    No one has been there.
8    Q.    Have you had any contact with Paul Rinzella?
9    A.    No.
10   Q.    We'll just skip that.
11   A.    You want the option section?
12   Q.    No, actually it's the manual.  Under Roman
13         Numeral Section 6 entitled "Machine
14         Operation."
15   A.    Yes.
16   Q.    I believe number 3 is entitled -- or says,
17         close and latch the cabinet door.
18   A.    Yes.
19   Q.    How do you latch the cabinet door on the
20         rotary washer?
21   A.    There's a clamp that fits over the toggle
22         like this (indicating), just two hooks.
23   Q.    When you say like this --
24   A.    I know you can't --
25   Q.    -- they can take the words down, but nobody

**51**

1          disconnect switch that is beyond the machine;
2          it's between the power source in the building
3          and the machine.
4    Q.    And this is information that apparently is
5          within the operating manual, Exhibit 4 to
6          your deposition?
7    A.    Uh-huh.
8    Q.    That is telling the customer or the person
9          doing the installation work that if you want
10         to install a safety disconnect switch, this
11         is where you do it, between the power source
12         and the actual power distribution block?
13   A.    Yes.
14   Q.    All right.  Does the company at the present
15         time make any recommendations regarding the
16         use of a lockable safety disconnect switch
17         when installing a washer?
18   A.    Yes, we recommend a licensed electrician do
19         it as per local code.
20   Q.    Does it make any recommendation regarding the
21         licensed electrician installing a lockable
22         safety disconnect switch when installing a
23         washer?
24   A.    No.
25   Q.    It's the customer's decision based on however

**50**

1          knows what it means.
2    A.    It's a latch that fits over two togs or dogs,
3          and it's clamped down with a -- I guess it
4          would be just a mechanical clamp.
5    Q.    And that closing the door and applying the
6          latch would engage the interlock?
7    A.    Yes.
8    Q.    If you could turn a couple of pages to the
9          next section, section 7 entitled "Machine and
10         Wiring Diagrams."  If you could skip the
11         first page that has the control panel layout
12         and go to the next page, --
13   A.    Uh-huh.
14   Q.    -- that's the power schematic drawing.
15   A.    Uh-huh.
16   Q.    In the upper left-hand page of that -- strike
17         that.  In the upper left-hand corner of that
18         page, the power schematic for the 220 volt
19         machine, there's a dotted line that goes to
20         the words "lockable safety disconnect switch
21         parenthesis (by customer,) close
22         parenthesis."
23   A.    Uh-huh.
24   Q.    What is that?
25   A.    Lockable safety disconnect switch.  That's a

**52**

1          he decides or makes decisions?
2    A.    Yes.
3    Q.    If you could turn to, I think it's two pages
4          later, it's the drawing RW-200 Rotary Washer
5          Control Schematic.  The middle of that
6          diagram for the wash pump contactor, between
7          rectangle 6 and 7 is a door limit switch.
8    A.    Uh-huh.
9    Q.    Do you see that entry?
10   A.    Yes, I do.
11   Q.    Is that the interlock that you talked about
12         earlier?
13   A.    Yes.
14   Q.    So door limit switch is just another term --
15   A.    Yes.
16   Q.    -- for the safety switch, another term for
17         the interlock?
18   A.    The door limit switch interlocks, yes.
19   Q.    And that's the only interlock shown on the
20         rotary washer control schematic drawing
21         RW-200, correct?
22   A.    Yes, yes.
23   Q.    If you could turn two more pages to page 1 of
24         3 for the model 3648-R rotary washer, under
25         the electric, there is -- this is a parts

53

| | |
|---|---|
| 1 | list, in essence? |
| 2 | A. Yes. |
| 3 | Q. Middle of the parts list there is a Viking |
| 4 | number 30646, and it's a limit switch? |
| 5 | A. Yes. |
| 6 | Q. That's the same limit switch that is shown on |
| 7 | the electric schematic drawing and the same |
| 8 | switch that we referred to as the interlock |
| 9 | or the safety switch that is in the manuals? |
| 10 | A. Yes. |
| 11 | Q. At the end of the Viking portion of this |
| 12 | manual, there's also attached, I believe, |
| 13 | something called the Wayne Model P-265 gas |
| 14 | type -- strike that -- the Wayne Model P-265 |
| 15 | power type gas burner, correct? |
| 16 | A. Yes, yes. |
| 17 | Q. The company attaches the manual for the gas |
| 18 | burner that is part of a washer to its own |
| 19 | manual, correct? |
| 20 | A. That's correct. |
| 21 | Q. All right. And there's an indication on the |
| 22 | Wayne cover page that it's AGA? |
| 23 | A. Uh-huh. |
| 24 | Q. And that's the American Gas Association -- |
| 25 | A. Yes. |

HARPER COURT REPORTING
316.265.1534

55

| | |
|---|---|
| 1 | sale? |
| 2 | A. I don't know. |
| 3 | Q. Should the Wayne gas manual have been |
| 4 | provided to Hillside in the ordinary course |
| 5 | of business -- |
| 6 | A. Yes. |
| 7 | Q. -- as you understand it on how business was |
| 8 | conducted back in the early 1990's, |
| 9 | recognizing you were still working for Koch |
| 10 | at the time? |
| 11 | A. Yes. |
| 12 | Q. Okay. Was there someone involved with Viking |
| 13 | Corporation back in the early 1990's whose |
| 14 | first name was Howard? |
| 15 | A. Yes. |
| 16 | Q. Who is Howard? |
| 17 | A. Howard. Howard, I believe was the plant |
| 18 | manager. |
| 19 | Q. And what did Howard do as plant manager in |
| 20 | general? |
| 21 | A. Plant manager's duties. I don't know what he |
| 22 | did. |
| 23 | Q. Was he still associated with the company when |
| 24 | you came on board in 1999? |
| 25 | A. No. I don't even know when he left. |

HARPER COURT REPORTING
316.265.1534

54

| | |
|---|---|
| 1 | Q. -- symbol indicating that the burner is AGA |
| 2 | approved? |
| 3 | A. Yes. |
| 4 | Q. Do you know how long Viking Corporation has |
| 5 | used a Wayne gas burner as part of its rotary |
| 6 | washers? |
| 7 | A. No. |
| 8 | Q. Do you know if the company used a Wayne gas |
| 9 | burner prior to your involvement in the |
| 10 | company in January of 1999? |
| 11 | A. Yes. |
| 12 | Q. All right. So any sales of rotary washers |
| 13 | prior to January 1, 1999, for some period of |
| 14 | time would have had a Wayne gas burner? |
| 15 | A. Yes. |
| 16 | Q. All right. Do you know for how long? |
| 17 | A. No. |
| 18 | Q. Do you know if the rotary washers sold by |
| 19 | Viking to Hillside had a Wayne gas burner as |
| 20 | part of that machine? |
| 21 | A. I believe it did. |
| 22 | Q. Okay. And do you know if the Wayne manual, |
| 23 | either the one that is shown that is part of |
| 24 | this document, Exhibit 4 of your deposition, |
| 25 | was provided to Hillside as part of that |

HARPER COURT REPORTING
316.265.1534

56

| | |
|---|---|
| 1 | Q. Are you familiar with a Kansas Department of |
| 2 | Health and Environment Bureau of Waste |
| 3 | Management? |
| 4 | A. No. |
| 5 | Q. Are you aware that the State of Kansas has |
| 6 | rules and regulations dealing with evaporator |
| 7 | units? |
| 8 | A. No. |
| 9 | Q. Are you aware that the Environmental |
| 10 | Protection Agency of the federal government |
| 11 | has rules and regulations dealing with |
| 12 | evaporator units? |
| 13 | A. No. |
| 14 | Q. The evaporator units that were sold as part |
| 15 | of rotary equipment by Viking Corporation, |
| 16 | were they totally enclosed treatment systems? |
| 17 | A. I don't know. |
| 18 | Q. Do you know what a totally enclosed treatment |
| 19 | system is as defined in 40 Code of Federal |
| 20 | Regulations, part 260.10? |
| 21 | A. No, I don't. |
| 22 | Q. Do you know if the company, Viking |
| 23 | Corporation, has ever made a determination or |
| 24 | attempted to determine whether or not the |
| 25 | evaporation units sold by the company were |

HARPER COURT REPORTING
316.265.1534

**59**

1  VOCs are or what their impact is.
2  Q.  What is your passing understanding, at least
3      at the present time of what a VOC is and the
4      significance in the industry or the business?
5  A.  Volatile organic compounds are, in our
6      experience, most often are talked about
7      relative to painting. People who run a paint
8      operation have to be concerned about VOCs and
9      the kind of paint that they're using. That's
10     really about the limit of my understanding of
11     VOCs.
12 Q.  You were born and raised in Kansas?
13 A.  For the most part.
14 Q.  You left Kansas while you were working for
15     Koch Industries, correct?
16 A.  Yes.
17 Q.  You came back to Kansas after you became
18     involved with Viking Corporation in January
19     of '99?
20 A.  Yes.
21 Q.  So is it fair to say that you spent most of
22     your life living, working, going to school in
23     Kansas?
24 A.  Yes.
25 Q.  Okay. Are you aware that Kansas has a state

---

1      totally enclosed treatment systems as defined
2      in 40 Code of Federal Regulations, part
3      260.10?
4  A.  I don't know.
5  Q.  Does the company have any records of
6      attempting to determine whether or not the
7      evaporation units that it sold were totally
8      enclosed treatment systems?
9  A.  I don't know.
10 Q.  From your work here at Viking Corporation and
11     your previous work for Koch, or education,
12     training and experience, are you familiar
13     with the term "volatile organic emissions"?
14 A.  Volatile organic emissions?
15 Q.  Or VOCs?
16 A.  VOCs, yes.
17 Q.  Okay. What is a VOC?
18 A.  Volatile organic compound, I believe.
19 Q.  When did you first become familiar with VOCs?
20     Would it have been in school at Kansas State
21     or --
22 A.  Probably would have been ten years ago,
23     approximately.
24 Q.  As part of your work for Koch?
25 A.  Yeah -- yes.

---

**60**

1      agency, the Department of Health and
2      Environment?
3  A.  Yes.
4  Q.  Are you aware that the Kansas Department of
5      Health and Environment has a Bureau of Waste
6      Management located in Topeka, Kansas?
7  A.  No, just what you told me here.
8  Q.  Right. The purchase of Viking Corporation
9      that became effective January 1, 1999, --
10 A.  Uh-huh.
11 Q.  -- how long was the negotiations leading up
12     to that final transfer that took effect
13     1/1/99?
14 A.  Probably 18 months.
15 Q.  And during that 18-month period, did you have
16     an opportunity to review records and
17     documents, conduct a due diligence
18     investigation as to the business of Viking
19     Corporation?
20 A.  Yes.
21 Q.  And in reviewing the records and documents as
22     part of that due diligence investigation and
23     during the past six years that you have been
24     president of the corporation, have you had a
25     chance to review historical documents and

---

**58**

1  Q.  Let me just back up to your work at Koch for
2      a second. Was that sort of the business end
3      of Koch Industries, or were you involved in
4      sort of any hands-on type operation?
5  A.  Sales and trading.
6  Q.  Why would the sales and trading -- strike
7      that. What did you sell and trade?
8  A.  We sold -- we sold solid fuel to cement
9      plants, to power stations, to any boiler
10     applications. We also traded various kinds
11     of raw materials like iron ore, coal,
12     petroleum coke, which is a solid fuel; so
13     they went to various industrial applications
14     and some steel mills as well, so ---
15 Q.  Recognizing that that is the type of business
16     that you were involved in with Koch
17     Industries -- was it Koch Industries?
18 A.  Yep -- yes.
19 Q.  Did you have to familiarize yourself with
20     issues that would have an impact on Koch as
21     well as the people it did business with?
22 A.  Yes.
23 Q.  And is that how you came to become aware of
24     the term VOCs?
25 A.  I only have a passing understanding of what

61

```
 1        records here at the company?
 2   A.   Yes.
 3   Q.   Are you aware of any contact with the
 4        Department of Health and Environment for the
 5        State of Kansas within the historical
 6        documents, within the records that you have
 7        reviewed for the due diligence during the
 8        past six years?
 9   A.   No.
10   Q.   Are you aware of any contact that the company
11        has had with the Department of Health and
12        Environment?
13   A.   No.
14   Q.   Does the company sell nationwide at the
15        present time?
16   A.   Yes, we do.
17   Q.   The largest percentage of any sales are
18        concentrated in what area or region of the
19        country?
20   A.   There's no specific region.  Approximately
21        60 percent of our business is east of the
22        Mississippi; 40 percent would be
23        approximately west.  Inside that percentage,
24        maybe 20 percent would be in Canada, 2 or 3
25        percent potentially other, international.
```

63

```
 1   Q.   Did you know a Sherry Davis?  Sherry is
 2        S-H-E-R-R-Y; Davis D-A-V-I-S.
 3   A.   Go ahead.
 4   Q.   While you were either at Kansas State
 5        University or since you've left and
 6        graduated?
 7   A.   No.
 8   Q.   Have you attempted to -- strike that.  When
 9        you were looking into the purchase of Viking
10        Corporation back in the '97, '98 time period,
11        did you attempt to educate yourself on the
12        general business that Viking Corporation was
13        involved in, the sale of washers,
14        shotblasters, equipment that would be
15        involved in, I guess cleaning equipment or
16        degreasing equipment?
17   A.   Yes, I did.
18   Q.   As part of that education process as well as
19        work in the business during the past six
20        years since January 1, 1999, are you aware of
21        any other businesses that sell equipment with
22        evaporator units?
23   A.   No.
24   Q.   Are you aware that the pollution -- Pollution
25        Prevention Institute at Kansas State
```

62

```
 1   Q.   Does any one state have the largest
 2        percentage of sales?
 3   A.   Not that I'm aware of.  It's well distributed
 4        around the country.
 5   Q.   Have you ever seen the Technical Guidance
 6        document HW-9503 dealing with the use of
 7        evaporation units on equipment published by
 8        the Kansas Department of Health and
 9        Environment Bureau of Waste Management?  And
10        I'll show you a copy.
11   A.   No.
12             MR. DOYLE:   All right, let's have
13        this marked as the next exhibit.
14            (At this time, the Court Reporter
15         Marked Lock Deposition Exhibit Number 7
16            for Identification.)
17   Q.   You attended Kansas State University?
18   A.   Yeah.
19   Q.   While you were there, did it have a pollution
20        prevention institute?
21   A.   Not that I'm aware of.
22   Q.   Are you aware at the present time that Kansas
23        State University has a pollution prevention
24        institute?
25   A.   No.
```

64

```
 1        University reports that many hot soak pots
 2        washer cabinets are equipped with evaporator
 3        units, but evaporator units have not been
 4        approved for use by the Kansas Department of
 5        Health and Environment unless they are
 6        completely enclosed systems?
 7   A.   No.
 8   Q.   Do you know that the Kansas Department of
 9        Health and Environment's Bureau of Waste
10        Management needs to approve evaporator units
11        prior to their use?
12   A.   No.
13   Q.   All right.  And it's fair to say that during
14        the six years since January 1, 1999, that
15        Viking Corporation has never contacted the
16        Kansas Department of Health and Environment's
17        Bureau of Waste Management to determine
18        whether or not evaporator units were approved
19        for sale?
20   A.   Yes.
21   Q.   That's a true statement?
22   A.   Yes, we have not contacted them, that's true.
23   Q.   And are you aware whether prior to January 1,
24        1999, Viking Corporation at any point in time
25        contacted the Kansas Department of Health and
```

## 65

1 Environment's Bureau of Waste Management to
2 determine whether or not the evaporator units
3 that it did sell as part of its washers were
4 approved for sale?
5 A. No, we never had any previous contact.
6 Q. And there were no records within the company
7 to document approval of evaporator units for
8 sale by Viking Corporation?
9 A. No, no.
10 Q. That's a true statement?
11 A. Yes.
12       MR. DOYLE:  Why don't we mark as
13 the next document that manual that I was
14 referring to and referencing when I asked
15 Mr. Lock the most recent series of questions
16 dealing with the Kansas Department of Health
17 and Environment and its Bureau of Waste
18 Management.  The manual is entitled
19 "Pollution Prevention for the Automotive
20 Maintenance and Repair Industry."  It also
21 has on its cover page "Kansas State
22 University" and also has a reference to the
23 "Pollution Prevention Institute."  My best
24 memory, having printed the document sometime
25 earlier this year, is I don't remember a date

## 66

1 on this document.
2       (At this time, the Court Reporter
3       Marked Lock Deposition Exhibit Number 8
4       for Identification.)
5 Q. Do you have access to the Internet here at
6 the office?
7 A. Yes.
8 Q. Do you have access to the Internet at home?
9 A. Yes.
10 Q. All right.  Are you familiar with the Federal
11 Registrar or an entity called the Federal
12 Registrar?
13 A. No.
14 Q. Are you familiar with the -- strike that.
15 Does the company sell equipment in the state
16 of Ohio?
17 A. Yes.
18 Q. And has the company sold equipment since
19 basically about the time of the beginning of
20 the company in 1978, 1979 time period in the
21 state of Ohio?
22 A. Yes.
23 Q. Do you know if the company ever attempted to
24 determine whether or not its evaporator units
25 were approved for sale by the Division of

## 67

1 Solid and Hazardous Waste Management for the
2 State of Ohio's Environmental Protection
3 Agency?
4 A. I don't know.
5 Q. Do you know if -- has the company -- strike
6 that.  Do you understand that you're
7 appearing here today on behalf of the
8 corporation, Viking Corporation, as a
9 representative of the corporation designated
10 to appear and respond to questions under the
11 deposition notice?
12 A. Yes.
13 Q. So that when I ask you questions, I'm asking
14 the questions of the corporation, Viking
15 Corporation, for you to answer as its
16 representative.
17 A. Yes.
18 Q. Do you know if Viking Corporation has ever
19 had any contact prior to your involvement
20 with the corporation, January 1, 1999 as its
21 president, with the State of Ohio's
22 Environmental Protection Agency?
23 A. I don't have any previous contact -- don't
24 know of any contact at all.
25 Q. Does the corporation, Viking Corporation,

## 68

1 have any records involving the Federal
2 Registrar?  And I'll represent to you that
3 it's a publication by the federal government
4 that deals with various documents,
5 information, publications that are put out by
6 the federal government.
7 A. No.
8 Q. Is the corporation aware that as early as
9 January 7th, 1987, there were published
10 reports within the Federal Registrar dealing
11 with evaporators and the requirement that
12 evaporators comply with 40 Code of Federal
13 Regulations 260.10 for the use of evaporators
14 in the market place?
15 A. I'm not aware of that.
16 Q. Does Viking Corporation have a copy of the
17 Code of Federal Regulations or any section of
18 the Federal Code of Regulations here or in
19 its possession, custody and control?
20 A. No.
21 Q. Do you know if Viking Corporation has ever
22 had a copy of the Code of Federal Regulations
23 or a portion of the Federal Code of
24 Regulations within its possession, custody or
25 control?

71

1  A.  No.
2  Q.  Do you know Larry Carley, C-A-R-L-E-Y?
3  A.  No.
4  Q.  Are you aware that you were quoted in an
5      article by Larry Carley, called the "Aqueous
6      Alternative" back in 1999?
7  A.  No.
8  Q.  Would you agree with the following: "The
9      trend over the past eight to ten years has
10     been to move away from solvents for
11     degreasing"?
12 A.  Yes.
13 Q.  And this is in an article that appeared -- or
14     is dated as of September 1999 --
15 A.  Okay.
16 Q.  -- so the time period would have been during
17     the 1990's.
18 A.  Uh-huh.
19 Q.  That the trend has been to move away from
20     solvents for degreasing?
21 A.  Yes.
22 Q.  What do you move towards?
23 A.  Aqueous.
24 Q.  And what is the difference between a solvent
25     and aqueous or aquaous?

1      to aqueous"?
2  A.  Yes.
3  Q.  So earlier than, say, eight to ten years
4      earlier, so back in the '80s, Viking
5      Corporation used to use solvents?
6  A.  We didn't use any solvents. We sold
7      vibratory shakers. Someone may have used
8      solvent and they may have used water based
9      chemistry; we don't really know, we didn't
10     sell either one. We sold the equipment and
11     they can use whatever. Now, what we have --
12     what we intend for folks to use is aqueous
13     based chemistry.
14 Q.  And the vibratory, are they different than
15     the rotary?
16 A.  Yes.
17 Q.  So this quotation that talks about a
18     vibratory equipment for cleaning CV shafts,
19     alternators, starters and A/C compressors,
20     that's a different piece of equipment --
21 A.  Yes.
22 Q.  -- than a rotary washer?
23 A.  Yes.
24 Q.  Do they still accomplish the same general
25     purpose, which is to clean or degrease the

70

1  A.  Solvent is normally used in a vibratory type
2      degreaser, typically in automotive, not in
3      spray washers. Aqueous is aqueous chemistry
4      with some sort of detergent and a rotary
5      style or a water based jet washer. So
6      solvent is used only for approved areas for
7      vibratory cleaning. We also make vibratory
8      cleaners as well.
9  Q.  All right. I'm probably comparing apples and
10     oranges, and I'm going to show my ignorance
11     again. But earlier the manual or the
12     documents that we have had marked today
13     reference caustic soaps or caustic
14     detergents. Is caustic a solvent, is it
15     aqueous, or am I mixing apples and oranges?
16 A.  Normally a caustic would be used in an
17     aqueous solution.
18 Q.  And solvents, are they -- I don't know --
19     petroleum based or --
20 A.  Yes. Mostly petroleum based, yes.
21 Q.  Would you agree also with a quotation in Mr.
22     Carley's article, quote: "A vibratory
23     equipment for cleaning CV shafts,
24     alternators, starters, and A/C compressors
25     used to use solvent but we've changed

1      equipment that is placed inside the point of
2      operation?
3  A.  Generally said, yes.
4  Q.  Is it fair to say in the rotary washers that
5      the equipment is placed into a basket that is
6      then rotated around in the point of
7      operation?
8  A.  Yes.
9  Q.  And the rotary, is it more like a tumble,
10     where they are tumbled about?
11 A.  A rotary sits in a basket and it rotates on a
12     horizontal plane. Tumble, tumble parts go
13     into a batch and they're tumbled like in a
14     cement mixer on top of one another. And a
15     vibratory piece of equipment, they would tend
16     to tumble more like in a cement mixer, with a
17     media that acts as a mechanical stripping
18     where it basically scrapes the parts clean.
19     And we use a solution to pull the
20     contaminants away from the part.
21 Q.  You used the analogy of a cement mixer.
22     Would it also be like a clothes dryer, that
23     type operation, recognizing the clothes dryer
24     has hot air, but it's still going around and
25     things are tumbling?

72

75

1  A.    Uh-huh, yes.
2              MR. DOYLE:  Why don't we mark the
3    article we were referring to.  I saw you
4    looking at it and --
5              THE WITNESS:  I think it's a long
6    time ago.
7              MR. DOYLE:  Yeah.  Why don't we
8    mark this as the next exhibit.
9          (At this time, the Court Reporter
10       Marked Lock Deposition Exhibit Number 9
11       for Identification.)
12  Q.    At the present time, how many employees work
13    at Viking Corporation?
14  A.    About 24.
15  Q.    And in January of 1999, how many worked here,
16    approximately?
17  A.    Approximately 24.
18  Q.    The business has stayed generally the same,
19    some of the same products, the same market
20    place during the six years?
21  A.    Yes.
22  Q.    Has the volume of equipment, the items,
23    numbers sold stayed basically the same?
24  A.    On average, yes.
25  Q.    Companies had ups and downs over the years?

---

1    for the design of machines?
2  A.    Not to my knowledge.
3  Q.    And would you believe you would be the most
4    knowledgeable person at the corporation on
5    that point, historical transactional data
6    involving the design, manufacture, and sale
7    of equipment by Viking Corporation during the
8    first 15 years of the corporate existence?
9  A.    Yes.
10  Q.    Was Mr. Engren involved in the design of
11    equipment?
12  A.    I believe so.
13  Q.    Does the company use any type of interlock
14    device that uses the temperature as a factor
15    in the operation of the interlock?
16  A.    No.
17  Q.    Is it feasible at the present time to have an
18    interlock that is temperature based?
19  A.    I don't know.
20  Q.    Do you have a self-cleaning oven at home?
21  A.    Yes.
22  Q.    Have you ever used the self-cleaning
23    mechanism?
24  A.    I have not.
25  Q.    Are you generally aware that in the use of a

---

74

1  A.    Correct.
2  Q.    Some years better than others?
3  A.    Yes.
4  Q.    At least one very bad year during the
5    six-year process?
6  A.    Yes.
7  Q.    Was Mr. Engren the sole shareholder of the
8    corporation back in 1998 when he was selling
9    out?
10  A.    Yes.
11  Q.    In the due diligence investigation and the
12    review of documents since you took over, can
13    you determine what was done as far as a
14    design process for equipment that was
15    manufactured by the company during the
16    initial 15 years of the company's operations,
17    so from roughly '78 up until the early '90s?
18  A.    No, I don't know. I don't know what they
19    did.
20  Q.    Did they ever employ outside engineering --
21    engineers to get involved in the design of
22    machines or parts of machines?
23  A.    I don't know.
24  Q.    Does the company have any documents that
25    would document the use of outside engineers

---

76

1    self-cleaning oven that you somehow lock the
2    door around it so that you can engage the
3    mechanism to self clean the oven?
4  A.    Yes.
5  Q.    How is that generally set up, at least in a
6    general sense?
7  A.    I don't know.
8  Q.    Are you aware that as long as the temperature
9    within the oven remains above a certain level
10    that you can not disengage that locking
11    device?
12  A.    Yes.
13  Q.    Is it mechanically feasible to install a
14    device at the present time on a washer so
15    that as long as the temperature within a
16    washer is above a certain level that it can't
17    be opened?
18  A.    I don't know.
19  Q.    At the present time -- well, strike that.
20    During the past six years that you have been
21    president of the corporation, have you
22    engaged any engineers for design purposes?
23  A.    No.
24  Q.    Are you aware of the company ever engaging
25    engineers for design purposes?

79

**Page 77 (left top)**

1 A. No.

2 Q. Other than engineers, are you aware of the
3 company ever hiring anyone to do any work
4 involved with the design of equipment
5 manufactured and sold by Viking Corporation?

6 A. No.

7 　　　　MR. DOYLE:　You know, I'm sure I've
8 forgotten things to ask you, and this is the
9 only day, so I'm going to take a break now.

10 　　　　THE WITNESS:　Okay.

11 　　　　(THEREUPON, a short recess was held
12 at 10:34 until 10:41 a.m.)

13 　　　　CROSS EXAMINATION

14 BY MR. FLEMING:

15 Q. Hello, my name is Kevin Fleming, I represent
16 Hillside; I have a few questions for you.

17 A. Okay.

18 Q. You have testified earlier about reviewing
19 drawings?

20 A. Uh-huh.

21 Q. And I think you testified at first that some
22 of these drawings might have had -- might
23 have shown the evaporator unit too?

24 A. The drawings that I'm talking about are hand
25 drawn of what they used to look like. I

HARPER COURT REPORTING
316.265.1534

**Page 79 (right top)**

1 Q. Do you know whether this was the washer that
2 was manufactured for Hillside?

3 A. No, I don't know if that's exactly the
4 washer, no. It doesn't say Hillside or
5 anything.

6 　　　　MR. FLEMING:　Why don't we have
7 this marked as an exhibit.

8 　　　　(At this time, the Court Reporter
9 Marked Lock Deposition Exhibit Number 10
10 for Identification.)

11 Q. If a customer were going to order today a
12 rotary washer with an evaporator --

13 A. Uh-huh.

14 Q. -- and Viking decided to go ahead and build
15 it, who would design it?

16 　　　　MR. POWERS:　Objection.

17 A. I don't know.

18 Q. I'm going to show you another document. Have
19 you seen that document before?

20 A. Yes, yes.

21 Q. And what is that document?

22 A. It's a document from Hillside Automotive
23 releasing Viking Corporation of any and all
24 claims including warranty claims for the
25 purchase of the said washer.

HARPER COURT REPORTING
316.265.1534

**Page 78 (left bottom)**

1 don't have any visual drawings of them per
2 se.

3 Q. I'm going to show you a document here that
4 has been marked as Engren Exhibit 12. Can
5 you take a moment. It's a number of pages.

6 A. Okay.

7 Q. Are these the drawings that you reviewed
8 prior to the deposition today?

9 A. I'm not sure. Similar but I'm not sure.

10 Q. Do you see reference to the evaporator unit
11 on that first page?

12 A. Evaporator box. I see that.

13 Q. And do you see any drawing on the right that
14 would represent the evaporator box?

15 A. Something here called a vap box and sludge
16 box.

17 Q. Do you know who made these drawings?

18 A. No.

19 Q. Do you know when these drawings were made?

20 A. No.

21 Q. Do you know what -- what this drawing
22 depicts?

23 A. Yes.

24 Q. What does it depict?

25 A. 3672 rotary roll-out washer.

HARPER COURT REPORTING
316.265.1534

**Page 80 (right bottom)**

1 Q. Have you ever had any conversations with Gus
2 Annegrin (sp) regarding that release?

3 A. No.

4 Q. Excluding your attorney, have you had any
5 conversations with anyone regarding that
6 release?

7 A. No.

8 Q. When did you first become aware that Paul
9 Rinzella of Hillside had executed this
10 release?

11 A. I don't know when exactly, but it's -- it's
12 been discovered during -- during the time we
13 were -- sometime after we were subpoenaed.

14 Q. Are there currently any employees at Viking
15 today who were working at Viking in 1992?

16 A. There are employees, hourly workers on the
17 shop floor.

18 Q. Do you know if any of the -- any of the
19 employees that were there in 1992 are
20 still here today, do you know if any of them
21 were involved in the manufacture of the
22 rotary washer for Hillside?

23 A. I don't know.

24 Q. Would there be any records showing who
25 actually worked on it?

HARPER COURT REPORTING
316.265.1534

81

1  A.  No. No. Is this (indicating) yours, Kevin,
2      or mine? You want it --
3  Q.  That's mine.
4  A.  Okay.
5          MR. FLEMING:  Might as well mark
6      that as an exhibit.
7          (At this time, the Court Reporter
8      Marked Lock Deposition Exhibit Number 11
9      for Identification.)
10 Q.  I think you've already testified that you
11     never had any conversations with Paul
12     Rinzella; is that correct?
13         MR. POWERS:  Objection.
14 Q.  Have you had any conversations with Paul
15     Rinzella of Hillside?
16 A.  No, no.
17 Q.  Have you ever had conversations with anyone
18     from Hillside?
19 A.  No.
20 Q.  Since you have been president of Viking, do
21     you know of anyone at Viking who has had any
22     communications with Hillside?
23 A.  No.
24 Q.  Now, you testified that today it would be
25     your practice to give a verbal recommendation

HARPER COURT REPORTING
316.265.1534

---

83

1      come to us via our exposure to sales reps.
2  Q.  Okay.
3  A.  We don't sell to them; we sell to the end
4      user.
5  Q.  Okay. Is it your usual practice by you, I
6      mean Viking's usual practice to get UL
7      approval for its products?  By UL, I mean
8      Underwriter Laboratories.
9  A.  No.
10 Q.  Has Viking ever done that since you have been
11     here?
12 A.  Yes.
13 Q.  And when did it do that?
14 A.  Customer requests.
15 Q.  Has Viking ever got AGA -- by AGA, I mean
16     American Gas Association approval for a
17     product that contained a gas burner?
18 A.  No.
19         MR. FLEMING:  Those are all the
20     questions that I have. Thank you.
21         THE WITNESS:  Okay, thanks.
22         REDIRECT EXAMINATION
23 BY MR. DOYLE:
24 Q.  Mr. Lock, what, if any, information is
25     provided at the present time to purchases of

HARPER COURT REPORTING
316.265.1534

---

82

1      not to use caustic solutions to a customer?
2          MR. POWERS:  Objection.
3  A.  That's true.
4  Q.  If you were going to give this verbal
5      communication, when would it be done?  Would
6      it be done prior to the sale of the product
7      or subsequent to the sale?
8          MR. POWERS:  Objection.
9  A.  It would be done prior. Not in all cases.
10 Q.  What is the usual method whereby Viking sells
11     its products?  Do they sell directly to
12     consumers?  And by consumers, I realize these
13     are industrial commercial consumers, not --
14     not, you know, a singular person, or do they
15     use equipment brokers?
16 A.  It's all done direct. We use independent
17     sales reps on about possibly 20 percent,
18     approximately. So we get leads from
19     independent sales reps in the field
20     periodically; but nearly all transactions are
21     done direct between Viking and the end user.
22 Q.  Okay. So when you say 20 -- 20 percent use
23     independent sales reps and I think -- is that
24     what you said?
25 A.  Twenty percent of the deals that we do may

HARPER COURT REPORTING
316.265.1534

---

84

1      equipment from Viking Corporation regarding
2      maintenance to be performed on the equipment?
3  A.  A user's manual, operator's manual.
4  Q.  That would be the same operator's -- well,
5      strike that. It would be a manual similar to
6      the operator's manuals that we've looked at
7      earlier today that was marked as Exhibit 4
8      from your deposition and --
9  A.  Yes.
10 Q.  -- Exhibit 6 from your deposition?
11 A.  No, it would be similar to 4; it would not be
12     similar to -- you said Exhibit 6?  What did
13     you say?
14 Q.  I did. Only because Exhibit 6 from your
15     deposition is also entitled "Operator's
16     Manual."
17 A.  Right. An older version.
18 Q.  So any -- I forget exactly what I asked you,
19     so if I repeat a question, I apologize,
20     there's no separate document at the present
21     time that is provided to a customer dealing
22     with maintenance or how to maintain
23     equipment?
24 A.  No.
25 Q.  Historically has the company provided any

HARPER COURT REPORTING
316.265.1534