UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED OFFICE
CLERKS OFFICE

2006 JUN -5 A 11: 39

U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |
|---|---|
| EDWARD STEFFEN AND<br>MARSHA STEFFEN,<br><br>     Plaintiffs,<br><br>v.<br><br>VIKING CORPORATION,<br><br>    Defendant and Third Party Plaintiff<br><br>v.<br><br>HILLSIDE MACHINE, INC.,<br><br>    Third Party Defendant | Civil Action<br>No. 04-10592-RBC |

## THIRD PARTY PLAINTIFF, VIKING CORPORATION'S OPPOSITION TO THIRD PARTY DEFENDANT, HILLSIDE MACHINE, INC.'S MOTION FOR SUMMARY JUDGMENT

The third-party plaintiff, Viking Corporation ("Viking") opposes the motion of the third-party defendant, Hillside Machine, Inc. ("Hillside"), for summary judgment on the third-party complaint against it. As discussed below, the evidence, when viewed in the light most favorable to Viking, is more than sufficient to support Viking's claim that Hillside is contractually obligated to indemnify Viking for the plaintiff's claims against it. Hillside's contention that it is entitled to judgment as a matter of law is premised upon a misreading of the pertinent case law, and upon a highly selective, one-sided account of the facts and circumstances which led to its execution of the release at issue. In fact, there are numerous material questions of fact which are in dispute, and the matter cannot appropriately be resolved at the summary judgment stage.

## STATEMENT OF ADDITIONAL MATERIAL FACTS

1.  The operating manual supplied by Viking with the washer specified that no caustic cleaners be used in its operation. (Deposition of Gus Enegren attached as Viking's Exhibit 1 at p. 54).

2.  Viking insisted on the ban on caustic cleaners because their corrosive effect typically damaged the washer. (Enegren dep. at p. 54 – 55).

3.  Viking continues to recommend that caustic cleaners not be used in the washers they manufacture and/or distribute. (Deposition of Deron Lock attached as Viking's Exhibit 2 at pp. 44-45).

4.  Hillside's owner, Paul Renzella spoke with Gus Enegren, then the owner of Viking, in the first thirty (30) to sixty (60) days after the washer was delivered about the ban on caustic cleaners. (Enegren Dep. at p. 123-124).

5.  Mr. Enegren suspected that Hillside was using a caustic cleaner when Mr. Renzella reported a leaking fire tube in the washer. (Enegren Dep. at p. 55 and at p. 123).

6.  Mr. Renzella said that it was unreasonable not to be able to use a caustic cleaner in the washer. (Energren Dep. at p. 124).

7.  Hillside made a number of calls to Viking regarding problems with the washer. (Energren dep. at p. 75 – 76).

8.  Viking sent Howard Whitetree to Hillside to deal with the alleged problems with the washer and with Hillside's questions about how the washer was built, designed or used. (Enegren Dep at p. 61).

9.  Mr. Whitetree reported to Viking his observation that Hillside used caustic cleaner in the washer. (Enegren dep. at p. 125).

2

10.  Hillside's use of caustic cleaners in the washer was one of the primary reasons Viking asked for a release of liability and indemnification from Hillside (Energren Dep. at p. 53).

11.  Viking received a letter from an attorney representing Hillside referencing modifications that Hillside made to the washer with respect to pipes in the manifold, a low water shut down a water temperature gauge and a friction brake on the door (Enegren dep at p. 134-135; Letter marked as Hillside's Exhibit 6).

12.  A view of three photos of the washer revealed modifications from the original design of the washer with respect to the door latch, timer, water temperature gauge, temperature gauge and evaporator chamber door. (Enegren dep. at p. 16 and p. 18).

13.  Viking was informed that Mr. Renzella would be making modifications to the washer. (Enegren dep. at 136).

14.  Viking did not believe that Mr. Renzella had the experience to modify the washer. (Enegren dep. at p. 136).

15.  Viking did not believe that Hillside could use the washer safely based on its use of caustic cleaner in the washer and due to Mr. Renzella's inexperience in making modifications to the product. (Enegren dep. at p. 135 – 136).

16.  Viking was prepared to refund the entire purchase price in exchange for the return of the washer. (Enegren dep at p. 135).

17.  Hillside wished to retain the washer and also receive a refund of the entire purchase price. (Enegren dep. at p. 135).

18.  Viking's agreement to Hillside's terms was conditioned on a full and complete release from any and all liabilities associated with the washer. (Enegren dep at p. 135).

3

19.     Mr. Enegren explained to Mr. Renzella that the scope of the "release" of Viking from all
        liabilities associated with the washer included indemnification that protected Viking from
        claims brought by Hillside as well as any other claims arising out of Hillside's continued
        use of the machine. (Energren dep. at p. 136).

20.     Mr. Enegren believed that the "release" drafted by Hillside's attorney accurately
        reflected the scope of the protection that Viking requested. (Enegren dep. at P. 136 –137).

21.     The "release" executed between Hillside and Viking was the only time in over twenty
        (20) years of running Viking that Mr. Enegren felt the need or desires to have a release
        and indemnity agreement. (Enegren dep. at p. 84).

## STANDARD OF REVIEW

Summary judgment is rarely granted on the merits of an action alleging negligence.
*Foley v. Matulewicz*, 17 Mass. App. Ct. 1004, 1005, 459 N.E.2d 1262, 1263 (Mass. App. 1984).
"It is well settled that 'Rule 56 authorizes summary judgment *only* where the moving party is
entitled to judgment as a matter of law, where it is quite clear what the truth is, that no genuine
issue remains for trial.'" *Peckham v. Ronrico Corp.*, 171 F.2d 653 (1st Cir. 1949), *quoting Sartor
v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S. Ct. 724 (1944) (emphasis added).
Summary judgment must be denied if there is "the slightest doubt as to the facts." *Arenas v.
United States*, 322 U.S. 419, 434, 64 S. Ct. 1090 (1944). The moving party bears the burden of
showing that there is no genuine issue of fact as to any of the issues raised even though it does
not bear that burden at trial. *Berrios v. Perchik*, 20 Mass. App. Ct. 930, 933, 479 N.E.2d 695,
696 (Mass. App. 1985).

4

## ARGUMENT

### A.    THE EXCLUSIVITY PROVISIONS OF THE WORKER'S COMPENSATION ACT DO NOT PRECLUDE A CLAIM FOR IMPLIED CONTRACTUAL INDEMNITY.

Massachusetts recognizes that, in appropriate circumstances, an agreement to indemnify may be implied in a contract. *Monadnock Display Fireworks, Inc. v. Town of Andover*, 388 Mass. 153, 157-158, 445 N.E.2d 1053, 1056-1057 (1983); *Great Atlantic and Pacific Tea Co., Inc. v. Yanofsky*, 380 Mass. 326, 331-332, 403 NE.2d. 370, 373-374 (1980).    While the Massachusetts appellate courts have never been presented with a viable implied contractual indemnity claim against an employer, they have held that an employer may be liable to a third party for express contractual indemnity, notwithstanding the exclusivity provisions of the Workers' Compensation Act. *Whittle v. Pagani Bros. Constr. Co.*, 383 Mass. 796, 422 N.E.2d 779 (1981); *Decker v. Black and Decker Manufacturing Co.*, 389 Mass. 35, 38, 449 N.E.2d 641, 643 (1983).    Moreover, they have acknowledged that the "majority position is that a third-party tortfeasor may recover indemnity from an employer ... if the employer had expressly *or impliedly* contracted to indemnify the third party," *Liberty Mutual Ins. Co. v. Westerlind*, 374 Mass. 524, 526, 373 N.E.2d 957, 959 (1978), and have assumed, without deciding, that a third party may assert a valid claim for implied contractual indemnity against an employer. *Larkin v. Ralph O. Porter, Inc.*, 405 Mass. 179, 182, 539 N.E.2d 529, 531 (1989).

Hillside offers no explanation for its suggestion that express and implied contractual indemnity claims against an employer should be treated differently.    Indeed, such a rationale is difficult to imagine.    A claim for implied contractual indemnity arises from evidence which establishes that the parties intended for the contract to incorporate an indemnity obligation, even though it was not expressly set forth in the language of the agreement itself.    As such, there is no

meaningful distinction between express and implied contractual indemnity. In either situation, the parties have entered into a transaction in which it is clear that they contemplated that one party would indemnify the other. The fact that such an agreement might constitute a departure from the rights and obligations which would otherwise exist may render it more difficult for a party to establish that an implied indemnity agreement was contemplated. Once such an implied obligation has been established, however, there is no reason to treat that obligation any differently than an express contractual obligation.

Unable to articulate any plausible rationale for its position, Hillside simply asserts that the Supreme Judicial Court has "refrained from extending" the right to implied contractual indemnity into this context, and that it has indicated that the issue would best be resolved by the Legislature. This is a mischaracterization of the SJC's rulings. The SJC has never "refrained" from allowing a third-party to recover from an employer on the basis of implied contractual indemnity. It has simply never been presented with a situation in which there is a sufficient evidentiary basis for concluding that a claim for implied contractual indemnity against an employer exists in the first place, and therefore has never needed to expressly rule on the question of whether such a claim would be precluded by the Workers' Compensation Act. *See Larkin v. Ralph O. Porter, Inc.*, 405 Mass. 179, 182, 539 N.E.2d 529, 531 (1989); *Decker, supra,* 389 Mass. at 38, 449 N.E.2d at 643; *New Bedford Gas and Edison Light Co. v. Maritime Terminal, Inc.*, 380 Mass. 734, 736, 405 N.E.2d 653, 655 (1980); *Liberty Mutual Ins. Co., supra*, 374 Mass. at 526-527, 373 N.E.2d at 959. Moreover, the SJC has never suggested that this is an issue which must be resolved by the Legislature. Instead, the SJC has acknowledged "strong criticism of the rules that a third party may not recover contribution from an insured employer and that only in limited circumstances may a third party recover indemnification from an insured

6

employer," but suggested that "conflicting policy considerations are best resolved in the Legislature." *Liberty Mutual Ins. Co., supra*, 374 Mass. at 527, 373 N.E.2d at 959. In other words, the Court deferred to the Legislature for any further curtailment of the exclusivity provisions, beyond the "limited circumstances" already identified. Because those "limited circumstances" include claims for contractual indemnity – express *or* implied – no resort to the Legislature is necessary to recognize the validity of Viking's claim.

## B.    MATERIAL QUESTIONS OF FACT PRECLUDE THE ENTRY OF SUMMARY JUDGMENT ON VIKING'S CLAIM AGAINST HILLSIDE FOR IMPLIED CONTRACTUAL INDEMNITY.

A claim for implied contractual indemnity requires the existence of "unique special factors demonstrating that the parties intended that the would-be indemnitor bear the ultimate responsibility for the plaintiff's safety." *Araujo v. Woods Hole, Martha's Vineyard, Nantucket Steamship Authority*, 693 F.2d 1, 2 (1st Cir. 1982). *See also Fall River Housing Authority v. H.V. Collins Co.*, 414 Mass. 10, 14, 604 N.E.2d 1310, 1313 (1992); *Croall v. Mass. Bay Transportation Authority*, 26 Mass. App. Ct. 957, 959, 526 N.E.2d 1320, 1322 (1988). Because the inquiry into the particular circumstances of the case is central to the analysis of such a claim, it is ill-suited for resolution via a motion for summary judgment. This is especially true here, where the parties have raised conflicting allegations regarding the circumstances and discussions which led up to the agreement in question, and there is substantial evidence to support Viking's claim that the parties fully intended that Hillside would indemnify Viking.

It is true that "a sales agreement, without more, is not a sufficient basis on which to imply on contractual obligation on the part of a buyer to indemnify a manufacturer or seller." *Decker, supra*, 389 Mass. at 39, 449 N.E.2d at 644. Here, however, there is more than a mere sales agreement between Viking and Hillside. To the contrary, the agreement at issue here is *not* the

7

initial transaction, in which the washer was sold by Viking to Hillside. Rather, the agreement in question is the parties' subsequent agreement, whereby Viking agreed to reimburse Hillside for the full purchase price of the machine, and also agreed to permit Hillside to retain the machine itself, in exchange for a release insulating Viking from any potential liability for Hillside's continued use of the machine. Viking insisted upon such a release because Hillside had modified the machine without Viking's involvement, and without the requisite expertise to do so, and because Hillside had insisted upon using in a manner which contradicted Viking's instructions and warnings. There is ample evidence from which a jury could reasonably conclude that "unique special factors" warrant the implication of an indemnity obligation.

## **Caustic Cleaner**

A vital issue of disputed fact derives from the varying accounts of the telephone conversations between Paul Renzella (the owner of Hillside) and Gus Enegren (then the owner of Viking) regarding the use of caustic cleaning products in the washer. Both agree that the manual for the Viking washer prohibited the use of caustic cleaners in the washer. (Hillside Exhibit "A" at ¶ 10, Viking Exhibit "1" at p. 54). In fact, Viking still continues to recommend against the use of caustic cleaning agents in its washers. (Viking Exhibit "2" at p. 43 – 44)

Mr. Renzella claims that Mr. Enegren's concern extended only to the possibility that someone operating the washer might be injured through inadvertent exposure to caustic cleaning solution. (Hillside Exhibit "A" at ¶ 10). Mr. Enegren testified, however, that concerns about the use of caustic cleaners in the washer were more fundamental and concerned the integrity of the machine itself. Mr. Enegren testified that the corrosive effects of caustic cleaners may cause damage to the washer. (Hillside Exhibit "1" at p. 54). These corrosive effects of caustic cleaning

8

solutions are one reason that Viking continues to recommend that caustic cleaners not be used in its washers. (Viking Exhibit "2" at p. 44).

Shortly after the washer was installed at Hillside, Mr. Enegren spoke with Mr. Renzella about the need to suspend the use of caustic cleaners in the washer. (Viking Exhibit "1" at pp. 123-124). Mr. Enegren urged Mr. Renzella not to use caustic cleaners in the Viking washer. (Viking's Exhibit "1" at p. 54). Mr. Renzella resisted this direction, claiming it was unreasonable not to be able to use caustic cleaners in the washer. (Viking Exhibit "1" at p. 124). Indeed, Mr. Renzella himself concedes that he disregarded Mr. Enegren's advice, and continued to use caustic cleaners in the washer. (Hillside Exhibit "A" at ¶ 10).

Mr. Enegren suspected that Hillside continued to use caustic cleaners in the washer when Hillside complained about malfunctioning parts in the washer. His suspicions were aroused by Mr. Renzella's complaints about leaking fire tubes in the washer (Viking Exhibit "1" at p. 55 and at p. 123). These suspicions were confirmed by the report of a Viking employee, Howard Whitetree. (Viking Exhibit "1" at p. 125).

Hillside's use of caustic cleaner in the Viking washer was one of the primary reasons Viking asked for a release of liability and indemnification from Hillside. (Viking Exhibit "1" at p. 53). While Mr. Renzella would have this Court believe that Viking's concerns about caustic cleaning solutions were minimal and had nothing to do with the washer' s operations, Mr. Enegren, seconded by Viking's current owner, Deron Lock , explained that Viking's concerns go directly to the integrity and successful operation of the product itself. The dispute is important because it addresses the knowledge each party brought to the negotiations for the "release" from any and all claims that concluded their contractual relationship, as well as the reasonable expectations that both Hillside and Viking brought to those negotiations. Therefore the differing

9

accounts of the parties' discussion about the use of caustic cleaner raises questions of material fact sufficient to defeat summary judgment.

## Modifications

Additional evidence highlighting the unique special factors in the context of this case arises from Hillside's modifications of the Viking washer. Hillside stops short of claiming that it did not modify the washer, focusing instead on a claim that it never modified the evaporator chamber. (Hillside Exhibit "A" at ¶ 13). This assertion implies that the evaporator chamber is so self-contained that modification or misuse of other parts of the washer would have no effect on the evaporator chamber, yet Hillside has presented no evidence to support such a claim.

Viking first learned of Hillside's modification of the washer in a letter from an attorney representing Hillside dated October 14, 1992. That letter discussed modifications Hillside made to the pipes in the manifold, a low water shut down, a water temperature gauge, and a friction brake on the door. (Hillside Exhibit "6"; Viking Exhibit "1" at p. 134-135). Mr. Enegren spoke with Mr. Renzella about modifications to the washer and was told that Hillside would continue modifying the machine. (Viking Exhibit "1" at p. 136) .

Modifications continued to be made to the washer with Mr. Enegren able to identify changes to the door latch, timer, water temperature gauge and evaporator chamber door in looking at just three photos of the washer shown to him at his deposition. (Viking Exhibit "1" at p. 16 and p. 18)    Mr. Enegren understood that Mr. Renzella would be making these modifications himself. (Viking Exhibit "1" at p. 135) He did not believe that Mr. Renzella had the requisite product knowledge or expertise to modify the washer. (Viking Exhibit "1" at p. 135).    Mr. Enegren was convinced that the combination of Mr. Renzella's personal

10

modifications of the washer, along with the continued use of caustic cleaner, meant that Hillside could not use the washer safely.   (Viking Exhibit "1" at p. 135-136).

In *Roy v. Star Chopper Co., Inc.*, 442 F.Supp. 1010 (D.R.I. 1977), *aff'd* 524 F.2d 1124 (1st Cir. 1978), *cert. denied* 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979), the District Court considered whether, under Massachusetts law, the manufacturer of a machine could implead the purchaser on a theory of implied contractual indemnity. The purchaser's employee had been injured while using the machine, and had recovered worker's compensation benefits from his employer before filing suit against the manufa cturer. Because the purchaser had participated in the design of the machine, and had undertaken responsibility for the addition of safety devices, the manufacturer was allowed to proceed with the indemnity claim, despite the absence of an express indemnity provision in the contract of sale. The Court explained that "the contractual indemnity claim exists independent of a duty owned to the employee." *Id.* at 1018. Relying on the majority rule in other jurisdictions, the Court concluded "that the Massachusetts Act grants the employer immunity from indemnity claims based solely on a non-contractual relationship as tortfeasors," but not against "express or implied obligations ... based on an independent contractual relationship." *Id.* Because the relationship between the manufacturer and the purchaser was "more in the nature of co-manufacturers," the Court found that it was "sufficiently different from the manufacturer/purchaser relationships" in other cases to permit the indemnity claim to survive summary judgment. *Id.* at 1020.

Hillside provided the specifications for the machine. (Hillside Exhibit "A" at ¶ 3). It also undertook to make modifications to it.  Hillside opted to disregard Viking's warnings and instructions, and to use caustic cleaners, which may have damaged the machine and/or contributed to the explosion.  On these facts alone, Viking and Hillside may be viewed as "co-

11

manufacturers," and grounds for implied contractual indemnity exist for the reasons set forth in *Roy*. At minimum the dispute over the amount of input that Hillside had in the creation and modification of the washer, as it existed at the time of Mr. Steffen's injury, raises material issues of fact that preclude summary judgment.

## Release

Nothing highlights the unique and special factors in the parties' relationship better than the manner in which they ended it. Most significantly, Viking agreed to reimburse Hillside for the purchase price of the machine, and allowed Hillside to keep the machine without paying anything for it. (Viking Exhibit "1" at p.135; Hillside Exhibit "A" at ¶ 18)  This extraordinary conclusion to this business relationship did not originate with Viking. Viking initially proposed that it refund Hillside's purchase price in exchange for the return of the washer. (Viking Exhibit "1" at p. 135). Hillside proposed that it be given the refund, and that it also be permitted to keep the machine. (Viking Exhibit "1" at p. 135) Mr. Enegren, understandably confused about how Viking would derive any benefit from this proposal, spoke with Mr. Renzella about the matter. Their conflicting accounts of those conversations raise additional factual disputes between the parties.

Mr. Enegren maintains that Viking's agreement to Hillside's proposal was conditioned on a full release from any and all liabilities associated with the washer. (Viking Exhibit "1" at p. 135). His discussions with Mr. Renzella touched specifically on the topic of indemnification, as he sought to protect Viking from claims brought by Hillside as well as any other claims arising out of Hillside's continued use of the washer. (Viking Exhibit "1" at p. 136). The "release" executed between Viking and Hillside was the only time in over twenty (20) years of running Viking that Mr. Enegren felt the need to insist upon a release and indemnity agreement. (Viking

12

Exhibit "1" at p. 84). Knowing that Hillside was misusing the washer by using caustic cleaners, and that it had modified the washer without the skill to properly do so, Viking had good reason to be concerned about the potential for future claims arising from Hillside's continued use of the washer, and a valid basis for insisting that it be insulated from any such claims. Given these facts about the parties' relationship, it is entirely reasonable that Viking would seek such an expansive set of protections.

Mr. Renzella, for his part, maintains that he never discussed indemnification with Mr. Enegren. (Hillside Exhibit "A" at ¶ 18) Further, he claims that the only claims the two men discussed were claims by Hillside against Viking for problems with the washer. . (Hillside Exhibit "A" at ¶¶ 18 and 23). This assertion is simply not plausible. Having returned the full $12,210 purchase price to Hillside, Viking's only remaining exposure to claims by Hillside was limited to a potential claim that Viking should reimburse Hillside for the relatively minimal cost of spare parts and installation. Even this potential claim was of dubious merit, in light of the likelihood that any additional costs were the result of Hillside's insistence upon disregarding Viking's warnings and instructions regarding the use of caustic cleaners. Thus, Viking had little to gain by agreeing to permit Hillside to retain the machine, and much to lose if it allowed Hillside to continue to use the mistreated and modified machine without obtaining protection against any future claims which might arise from such use.

By returning the purchase price and obtaining a blanket release from Hillside, Viking extinguished any further obligations arising from the manufacture and sale of the machine, while Hillside agreed to assume all responsibility for future claims arising from the machine. In short, Hillside did not merely take on the role of "co-manufacturer" with Viking, it actually agreed to

13

step into Viking's shoes and undertake sole responsibility for any design or manufacturing defects in the machine.

Under the circumstances, Hillside's agreement to release Viking from any liability arising from the machine constitutes "a clear expression in the contract" sufficient to support a claim for implied contractual indemnity. *New Bedford Gas and Edison Light Co. v. Maritime Terminal, Inc.*, 380 Mass. 734, 736, 405 N.E.2d 653, 655 (1980). Coupled with the role played by Hillside in the use, design and modification of the machine, the language of the release warrants a finding of "unique special factors" supporting liability for implied contractual indemnity. *See Samos Imex Corp. v. Nextel Communications, Inc.*, 20 F.Supp.2d 248, 251 (D.Mass. 1998) ("special factors result from the contract provisions as viewed against the relationship between the parties").

Hillside claims that, even if the circumstances support the conclusion that an indemnity obligation exists, Hillside cannot be compelled to indemnify Viking for Viking's own negligence. It is true that some cases have indicated, at least in dicta, that "a party may not obtain indemnification for its own negligence under a theory of implied contractual indemnity." *Kelly v. Dimeo, Inc.*, 31 Mass. App. Ct. 626, 628, 581 N.E.2d 1316, 1318 (1991); *Great Atlantic and Pacific Tea Co., Inc. v. Yanofsky*, 380 Mass. 326, 334, 403 NE.2d. 3 70, 375 (1980). Because the terms of the release, under the circumstances presented here, could properly be construed to give rise to an express indemnity obligation, such statements in the case law are inapposite. Moreover, even if the indemnity obligation were implied rather than express, assertions suggesting that there can be no implied indemnity for the indemnitee's own negligence overlook the distinction between implied indemnity based upon the terms and circumstances of the contract between the parties and implied indemnity arising by operation of

14

law because of a recognized "special relationship" between the parties. Where, as here, the claim is premised upon the assertion that the parties intended for the contract to incorporate an indemnity obligation – also known as "implied in fact" indemnity – indemnity "is claimable without reference to distinctions between primary and secondary, or active and passive, negligence since it is generally based a contractual relationship rather than equitable considerations, and concerned with obligations flowing between indemnitor and indemnitee, rather than being founded upon a tort or upon any duty which the indemnitor owes to an injured third party." 42 C.J.S. Indemnity § 31 (2005).

Finally, even if Viking were not entitled to seek contractual indemnity for its own negligence, questions of fact preclude a finding that Viking was negligent at this stage of the proceedings. The plaintiff's claims against Viking sound in negligence *and* breach of warranty. Viking could be held strictly liable to the plaintiff for breach of warranty, even if the jury were to find that Viking was not negligent. Thus, even if Viking is not entitled to indemnity for its own negligence, it is premature to assert that Viking is not entitled to indemnity under any circumstances.

## C.    INJURIES TO HILLSIDE'S EMPLOYEES WERE REASONABLY FORESEEABLE WHEN THE IMPLIED CONTRACTUAL INDEMNITY AGREEMENT WAS CREATED.

Hillside's final argument asserts that the plaintiff's injuries were not "sufficiently foreseeable by the parties when the indemnification agreement was implied to permit a holding that they are within its scope." *Great Atlantic and Pacific Tea Co., Inc., supra,* 380 Mass. at 333, 403 N.E.2d at 374. The argument is without merit. Hillside elected to retain and use a machine, which was purportedly so defective and plagued with problems that Hillside demanded and received its money back from the manufacturer. Viking knew that Hillside had modified the

15

machine without the requisite expertise to do so, and that it was using corrosive cleaners which could damage the machine and affect its safe and proper use. Under these circumstances, the potential for personal injuries arising from the continued use of the machine was manifest, and it was the potential for such injuries – not merely the possibility that Hillside would seek reimbursement for minimal additional costs – which provided the primary impetus for Viking's insistence upon blanket protection from future claims. At the very least, there are material questions of fact which remain to be resolved at trial.

## CONCLUSION

Wherefore, the third party plaintiff, Viking Corporation, respectfully request that the motion for summary judgment brought by third party defend ant, Hillside Machine, Inc. be denied.

DEFENDANT and THIRD PARTY PLAINTIFF,
VIKING CORPORATION
By its attorneys

/ s / Robert P. Powers
Robert P. Powers (BBO No. 544691)
T. Dos Urbanski (BBO No. 652465)
MELICK, PORTER & SHEA, L.L.P.
28 State Street
Boston, MA 02109
(617) 523-6200
(617) 523-8130

16