Page 140

```
 1   DATE:       September 16, 2005
 2   TO:         Mr. Gus Enegren      Job #743879
                 c/o Robert P. Powers, Esq.
 3               Melick, Porter & Shea, LLP
                 28 State Street
 4               Boston, Massachusetts  02109
 5   IN RE: Steffen vs. Viking Corporation
 6   CASE NO.:  04-10592-RB
 7           Please take notice that on Friday, the 9th of
     September, 2005, you gave your deposition in the
 8   above-referred matter.  At that time, you did not waive
     signature.  It is now necessary that you sign your
 9   deposition.
             As previously agreed, the transcript will be
10   furnished to you through your counsel.  Please read the
     following instructions carefully:
11           At the end of the transcript you will find an
     errata sheet.  As you read your deposition, any changes
12   or corrections that you wish to make should be noted on
     the errata sheet, citing page and line number of said
13   change.  DO NOT write on the transcript itself.  Once
     you have read the transcript and noted any changes, be
14   sure to sign and date the errata sheet and return these
     pages to me.
15           If you do not read and sign the deposition
     within a reasonable time, the original, which has
16   already been forwarded to the ordering attorney, may be
     filed with the Clerk of the Court.  If you wish to waive
17   your signature, sign your name in the blank at the
     bottom of this letter and return it to us.
18
                         Very truly yours,
19

20           _____

                         Rachel W. Bridge, RMR, CRR
21                       ESQUIRE DEPOSITION SERVICES, INC
                         515 North Flagler Drive
22                       West Palm Beach, Florida  33401
23   I do hereby waive my signature.
24   _____
25   Gus Enegren
```

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS
CASE No.  C.A. NO. 04-10592-RBC

Edward Steffen and
Marsha Steffen,

          Plaintiffs,

-vs-

Viking Corporation,

          Defendant.

_____/

DEPOSITION OF GUS ENEGREN

Friday, September 9, 2005
9:20 - 1:00 P.m.

515 North Flagler Drive
Suite 200-Pavilion
West Palm Beach, Florida 33401

Reported By:
Rachel W. Bridge, RMR, CRR
Notary Public, State of Florida
Esquire Deposition Services
West Palm Beach Office   Job #743879
Phone:  800.330.6952
        561.659.4155

Page 2

1  APPEARANCES:
2  On behalf of the Plaintiffs:
3    WILLIAM J. DOYLE, JR., ESQUIRE
      LEAVIS and REST, PC
4    83 Central Street
      Boston, Massachusetts 02109
5    Phone: 617.742.1700
6
7  On behalf of the Defendants:
8    ROBERT P. POWERS, ESQUIRE
      MELICK, PORTER & SHEA, LLP
9    28 State Street
      Boston, Massachusetts 02109
10   Phone: 617.523.6200
11
      KEVIN FLEMING, ESQUIRE
12   DAVIS, WHITE & SULLIVAN, PC
      One Longfellow Place Suite 3609
13   Boston, Massachusetts 02114
      Phone: 617.720.4060
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1                - - -
              I N D E X
2                - - -
3
4  WITNESS:        DIRECT  CROSS  REDIRECT  RECROSS
5  Gus Enegren
      By Mr. Doyle        4         133
6     By Mr. Fleming           106
      By Mr. Powers            134
7
                 - - -
8          E X H I B I T S
                 - - -
9  NUMBER              PAGE
10  Enegren Exhibit 1      8
11  Enegren Exhibit 2      8
12  Enegren Exhibit 3      13
13  Enegren Exhibit 4      74
14  Enegren Exhibit 5      74
15  Enegren Exhibit 6      74
16  Enegren Exhibit 7      77
17  Enegren Exhibit 8      80
18  Enegren Exhibit 9      85
19  Enegren Exhibit 10     86
20  Enegren Exhibit 11     98
21  Enegren Exhibit 12     99
22  Enegren Exhibit 13     114
23  Enegren Exhibit 14     115
24  Enegren Exhibit 15     117
25

Page 4

1              P R O C E E D I N G S
2                    - - -
3      Deposition taken before Rachel W. Bridge,
4  Certified Realtime Reporter and Notary Public in and for
5  the State of Florida at Large, in the above cause.
6                    - - -
7  Thereupon,
8              (GUS ENEGREN)
9  having been first duly sworn or affirmed, was examined
10  and testified as follows:
11              DIRECT EXAMINATION
12  BY MR. DOYLE:
13      Q.  Sir, my name is William Doyle.  I represent
14  Edward and Marsha Steffen in a case that's currently
15  pending in Massachusetts.  I'm going to be asking you
16  some questions this morning.
17      If at any time you want to take a break for
18  any reason, you want to speak to your counsel for any
19  reason, you just want to stretch your legs, just let me
20  know and we'll do whatever we can to accommodate you.
21  Otherwise, we'll try to get down to business and get you
22  in and out of here as quickly as possible.
23      As you may know, any answers that you give
24  should be oral.  Nods of the head or hand gestures
25  cannot always be accurately recorded.

Page 5

1      I'll try not to interrupt any answer that you
2  give.  If you could wait until the end of the question
3  before you start to give an answer, that way there will
4  be a complete question, a complete answer.  It will be
5  easier for you to read the transcript when you get it.
6  It's always easier for the stenographer to take down
7  what's taking place if only one person is speaking at
8  the same time.
9      Any problems at all, just let somebody know.
10  Otherwise, we'll just try to get down to business, okay?
11      A.  Very good.  Thank you.
12      MR. DOYLE:  Before we went on the record, it
13  was agreed that Mr. Enegren would have four months
14  to review the deposition transcript, waive any
15  requirement for the notary public and sign under
16  the pains and penalties of perjury.
17      Counsel also agreed to the usual stipulations.
18  All objections except as to form and motions to
19  strike will be reserved until the time of trial.
20      At the present time, approximately 20 minutes
21  after 9:00, 25 minutes after 9:00, Kevin Fleming is
22  not here.  He has called his office in Boston
23  advising them that he's here in Florida.  I know
24  that because I was on the plane with him yesterday.
25      Apparently he's had problems with a cab

2 (Pages 2 to 5)

Page 6

1     arrangement from his hotel, which I believe is in
2     the close proximity, but as of 9:25, because of
3     Mr. Enegren's schedule and commitments and after
4     waiting some 20-plus minutes, counsel believed that
5     it was appropriate to start the deposition.
6         Anything else, Mr. Powers?
7         MR. POWERS: I'm all set. Let's go.
8  BY MR. DOYLE:
9     Q.  Okay. Could you please tell us your name,
10 sir?
11    A.  My name is Samuel G. Enegren.
12    Q.  And I apologize for mispronouncing your name
13 earlier today, and I'll try not to do it again.
14    A.  No problem. Please feel free to call me Gus.
15    Q.  And do you live in Massachusetts?
16    A.  No, sir.
17    Q.  Have you ever lived in Massachusetts?
18    A.  No, sir.
19    Q.  Do you have any plans to live in
20 Massachusetts?
21    A.  No.
22        (Thereupon, Mr. Fleming entered the room.)
23        MR. DOYLE: Why don't we go off the record for
24 a second.
25        (Discussion held off the record.)

Page 7

1         MR. DOYLE: Back on the record.
2  BY MR. DOYLE:
3     Q.  At the present time are you employed by
4  anybody?
5     A.  Yes.
6     Q.  And who are you employed by?
7     A.  I am employed by Capital Alliance Financial
8  Services.
9     Q.  And what's your position with that company?
10    A.  President and CEO.
11    Q.  Prior to working or being affiliated with
12 Capital Alliance, did you work for anyone else?
13    A.  I was self-employed as a managing director at
14 Chapman Associates, which is a mergers and acquisitions
15 firm.
16    Q.  And prior to being associated with Chapman,
17 did you work for somebody?
18    A.  Prior to Chapman, I owned Viking Corporation
19 and sold that in approximately, last month of 1999, I
20 believe.
21    Q.  I'm going to show you a copy of a document
22 that I got off the internet from Sunbelt Business
23 Advisors Network, LLC. I just ask if you can look at
24 that at least in a general sense.
25        Was that something that was put out while you

Page 8

1  were associated with Chapman?
2     A.  There was a very brief lull between Chapman
3  and Capital Alliance. I bought a Sunbelt franchise in
4  Las Vegas, got set up, but we never engaged in any
5  business activity. Apparently it's still out there on
6  the web.
7     Q.  Does this give your general background as far
8  as your business experiences, your professional program?
9     A.  Yes.
10    Q.  Is it generally accurate?
11    A.  Yes.
12        MR. DOYLE: Why don't we mark that as Exhibit
13 2. I had marked as Exhibit 1 -- we will just stay
14 on the record for a second. I've had marked as
15 Exhibit 1 just before we started a copy of the
16 notice for this deposition.
17        (Enegren Exhibit Nos. 1 and 2 were marked for
18 identification.)
19 BY MR. DOYLE:
20    Q.  Is there also a company by your name
21 incorporated somewhere around Kansas or Missouri?
22    A.  I am a subchapter S corporation out of
23 Missouri, Kansas City, Missouri, yes.
24    Q.  Maybe a family member?
25    A.  It's Samuel G. Enegren, Incorporated, and I

Page 9

1  use a registered agent I think through an attorney.
2     Q.  What's that business do, if anything?
3     A.  Nothing. It's a sub S. I take my income
4  there for tax reasons.
5     Q.  Through that state?
6     A.  Yes.
7     Q.  For tax reasons?
8     A.  You know, you'd have to talk to my CPA. I
9  don't know exactly how we do it, but it's something my
10 CPA set up for me when I lived in Kansas City.
11    Q.  But that business is, it doesn't make
12 anything?
13    A.  No.
14    Q.  It doesn't perform any services per se?
15    A.  No office, no store front, no inventory, no
16 warehouse, no employees other than myself.
17    Q.  All right. Did you start Viking Corporation?
18    A.  Yes, in February of 1978.
19    Q.  And did you have any background in the
20 business, that business prior to starting the company?
21    A.  No.
22    Q.  How did you come or why did you start a
23 business in that area?
24    A.  My father had started and owned a similar
25 business. I don't know the exact dates, but in the

3 (Pages 6 to 9)

Page 10

1  1950s. Owned that for a number of years, sold it,
2  retired.
3          1978 I came along and said, "Dad, I want to
4  start my own thing."
5          And so he delivered to me patents, designs,
6  drawings, and said, "Here, let's go together. I'll help
7  you get it started."
8          And that was the birth of Viking Corporation.
9      Q.  Are you originally from the Kansas area?
10     A.  I was born and raised in Wichita, Kansas.
11     Q.  Did you go to school in and around Wichita?
12     A.  Yes, I went to high school at Wichita
13  Collegiate School and went to Wichita State University.
14     Q.  Did Viking have a website while you were
15  there?
16     A.  Honestly, I don't recall.  We were
17  contemplating it, and I don't recall if we actually got
18  it up or if that was done by the folks after we sold the
19  business.  I think it may have come along after.
20     Q.  Let me just ask you some questions about the
21  background of Viking based on information that I was
22  able to get off the internet in January of '04.
23          Viking was founded approximately 1979 or so?
24     A.  February of 1978.
25     Q.  It was founded to address issues or to do

Page 11

1  business involving blast cleaning and washing needs of
2  the automotive rebuilding industry?
3      A.  Correct.
4      Q.  Since the company was started in February of
5  1978, Viking developed many other products to help with
6  surface cleaning and preparation needs?
7      A.  Correct.
8      Q.  Viking while you were associated with the
9  company was known for quality, heavy duty equipment, and
10  that is why Viking customers stayed Viking customers?
11     A.  Correct.
12     Q.  Initially when the company was started in
13  February of 1978, was there one product or a limited
14  number of products that were manufactured?
15     A.  There were three primary products that had
16  several variations, the first being airless shot
17  blasting machines in one variation or another; the
18  second being hot water spray wash systems to remove
19  grease as a pretreatment before blasting; and then we
20  also made a vibratory degreasing machine that was a
21  similar product used in a different application to
22  remove grease.
23     Q.  Similar to the --
24     A.  Hot water spray.
25     Q.  Do one of those three types of equipment, is

Page 12

1  that type that we're involved with in this case as far
2  as a degreaser?
3      A.  Yes.  The hot water spray degreaser was
4  purchased by Hillside Machine.
5      Q.  Starting roughly in February of 1978 when the
6  corporation was started, Viking would build, when orders
7  were placed, degreasing machines with spray washing
8  degreasing machines?
9      A.  Yes.
10     Q.  Were they different models of spray washing,
11  degreasing machines that were built starting with the
12  outset, the beginning of the company in roughly February
13  of 1978?
14     A.  Yes.  There were basically three types.
15     Q.  What were the three types that were built
16  starting at the beginning of the company?
17     A.  The one is representative of the machine that
18  was sold to Hillside Machine, being a rotating table
19  wash, which would rotate the part in a vertical axis.
20          The second model would be a machine that
21  tumbles parts around a horizontal axis.
22          And then the third would be a machine that
23  passes parts through in some configuration, either on a
24  conveyor belt or a hanging conveyor mechanism of some
25  kind.

Page 13

1      Q.  Earlier this morning Mr. Powers provided me
2  with a color copy of a photograph.
3          Is this a spray wash degreasing machine
4  generically similar to the one sold by Viking to
5  Hillside Automotive?
6      A.  Yes, sir.
7          MR. DOYLE:  Why don't we have that marked as
8  Exhibit 3.
9          (Engren Exhibit No. 3 was marked for
10  identification.)
11  BY MR. DOYLE:
12     Q.  The spray wash degreasing machine that we've
13  had marked as Exhibit 3, were there different options or
14  models of this machine that were built by the company
15  during the initial years of the company, say the late
16  seventies, early eighties?
17     A.  Yes, sir.
18     Q.  And could you tell me about the options and/or
19  models of the spray washing degreasing machine that were
20  built during say the first roughly five or seven years
21  of the company?
22     A.  The models would not have changed over the
23  life of the company, at least while I was there, first
24  off.
25          Secondly, within the scope of the rotating

Page 14

1  table machine that was purchased by Hillside, that
2  machine would have been made in various diameters of
3  capacity and in various heights on the same basic
4  framework. That's the first variation or two variations
5  that come to mind.
6      Now with regard to options, the two primary
7  options would be an electric heating mechanism or a gas
8  heating mechanism.
9      There were numerous other smaller options, but
10  they were more nuances than fundamental changes.
11      Q. Just so I can back up for a second, if I
12  understand what you just said, the major options that
13  you just talked about would be the distinction between
14  gas and electric?
15      A. Yes, sir.
16      Q. And size?
17      A. Yes, sir.
18      Q. And was there a third one?
19      A. Not really.
20      Q. All right. While you were associated with the
21  company, with Viking Corporation, did it have a business
22  presence at Waynesboro, Pennsylvania?
23      A. No, sir.
24      Q. Since you left the company, do you know if
25  Viking Corporation has set up a business presence, a

Page 15

1  factory, a sales office, someplace to service equipment
2  in Waynesboro, Pennsylvania?
3      A. I have no knowledge of that.
4      Q. I'm going to show you a series of photographs
5  that were marked as Exhibit 1, 2, 3, 4, and 5 at a
6  deposition of a Mr. Gorman on September 1, 2005. And
7  recognizing that the photographer was not as skilled as
8  Viking Corporation's photographer, could you take a look
9  at those photographs and then I'll ask you a couple of
10  questions.
11      A. Yes, sir.
12      Q. Does that appear to be a Viking Corporation
13  spray wash degreasing machine, at least in a general
14  sense?
15      A. Yes.
16      Q. Does that appear to be the type, size, model
17  of machine that was sold by Viking Corporation to
18  Hillside in approximately 1992, at least in a general
19  sense?
20      A. In a general sense, it appears to be.
21      Q. All right. The condition of the machine as
22  depicted in those five photographs would not have been
23  the condition of the machine as it left the Viking
24  Corporation plant sometime in late 1992, correct?
25      A. Correct.

Page 16

1      Q. All right. While you were affiliated with the
2  company, did you have hands-on involvement as far as
3  sales, marketing, production of the various products?
4      A. Yes, I did.
5      Q. Were you aware of what was taking place say on
6  the immediate factory floor when you were affiliated
7  with the company?
8      A. Yes.
9      Q. Would you consider yourself intimately
10  familiar with this type of spray wash degreasing machine
11  that the company made?
12      A. Yes.
13      Q. All right. In looking at those five
14  photographs that were marked as an exhibit at
15  Mr. Gorman's deposition on September 1, if you're able,
16  can you point out anything that does not appear to be
17  original equipment to this Viking spray wash degreasing
18  machine as it would have left the plant in Wichita,
19  Kansas?
20      A. Starting with Exhibit 1, the door latch is
21  different. The timer is different. There's a water
22  temperature gauge I don't recognize.
23      Q. All right. Can I just stop you there then for
24  a second?
25      A. Yes, sir.

Page 17

1      Q. The door latch, could you just point to me the
2  latch that you're referring to?
3      A. It's a vertical bar on the left-hand side of
4  the door and a handle apparently used to open the door.
5      Q. Appears to be some sort of a white metal of
6  some sort?
7      A. Yes.
8      Q. Okay. If you would continue on.
9      A. On Exhibit 2, same comment regarding the door.
10  The vertical pipe on the exhaust of the gas was not
11  provided by Viking, but was provided by the installation
12  company that installed the gas, which is correct,
13  legally correct, I'm sorry.
14      Q. Just so the record is clear, in looking at
15  that photograph, you're making reference to the
16  cylindrical white metal, what appears to be a pipe
17  towards the top of the photograph on the right side?
18      A. Correct.
19      Q. Okay. That appears to be coming out of a
20  rectangular blue painted stack?
21      A. Yes, correct.
22      Q. Anything else?
23      A. On that one, no.
24      With regard to Exhibit 3, there appears to be
25  a padlock hasp that's been added to the door. That's

5 (Pages 14 to 17)

Page 18

1  the only modification that appears to be present.
2      Q.  If I could just ask you to look at that
3  picture for a second, the area that's depicted in this
4  photograph, Exhibit 3 from Mr. Gorman's deposition, it's
5  been referred to some of the time in this case as a
6  chamber.
7          Did the company have a name to reference that
8  section of the machine?
9      A.  Just a waste combustion chamber.
10     Q.  Was it also known as an evaporator?
11     A.  Yes.
12     Q.  For purposes of today's deposition, what term
13 or what phrase would be easiest for you to reference
14 this area of the machine?
15     A.  Let's call it an evaporator.
16     Q.  Fine.  If you could look at the other
17 photographs, 4 and 5, just to see, recognizing you may
18 not have seen these pictures recently, or you may have,
19 but do you notice anything else that doesn't appear to
20 be original equipment to the machine?
21     A.  For the record, I've not seen these photos
22 before.  Exhibit 4 doesn't show anything that I have not
23 commented on already.
24          Exhibit 5, I'm not sure what I'm seeing on
25 Exhibit 5, honestly.  It appears there are not one, but

Page 19

1  two temperature gauges on Exhibit 5.  I suspect that one
2  of the two has been added or modified.  And I'm not sure
3  if this is the original burner or not.  I suspect it's
4  not.
5      Q.  Does that appear at least from your cursory
6  observation to be a gas burner?
7      A.  Yes, sir.
8      Q.  All right.  And behind the gas burner that's
9  shown in Exhibit 5, would that be a bucket that would go
10 into the evaporator chamber?
11     A.  Yes, sir.
12     Q.  All right.  And would the waste product that's
13 generated from the operation of the spray wash
14 degreasing machine come out and go into that bucket
15 during the --
16     A.  Yes, sir.
17     Q.  I just want to back up and just on a sort of
18 preliminary matter, you're not a lawyer, are you?
19     A.  No, I'm not.
20     Q.  Recognizing that you're not a lawyer, do you
21 at least have a general sense that any conversations
22 with legal counsel, with attorneys associated with you
23 or with Viking Corporation are protected and that you
24 don't have to disclose any conversations or the
25 substance of any of those conversations?  Because I

Page 20

1  don't want to get into it.
2          When you told me you hadn't seen the
3  photographs, we sort of started to get close to an area
4  of what you've done or may have done with counsel, okay?
5          So I just, I say that just to sort of indicate
6  that those conversations at least I believe are
7  protected and privileged and are not subject to
8  disclosure, all right?
9      A.  Thank you.
10     Q.  In 1992, in the years just prior to '92, so
11 '91, '92, did Viking Corporation have an in-house sales
12 force that would be involved in selling their products
13 in the marketplace?
14     A.  Yes.
15     Q.  And who would have comprised the in-house
16 sales force?
17     A.  I would have been involved in that.  We also
18 had Chris Winslow and I believe perhaps Martin Freund,
19 maybe one other person in support, parts sales.
20     Q.  In reviewing certain documents, I've seen a
21 first name of Howard.
22     A.  Yes.
23     Q.  Was Howard involved in sales?
24     A.  Not so much in sales.  He was our plant
25 manager and production manager.

Page 21

1      Q.  All right.  And did the company have an
2  outside sales force who would be involved in selling its
3  product?
4      A.  We had a very, very limited number of outside
5  sales reps.
6      Q.  All right.  And just before we go on, before I
7  forget, Freund is pronounced like the word friend, but I
8  believe the spelling is F-r-e-u-n-d.
9      A.  Correct.
10     Q.  And when you mentioned that you had a limited
11 outside sales force, what does that mean?
12     A.  We were contacted occasionally by
13 manufacturers' representatives that wanted to sell 24
14 product, and would make an arrangement to allow them to
15 do that.
16     Q.  They would earn a commission based on the
17 sale?
18     A.  Correct.
19     Q.  Did the company have any formal agreements
20 that were in existence prior to September of 1992 for an
21 ongoing relationship with any outside sales
22 representatives?
23     A.  I don't recall if we had a formal written
24 agreement or if it was a verbal agreement.
25     Q.  All right.  Were there any verbal agreements,

6 (Pages 18 to 21)

Page 22

1  a general understanding with any of these outside sales
2  reps?
3      A. I'm sure we had some in place. I don't recall
4  exactly who or when.
5      Q. In general, how would that work? Not being
6  familiar, not being in this business or in business in
7  general.
8      A. Typically a manufacturer's rep would ask for
9  copies of catalogs, would visit with a client. The
10 client would express interest. He would submit a
11 request verbally or in writing for a quotation. A
12 quotation would be generated.
13     The sales agent would receive an order, submit
14 it to us. And we would manufacture the machine and
15 deliver it to the client. When the client paid us, we
16 would pay a commission to the sales agent.
17     Q. Recognizing the company may have had that type
18 of general arrangement plus an in-house sales force,
19 what, if anything, did the company do prior to September
20 of 1992 as far as marketing its product line, including
21 the spray wash degreasing machines?
22     A. We attended trade shows. We did direct mail.
23 We did some telemarketing. We had a great deal of word
24 of mouth sales. We did substantial amount of magazine
25 advertising.

Page 23

1      Q. Let me show you one document that was marked
2  as Exhibit 3 at Mr. Renzella's deposition, and that
3  deposition was taken September 15, 2004.
4          Recognizing that it's a, the quality of the
5  document is poor, do you at least recognize in a general
6  sense what's depicted on that page?
7      A. In a general sense, yes, I do.
8      Q. What is it?
9      A. It appears to be a sales piece for selling
10 washing equipment, spray washing equipment.
11     Q. And is it something that Viking Corporation
12 would have used at some point in time while you were
13 associated with the company?
14     A. It would be similar, but I don't recognize the
15 document.
16     Q. So is it fair to say you don't recognize the
17 format of the document?
18     A. I don't think we, I don't think Viking
19 produced this document.
20     Q. Do you know who, if anyone, produced that
21 document or where it came from?
22     A. Not off the top of my head, no, I don't recall
23 it.
24     Q. Okay. Can you tell whether or not this
25 document is referring to equipment or referring to

Page 24

1  Viking Corporation?
2          And I'm just going to draw your attention to
3  near the bottom of the page there is something about
4  standard equipment, and it talks about different types
5  of equipment.
6      A. I don't see any reference at all to Viking
7  here, but yes, it references gas or electric, complete
8  insulation, a cylinder head rack and a parts basket.
9  All of those would be used in Viking equipment and were
10 part of what was sold to Hillside Machine, but I don't
11 recognize the document itself.
12     Q. But that equipment that you just referred to
13 as far as baskets or racks, that would also be part of
14 any competitor's equipment that made similar equipment?
15     A. Yes, absolutely.
16     Q. All right. And I'll get that back from you.
17         Who were Viking's competitors in the
18 marketplace back in the 1990s, from 1990 up until you
19 sold the company, I think the last month of '98?
20     A. It's been a long time. Peterson Machine Tool
21 comes to mind as one competitor. Another would be
22 Winona Van Norman.
23     Q. Do you how to spell that?
24     A. W-i-n-o-n-a, second word, V-a-n, third word,
25 N-o-r-m-a-n.

Page 25

1      Q. Earlier when you were talking about your
2  father helping you get started in the business in 1978,
3  I think there was some reference to plans and also
4  patents.
5          Do you hold any patents in your own name that
6  would have been used in the spray wash degreasing
7  machine sold to Hillside Automotive?
8      A. No.
9      Q. Did your father hold or does your father or
10 did your father hold any patents for the spray wash
11 degreasing machine that was sold to Viking?
12     A. No.
13     Q. Do you have approximately three patents in
14 your name?
15     A. Did have, yes.
16     Q. What happened to the patents?
17     A. I believe those were sold to Viking at the
18 time I sold the company to its present owners.
19     Q. And do you remember at least in a general
20 sense what those patents involved?
21     A. The first was a patent dating back I believe
22 to 1974 for an airless shot blasting machine.
23         The second was a patent related to a wheel
24 cleaning system which did incorporate a spray wash
25 machine with it.

Page 26

1 And the third, I don't recall. Probably was
2 related to a machine -- I know it was -- that was used
3 to clean high pressure gas cylinders.
4 Q. That one would not have been involved in the
5 spray wash degreasing machine sold to Hillside?
6 A. Correct.
7 Q. Getting back to the outside salespeople that
8 would have occasionally or would have done business with
9 Viking at certain periods of time, do you remember a
10 gentleman by the name of John Zanetti?
11 A. I remember the name.
12 Q. All right. Do you know if Viking had any
13 business relationship or business dealings with John
14 Zanetti prior to the sale of the spray degreaser to
15 Hillside in approximately 1992?
16 A. I don't recall.
17 Q. Was John Zanetti an outside salesperson who
18 would have worked on a commission basis if and when he
19 made a sale?
20 A. Yes, sir.
21 Q. Okay. Let me show you a document that was
22 marked as Exhibit 2 at Mr. Renzella's deposition, and I
23 believe it's entitled Sales Order.
24 Have you seen this document before?
25 A. Perhaps, but I don't recall it.

Page 27

1 Q. At the present time do you have any memory of
2 seeing that document before?
3 A. No.
4 Q. All right. Does the document appear to be,
5 based on its face, a sales order with Hillside
6 Automotive buying from Viking Corporation some sort of
7 piece of equipment?
8 A. Yes.
9 Q. Recognizing that the quality is not great,
10 that it's difficult to read some of the language, I'm
11 going to ask you to try to read over that form and then
12 I'll ask you some questions.
13 Have you had a chance to read it?
14 A. Yes.
15 Q. Can you read the whole thing?
16 A. Most of it.
17 Q. Okay. Is that a sales order form for a spray
18 wash degreasing machine?
19 A. Yes.
20 Q. All right. And in the order area of the form
21 there appears to be 36-by-72. Would that be the
22 dimensions of the machine?
23 A. Diameter by height of the inside capacity of
24 the machine.
25 Q. The company back in 1992 could make this type

Page 28

1 of machine with different diameters, different heights
2 to meet the customer's order requirement?
3 A. Correct.
4 Q. This customer is apparently ordering one that
5 he wants 36 inches wide by 72 inches high?
6 A. Correct.
7 Q. All right. There's a reference I believe that
8 talks about with gas fired.
9 A. Yes.
10 Q. And does that indicate that the customer's
11 ordering a gas burner instead of the electric option or
12 the electric heater that could also have been built with
13 that machine?
14 A. Yes, sir.
15 Q. So that's one of the two options that we
16 talked about earlier, gas or electric?
17 A. Correct.
18 Q. All right. And this customer for whatever
19 reason wants a gas heater?
20 A. Yes, sir.
21 Q. All right. And would the gas heater in a
22 general sense heat up the water, raise the temperature
23 of the water that's going to be used in the system,
24 along with some cleansing agent to degrease the items
25 that are going in?

Page 29

1 A. Yes.
2 Q. Is the gas burner involved either directly or
3 indirectly with the chamber, the evacuator?
4 A. Evaporator.
5 Q. The evaporator chamber that we talked about
6 earlier?
7 A. Yes, it is.
8 Q. How is the gas burner involved either directly
9 or indirectly with the evaporator chamber?
10 A. The exhaust from the natural gas burner passes
11 through the evaporation chamber prior to entering the
12 vertical exhaust that takes the exhaust out of the
13 building.
14 Q. So the exhaust fumes generated by the gas
15 burner would be hot?
16 A. Yes.
17 Q. Just by the very action of the combustion of
18 the gas fuel?
19 A. Correct.
20 Q. And it passes through that chamber, raising
21 the temperature in the chamber?
22 A. Correct.
23 Q. All right. And as a result of the temperature
24 in the chamber being raised, it causes evaporation of
25 liquid over time that might be in the part?

Page 30

1    A. Correct.
2    Q. By necessity, the gas fumes have to be vented
3  as part of the process, correct?
4    A. Correct.
5    Q. All right. The burning of the gas would
6  result in some sort of fume, carbon monoxide that you
7  want to get away from the work force to the outside?
8    A. Yes.
9    Q. All right.
10   A. I don't know whether it's carbon monoxide or
11 not, but you don't want fumes in the building for
12 several reasons.
13   Q. So that's the reason that you'll have a
14 chimney or a stack similar to the blue rectangular
15 column shown in Exhibit 2 from Mr. Gorman's deposition?
16   A. Yes, sir.
17   Q. And then the installer or the purchaser makes
18 the final arrangements on how to continue venting the
19 fumes, and in this case you end up seeing the
20 cylindrical white metal pipe that's also shown in at
21 least one of the photos from Mr. Gorman's deposition?
22   A. Correct.
23   Q. And you would, based on your experience,
24 expect that pipe to go somewhere away from the machine,
25 possible outside, but at least away from the operation

Page 31

1  of the machine?
2    A. State law mandates the external exhaust of the
3  gases, as well as the manner of its installation and the
4  composition of the pipe that's used to exhaust the flu
5  gas.
6    Q. If we get back to the order form, the sales
7  order form that was Exhibit 2 to Mr. Renzella's
8  deposition, there is a reference in the body of the
9  order form to a safety switch on door, I believe.
10   A. Yes.
11   Q. What was that?
12   A. That's a contact switch mounted to the primary
13 cabinet door that turns off the spray pump in the event
14 the door is opened during operation, opened during
15 operation.
16   Q. We're talking strictly the washing section of
17 this spray washer?
18   A. Correct.
19   Q. All right. So if you break the seal between
20 the door and the jam or the frame, it will shut down,
21 preventing the hot fluid from escaping from the chamber?
22   A. Correct.
23   Q. As the company was building this model
24 machine, did it always install a safety switch on the
25 door?

Page 32

1    A. To my recollection, yes.
2    Q. Why?
3    A. It was a primary safety issue to keep the
4  operator safe.
5    Q. Because he didn't want the operator being
6  sprayed with a hot fluid that contained some sort of a
7  cleansing agent?
8    A. Correct.
9    Q. Was there a similar type safety switch on the
10 evaporator chamber?
11   A. I don't recall that we ever installed one on
12 the evaporator chamber.
13   Q. All right. The evaporator chamber did not
14 have fluids circulating in the chamber, correct?
15   A. Correct.
16   Q. It was just fluid that would be in a part or a
17 container of some sort?
18   A. Container, yes.
19   Q. The safety switch on the washing chamber, was
20 it an electrical type contact or magnetic type contact?
21   A. It was a physical contact switch that was an
22 electrical connection.
23   Q. So that when the door is closed, a button
24 might be pushed in?
25   A. Exactly.

Page 33

1    Q. And you open the door, the button pops out,
2  breaking the contact, breaking the circuit?
3    A. Exactly.
4    Q. All right. And when you break the circuit, it
5  shuts down the operation?
6    A. Exactly.
7    Q. All right. And was that something feasible
8  for the company to do at the installation of the safety
9  switch on the washing chamber door during the roughly 20
10 years or so that you were associated with Viking
11 Corporation?
12   A. Yes.
13   Q. Did the company ever install a safety type
14 switch on the evaporator chamber door at any time that
15 you were associated with the company?
16   A. No.
17   Q. Was the safety switch on the washing chamber
18 door an option that the purchaser could either buy or
19 not buy?
20   A. I don't recall that it was an option. I think
21 it was a standard feature, but I don't recall, honestly.
22   Q. To the best of your memory, recognizing it's
23 been roughly six years or so since you were associated
24 with it or you were president of the corporation, and
25 time has a way of dulling the memory, I guess, to the

Page 34

1 best of your memory, that safety switch on the washing
2 chamber door was standard equipment that would have been
3 installed on any of the washing, spray wash degreasing
4 machines?
5 A. I believe it was.
6 Q. Did the company also, as part of that order,
7 Exhibit 2 from Mr. Renzella's, get an order to build the
8 spray washer with a float with double water level safety
9 switch?
10 A. Yes.
11 Q. In general, what is a float with a double
12 water level safety switch?
13 A. Because the machine is cleaned using hot
14 water, the water approaches boiling, if not boiling. A
15 lot of the water will evaporate off.
16 And in order to keep the machine from emptying
17 itself through evaporation say over a long weekend, for
18 example, if the operator or management fails to turn the
19 power off during a weekend, it's got a connection to an
20 outside water source. As the water drops, the water
21 level drops, it opens a valve that refills the machine
22 automatically.
23 Q. So there is some sort of low water level
24 switch?
25 A. Correct.

Page 35

1 Q. That allows it to refill if it's unattended or
2 the operator somehow is not aware that the level is
3 dropping down.
4 A. Correct.
5 Q. Was there also a high level switch that was
6 built and installed on the machine?
7 A. I believe there was. I think that's what's
8 referred to when it says a -- let me find the line -- a
9 double water level. There is a high sensor and a low
10 sensor.
11 Q. And you would have the high sensor so that it
12 doesn't overfill and you've got water escaping from the
13 chamber?
14 A. Correct.
15 Q. All right. Was the high level water level
16 safety switch and the low level water level safety
17 switch standard equipment on the machine?
18 A. I believe it was at the time, yes.
19 Q. And at the time you're referring to roughly
20 19 --
21 A. At the time of the sale to Hillside Machine.
22 Q. I'm sorry to interrupt you.
23 A. I apologize.
24 Q. But it was standard equipment, those water
25 level safety switches, when this machine was sold to

Page 36

1 Hillside back approximately September of 1992?
2 A. I believe that's correct.
3 Q. All right. This order, the sales order form,
4 Exhibit 2 from Mr. Renzella's deposition, also contained
5 a request for a sludge trap evaporator and two sludge
6 containers.
7 A. Yes.
8 Q. What's a sludge trap?
9 A. Essentially it's a method to clean the
10 machine.
11 Q. Is at least a section of the sludge trap shown
12 in Exhibit 5 from Mr. Gorman's deposition?
13 A. Yes.
14 Q. All right. Would what's shown as Exhibit 5 in
15 Mr. Gorman's deposition be at the back side away from
16 that washing chamber door that we were looking at
17 earlier in one of the photographs?
18 A. Yes.
19 Q. In essence, the sludge that is generated
20 during the wash process would come out into that area,
21 sort of that triangular-shaped area, fall into the
22 container, the bucket, and then if the owner/operator
23 wants, he can take the chamber, put it in the evaporator
24 chamber to evaporate down?
25 A. Generally, yes.

Page 37

1 Q. At least in a general layman's sense, I've
2 described the process that would take place when
3 operating this spray degreasing machine that has a
4 sludge trap with an evaporator?
5 A. Correct. The emptying of the sludge trap is
6 done manually with a hoe for all purposes, but yes, that
7 is how it operates.
8 Q. So would the operator have to pick up this
9 rectangular cover that has a handle that's shown in
10 Exhibit 5 from Mr. Gorman's deposition and use a hoe
11 type device in order to pull the sludge out into the
12 drop-down chute that then goes into the container?
13 A. On this model, yes.
14 Q. Were there any other models made by the
15 company during the 20 or so years you were associated
16 with the company that had a different sludge trap or
17 evaporation system?
18 A. Yes.
19 Q. Could you describe for me those different
20 sludge trap or evaporation systems?
21 A. They were all fundamentally the same. The
22 difference would have been related to the method of
23 cleaning the machine. Some of the machines had an
24 automatic drag link that were self-purging, but they
25 were fundamentally the same machine.

Page 38

1   Q. So there was a mechanical type operation to
2   get the sludge out of the machine towards the container?
3   A. Yes, sir.
4   Q. But in this, in the machine sold to Hillside,
5   it was a manual use, something like a hoe?
6   A. Correct.
7   Q. To pull it out?
8   A. Correct.
9   Q. Were there any different type or style or
10  model evaporation chambers made on any of the equipment
11  manufactured by Viking Corporation during the 20 years
12  you were associated with the company?
13  A. No.
14  Q. So on any type of machine that the company
15  made during 1978 until approximately 1998, they would
16  all have that same chamber with the exhaust, where the
17  exhaust fumes would pass through it, raising the
18  temperature that would cause the sludge to condense
19  down?
20  A. No. Some had no evaporation chamber.
21  Q. The evaporation chamber was an extra cost
22  purchase option that the buyer could request?
23  A. Yes. I believe so. I don't recall whether it
24  was an option or we just simply made it available at
25  some x point.

Page 40

1   that accumulated in these machines. And they wanted to
2   see if they couldn't just evaporate and reduce
3   volumetrically what they had to dispose of.
4       And so we designed an evaporation chamber at
5   their request into the machine and began selling it on
6   an ongoing basis.
7   Q. Prior to Viking Corporation building machines
8   with evaporation chambers, do you have a memory of any
9   of Viking Corporation's competitors or other companies
10  in the similar business of building washers and
11  degreasers for commercial equipment, automotive
12  equipment, having evaporation chambers for the reduction
13  of waste products?
14  A. I don't recall that.
15  Q. After Viking Corporation started to build
16  equipment with evaporation chambers in the mid 1980s,
17  did any competitors start to build similar type products
18  with evaporation chambers?
19  A. I would have to surmise, because I don't have
20  recollection of it.
21  Q. You'd have to surmise what?
22  A. I assume two or three of our competitors,
23  primarily the two located in Wichita, followed our lead
24  on that and incorporated the design into their machines,
25  but I don't recall.

Page 39

1   Q. Okay. At some point in time did the company
2   start making degreasing machines or equipment with
3   evaporation chambers?
4   A. Yes.
5   Q. At the beginning when you first set up the
6   company in 1978, would equipment be sold with
7   evaporation chambers?
8   A. No.
9   Q. At what point in time did the company start
10  installing evaporation chambers on its equipment?
11  A. You know, I don't recall the exact date. I
12  would guess mid eighties, but I don't recall.
13  Q. All right. Recognizing that you don't, you
14  may not have any documents with you and you don't
15  remember the exact date, was it approximately the mid
16  1980s that Viking Corporation started selling equipment
17  with evaporation chambers similar to the one depicted in
18  Mr. Gorman's deposition?
19  A. I would say yes.
20  Q. All right. How did the company come to
21  design, manufacture, install evaporation chambers on its
22  equipment?
23  A. My recollection is that was a request we had
24  from one of our clients that was having a great deal of
25  expense and difficulty related to disposing of the waste

Page 41

1   Q. Why would you surmise that the two competitors
2   in Wichita would start to do it?
3   A. It was a regular practice that when we
4   incorporated a new feature, they followed with a
5   matching or similar feature.
6   Q. Or vice versa?
7   A. Rarely did we follow their lead.
8   Q. And who were the two companies in Wichita?
9   A. The first company is LS Industries,
10  Incorporated.
11      The other one is a company called ARE
12  Industries, incorporated.
13  Q. LS is capital L, capital S?
14  A. Yes, sir.
15  Q. Are they still in business at the present
16  time?
17  A. To my knowledge, they are.
18  Q. And the other company, ARE, I believe, are
19  they also in business, as far as you know?
20  A. Yes.
21  Q. And at least when you were in the business,
22  associated with Viking, were those two companies, LS and
23  ARE, building commercial washing equipment to clean
24  automotive or commercial equipment?
25  A. Yes.

Page 42

1   Q. Was there a design process at Viking for
2 designing the evaporator chamber?
3   A. I would have to say no, with the explanation
4 that it was done through reverse engineering. That is,
5 we had a client that said build a big box in the exhaust
6 tube that I can put waste product in to reduce it
7 volumetrically.
8   Q. Was there any type of analysis done at Viking
9 to determine the feasibility of doing that?
10   A. We did not do an engineering analysis, no.
11   Q. Was there any type of analysis done, a profit
12 and loss analysis, a marketing analysis, any type of
13 analysis done regarding this feature at any point in
14 time that you're aware of?
15   A. Chris and I discussed it with clients, other
16 clients that had a need for this type equipment.
17 Virtually all of the clients found it very appealing and
18 requested it.
19   Q. And Chris would be Chris Winslow?
20   A. Yes, sir.
21   Q. And was the feedback from the clients the fact
22 that waste disposal cost for sludge material that would
23 be generated during the washing process was a
24 significant cost of doing business for customers of
25 Viking and that anything that could be done to reduce

Page 43

1 the waste disposal cost would be attractive to the
2 customers?
3   A. Yes, sir.
4   Q. All right. Were you aware at any point in
5 time that the cost of disposing of liquid waste was
6 higher than the cost of disposing of solid waste?
7   A. No.
8   Q. All right. Do you at the present time know
9 that it's cheaper to dispose of solid versus liquid
10 waste?
11   A. No.
12   Q. Do you remember who the customer was that came
13 up with the request to have some sort of chamber,
14 evaporator chamber built?
15   A. You know, I can barely remember breakfast. I
16 don't remember which client requested that.
17   Q. How was breakfast?
18   A. It was very good, thank you. What I remember
19 of it was excellent.
20   Q. All right. Just so it's clear, we had
21 breakfast in the same location, but I got up and left.
22     MR. POWERS: Hopefully not because of the
23 food.
24     MR. DOYLE: Oh, no, no, the food was
25 excellent.

Page 44

1 BY MR. DOYLE:
2   Q. But back to business. Was the evaporator
3 chamber, the basic design or the process changed at all
4 from roughly the mid 1980s when it was first
5 incorporated into the Viking product line to when you
6 left the company in approximately the last month of '98?
7   A. No.
8   Q. And were there any options that were available
9 to be installed or used as part of that evaporation
10 process at any point in time?
11   A. No.
12   Q. Would the size of the chamber vary, the
13 evaporation chamber vary depending on the size of the
14 machine?
15   A. No.
16   Q. It was always the same basic size as shown in
17 one of those photographs?
18   A. Yes.
19   Q. Was the type of handle or latch or locking
20 mechanism for the evaporation chamber always the same
21 basic piece of equipment?
22   A. I don't recall, frankly.
23   Q. Do you know how, if any, way that the
24 evaporation chamber was closed or locked or secured when
25 it was installed on a piece of Viking equipment?

Page 45

1   A. There were two methods to close that door.
2 And I don't recall which one went out on the Hillside
3 Machine or when the variations took place.
4     We had a tension lever latch, and we also had
5 a wing nut that had to be bolted shut. I'm not sure
6 which was used when.
7   Q. All right. So the wing nut, you'd have to
8 close the door and physically operate the wing nut in
9 order to secure the door in a closed position?
10   A. Correct.
11   Q. And the tension latch is a spring type
12 operated mechanism?
13   A. No, they are typically not a spring type.
14 It's more like a, it's a U-shaped latch that hooks over
15 a hook on the door jamb. The latch itself is on the
16 door and has to be, the handle has to be pulled
17 180 degrees opposite and locked into place.
18   Q. So once again, it's an operator-controlled
19 latching mechanism?
20   A. Yes.
21   Q. Or locking mechanism?
22   A. Yes.
23   Q. Was there any type of interlocking device
24 similar to that safety switch on the washing chamber
25 door installed at any point in time on the evaporator

12 (Pages 42 to 45)

Page 46

1  chamber and its door?
2      A. No.
3      Q. All right. Did any customer, to the best of
4  your memory, ever request any type of safety switch or
5  interlocking device for the evaporator door?
6      A. No.
7      Q. Do you know if it was mechanically feasible to
8  install a safety switch similar to the one installed on
9  the washing chamber door back in 1992 at the time the
10 machine was sold to Hillside?
11     A. Yes.
12     Q. Would it be mechanically feasible to have a
13 temperature gauge as part of any safety switch on the
14 machine, the safety switch for the washing chamber door?
15     A. It is feasible.
16     Q. You basically, you've got the electric switch
17 and there's a temperature gauge part of that process
18 that would be involved in the process?
19     A. I don't know without looking at what's on the
20 market what we could do, but I'm sure there is both a
21 temperature switch and a contact switch that could
22 somehow be incorporated. It's feasible.
23     Q. And is that the type of device that's
24 installed and used as part of say a self-cleaning oven,
25 that when you're cleaning the oven, you have to lock the

Page 47

1  oven in place and you can't reopen it if the temperature
2  is above a certain level?
3      A. I don't know. I would assume so, but I don't
4  know.
5      Q. All right. Not knowing your living
6  arrangements or your household arrangements, do you have
7  a self-cleaning oven at your house now?
8      A. I know I have an oven. I know I have a wife,
9  so it's self-cleaning. That's about as far as I can go
10 on that one.
11     Q. Have you ever had to operate a self-cleaning
12 oven --
13     A. No, sir.
14     Q. -- to clean it?
15     A. No, sir, I have not.
16     Q. So you're not familiar with a locking
17 mechanism on a self-cleaning oven that's in the
18 marketplace at the present time?
19     A. I'm not.
20     Q. All right. Let me show you what it was marked
21 as Exhibit 4 at Mr. Renzella's deposition, and I'll
22 represent to you that I'm giving it to you in the way it
23 was initially presented to me, and that I believe there
24 is more than one document.
25         The first three pages appear to be operator's

Page 48

1  manual. Fourth page appears to be a price schedule.
2  The fifth page appears to be a June 1, 1992, facsimile
3  transmission sheet. The fourth page appears to be
4  similar to the document that I showed you earlier,
5  Exhibit 3 from Mr. Renzella's deposition.
6          And the last page appears to be some
7  handwritten notes. I'm just going to ask you to take a
8  look at it and ask you some questions about it.
9          MR. FLEMING: What exhibit is that?
10         MR. DOYLE: At Renzella's it's 4, I believe.
11         (Discussion held off the record.)
12         MR. DOYLE: Why don't we go back on the
13 record.
14 BY MR. DOYLE:
15     Q. Have you had a chance to look at the document
16 that was marked as Exhibit 4?
17     A. Yes, I have.
18     Q. Can we agree that Exhibit 4 appears to be
19 multiple documents that were stapled together?
20     A. Yes.
21     Q. All right. Are the first three pages a copy
22 of an operator's manual for the water blaster spray wash
23 degreasing machine manufactured by Viking Corporation?
24     A. They are. The three pages are an operator's
25 manual for a spray wash machine, yes.

Page 49

1      Q. Manufactured by Viking Corporation?
2      A. Yes.
3      Q. All right. During the 20 years you were with
4  the company, roughly 1978 to 1998, were there different
5  operator's manuals that would be used for a water
6  blaster spray wash degreasing machine?
7      A. Yes.
8      Q. All right. The one that's in front of you
9  now, the first three pages of Exhibit 4 from
10 Mr. Renzella's deposition, do you know where that
11 operator's manual came in the sort of the chronological
12 line of operator's manuals that would have been used?
13     A. This is an earlier manual, I would guess in
14 use maybe perhaps in the 1980s, possibly the early
15 nineties.
16     Q. Would an operator's manual accompany either
17 part of the documents transferred from Viking
18 Corporation to a purchaser of a machine?
19     A. Yes.
20     Q. If you could look on, I believe it's the third
21 page of the operator's manual or the last page of the
22 operator's manual. There is talk somewhere on that page
23 about a contact switch on control panel.
24     A. Yes.
25     Q. What's that?

13 (Pages 46 to 49)

Page 50

1    A.  That is the contact switch that disconnects or
2  interrupts power to the primary wash pump in the event
3  the operator deliberately or inadvertently opens the
4  door.
5    Q.  Is that part of the system that we talked
6  about earlier?
7    A.  Yes.
8    Q.  With the sort of the button switch on the
9  door?
10   A.  Yes.
11   Q.  All right.
12       MR. POWERS:  Could I just for clarification
13  purposes?
14       MR. DOYLE:  Sure.
15       MR. POWERS:  Are you referring to those first
16  three pages as an operating manual or are we
17  referring to them as part of an operating manual?
18       MR. DOYLE:  I don't know.
19       MR. POWERS:  Because you are referring to it
20  as an operating manual, and I don't know that it's
21  ever been established that it's anything other than
22  a collection of documents.
23       MR. DOYLE:  All right.  I'll try to clarify it
24  right now.
25

Page 51

BY MR. DOYLE:
1  BY MR. DOYLE:
2    Q.  Looking at Exhibit 4 from Mr. Renzella's
3  deposition, the first page, there are handwritten notes
4  on this document, on this first page, correct?
5    A.  Yes, sir.
6    Q.  That's not in your handwriting?
7    A.  No.
8    Q.  You don't recognize the handwriting?
9    A.  No, I do not.
10   Q.  You would not expect in the general course of
11  business for that type of handwritten notes to be on the
12  manual as it left Viking Corporation and was going to a
13  purchaser?
14   A.  Correct.
15   Q.  All right.  There is below the Viking
16  Corporation caption on the top of the page, Exhibit 4,
17  page one, there is an address, a P.O. box, Wichita,
18  Kansas, a zip code.  I believe there is a telephone
19  number and maybe a fax number or something for Viking,
20  correct?
21   A.  Correct.
22   Q.  And there are the words Operator's Manual?
23   A.  Correct.
24   Q.  All right.  Is this document, the first three
25  pages of Exhibit 4 from Mr. Renzella's deposition, an

Page 52

1  operator's manual for a water blaster spray wash
2  degreasing machine that was used by Viking Corporation
3  at some point in time during your 20 years of being
4  associated with the company?
5    A.  Yes.
6    Q.  All right.  And is it your best memory that
7  this three-page document would have been used during the
8  year 19 -- during the 1980s, perhaps into the early part
9  of the nineties?
10   A.  Yes.
11   Q.  Okay.  Is there anything in addition to these
12  three pages that would have been part of the operator's
13  manual?
14       And when I say these three pages, I'm talking
15  about the first three pages from Mr. Renzella's
16  deposition.  The first page appears to be a cover page
17  with a diagram of a machine and in large highlighted
18  letters the word water blaster with a trademark seal.
19  The second page says Viking Corporation and there is
20  boxed information for the entire page.  And the third
21  page, it's in a box similar to page two, and it just, it
22  goes on and the bottom line has I believe a telex
23  number.
24   A.  Yes.
25   Q.  Was there anything more than those three pages

Page 53

1  to the operator's manual?
2    A.  Typically an operator's manual included a
3  spare parts price list.  It would include a wiring
4  diagram.  It would include some general layout drawings
5  and manuals and other documents from the manufactured
6  components.
7        For example, a burner is a part of this
8  system.  We would incorporate the burner manual with our
9  manual.
10   Q.  Okay.  Near the bottom of this third page of
11  Exhibit 4 from Mr. Renzella's deposition there is a, I
12  believe a sentence or a separate paragraph that has --
13  it's highlighted.  "Never" is the first word, and it
14  talks about "Never disconnect this contact switch."
15       And that's the contact switch for the control
16  panel that we talked about a few minutes ago?
17   A.  Yes, sir.
18   Q.  The second paragraph sentence that starts with
19  "Never" talks about "Never use caustic detergents in
20  this machine."
21   A.  Correct.
22   Q.  What's a caustic detergent?
23   A.  Caustic is -- you know, I'm not sure I can
24  tell you the correct textbook dictionary definition.  It
25  is a highly aggressive cleaning agent that, because it

Page 54

1  oxidizes, it does a very good job of cleaning, but it's
2  also very, very dangerous. It's the, in terms of its
3  pH, I believe it's the opposite extreme of an acid, but
4  they have the same net result.
5      Q. So it would be a base?
6      A. I believe that's correct.
7      Q. It's a strong chemical that has a strong
8  chemical reaction when it's used?
9      A. Correct.
10     Q. And in the cleaning industry as you understood
11 it to exist back in the late seventies or eighties and
12 nineties, there were caustic cleaning chemicals or
13 cleaning products that would be used in this industry,
14 the industry of degreasing automotive parts?
15     A. Yes.
16     Q. And for some reason Viking Corporation as part
17 of the operator's manual wanted to tell the purchasers
18 never use caustic cleaning detergents?
19     A. Correct.
20     Q. And why was that language, "Never use caustic
21 cleaning detergents," contained within the operator's
22 manual and being passed on to the purchasers of the
23 machines?
24     A. Viking recommended against the use of caustic
25 detergents because they are highly corrosive. The

Page 55

1  machines are made out of ferrous metal, so the caustic
2  has a negative effect on the life of the machine. It is
3  very dangerous for the people that work around it, and
4  it's unnecessary.
5      Q. Because there were other cleaning agents,
6  detergents, solutions that were just as effective, but
7  not caustic, not damaging to the machines and the parts
8  of the machine?
9      A. And potentially to the operator, yes.
10     Q. At any point in time do you ever remember
11 having a conversation with anyone at Hillside
12 Automotive, including Paul Renzella, about the use of
13 cleaning products or caustic detergents or solutions on
14 the water blaster spray wash degreasing machine that
15 Hillside bought?
16     A. It's been a long time, but my recollection is
17 that that was one of the primary reasons that we asked
18 for a release of liability and an indemnity from
19 Hillside Machine.
20     If memory serves correctly, Hillside was
21 having some leaks in the fire tube on the machine, and I
22 think one of the reasons we suspected that was happening
23 was because the machine was being used with a caustic
24 that was corroding the fire tube inside the machine.
25     Q. Do you remember having any conversations with

Page 56

1  anybody at Hillside prior to their purchase of the water
2  blaster about the type of chemical or the brand name of
3  chemical to be used as a cleaning solution?
4      A. I don't recall a specific conversation.
5      Q. Do you remember general conversations on this
6  issue?
7      A. Not with anyone at Hillside. I can state
8  without hesitation that we used an Echo brand chemical.
9  I believe the part number was J3190. And we recommended
10 that almost as a routine course of conversation in
11 discussion of sales with clients, because it is a
12 biodegradable detergent.
13     Q. So if asked, Viking Corporation would
14 recommend or suggest Echo brand as the cleaning
15 solution?
16     A. At that time, yes.
17     Q. And that time being the early 1990s?
18     A. Yes, sir.
19     Q. It did not recommend or suggest Echo in its
20 operator's manual; is that correct?
21     A. Correct.
22     Q. It recommended or suggested that the customer
23 consult with a professional, a cleaning professional for
24 a noncaustic cleaning agent?
25     A. Correct.

Page 57

1      Q. All right. And that's the language that's
2  contained in that sentence, the second "never" sentence?
3      A. Correct.
4      Q. Are you familiar with a cleaning product by
5  the name of Zep?
6      A. I've heard the name.
7      Q. Do you know whether or not it's biodegradable
8  or their cleaning products are biodegradable?
9      A. I don't.
10     Q. What distinguishes a caustic cleaning solution
11 from a noncaustic? Is it the concentration of the
12 active ingredients or is it the chemical makeup, do you
13 know?
14     A. I don't know.
15     Q. Caustic as it's being used in the operator's
16 manual is a generic term, correct?
17     A. Correct.
18     Q. You're just conveying that it's a highly
19 reactive corrosive on ferrous metals?
20     A. Correct.
21     Q. All right. The date on the sales order,
22 Exhibit 2 from Mr. Renzella's, is May 11, 1992.
23     A. Correct.
24     Q. All right. And you would have expected in the
25 ordinary course of business that sometime in mid May or

15 (Pages 54 to 57)

Page 58

1   the second half of May that the sales order would have
2   been conveyed to Viking Corporation?
3       A.   Yes.
4       Q.   All right. Is the June 1, 1992, facsimile
5   transmission document that was part of Exhibit 4 from
6   Mr. Renzella's deposition a copy of a transmission from
7   you to I believe Paul Renzella at Hillside confirming
8   the order of the water blaster spray wash degreasing
9   machine?
10      A.   Yes.
11      Q.   Starting at about this time, roughly June 1,
12  1992, the company would have been aware that Hillside
13  Automotive, Paul Renzella was in the process of ordering
14  and purchasing a water blaster spray wash degreasing
15  machine?
16      A.   Yes.
17      Q.   And who would have been the contact person, if
18  anyone, at Viking Corporation that would have been
19  involved in this purchase?
20      A.   Either myself or Chris Winslow or Marty
21  Freund.
22      Q.   And would Mr. Zanetti still have been involved
23  in the sales process?
24      A.   Once the order was turned in, I believe
25  Mr. Zanetti would have gone into a holding mode, waiting

Page 59

1   on a delivery and a commission.
2       Q.   Was this the first time that Mr. Zanetti had
3   been involved in the sale of Viking Corporation's
4   products?
5       A.   I don't recall.
6       Q.   Other than the water blaster sold to Hillside,
7   was Mr. Zanetti involved in any other sales to any other
8   customers?
9       A.   I don't recall.
10      Q.   Have you ever met Mr. Zanetti?
11      A.   I don't think so. I've spoken with him on the
12  phone, but I have not met him in person.
13      Q.   Approximately September of 1992, did Hillside
14  deliver FOB a water blaster spray wash degreasing
15  machine to Hillside?
16      A.   Viking delivered --
17      Q.   I'm sorry.
18      A.   Yes. I don't know the date, but that seems
19  reasonable.
20      Q.   And in general, the practice at the time was
21  to sell it FOB, the customer made their own arrangements
22  as far as shipping?
23      A.   Usually.
24      Q.   Or paid for shipping anyways?
25      A.   Yes.

Page 60

1       Q.   After the machine was sold to Hillside,
2   delivered to Hillside sometime approximately September
3   of 1992, they paid for the machine?
4       A.   I assume so.
5       Q.   Somewhere as part of this purchasing, ordering
6   process, they did pay for the machine? They didn't get
7   it free?
8       A.   Not initially.
9       Q.   True. And we'll get to that. And I know
10  that.
11          Had Viking Corporation ever sold any equipment
12  to Hillside prior to this purchase?
13      A.   I don't recall that we did. I would say no.
14      Q.   Had you ever met Mr. Renzella prior to this
15  purchase?
16      A.   I don't think so.
17      Q.   Have you ever met him since the purchase?
18      A.   No.
19      Q.   Have you ever been to Hillside Automotive in
20  Massachusetts?
21      A.   No.
22      Q.   Have you ever been to Massachusetts?
23      A.   Many times.
24      Q.   Okay. Did any employee of Viking Corporation
25  visit Hillside as part of the purchase sales or post

Page 61

1   sales dealings with Hillside?
2       A.   Yes.
3       Q.   Who would have visited Hillside from Viking?
4       A.   I believe that I sent Howard Whitetree up on
5   at least one occasion, and it may have been numerous
6   occasions.
7       Q.   And what was the purpose in sending Howard?
8       A.   We had a number of issues with Hillside that
9   came up post delivery. The city inspectors required
10  certification of the gas burner. There were some issues
11  like that. And then Paul Renzella had some --
12      Q.   Issues?
13      A.   -- issues regarding how the machine was built
14  or designed or used, and we did our best to try and
15  resolve those.
16      Q.   You're not sure how many trips Howard made to
17  Hillside, but you know he made at least one?
18      A.   Correct.
19      Q.   You talked about inspectors or issues
20  involving inspections of the machine.
21          Do you remember if this was the first time
22  that Viking Corporation had sold its equipment for a
23  customer in Massachusetts?
24      A.   No. It was not the first time.
25      Q.   Do you know who Viking Corporation had sold

Page 62

1 equipment to prior to Hillside in Massachusetts?
2    A.  No.
3    Q.  Do you know how many occasions either exactly
4 or approximately Viking Corporation had sold equipment?
5    A.  No.
6    Q.  The equipment that was sold, would it be part
7 of the Viking product line?  You weren't selling
8 somebody else's as a middleman or anything?
9    A.  Correct.  It would have been part of the
10 Viking product line.
11    Q.  And do you know if they were gas-operated
12 pieces of equipment that were sold?
13    A.  No -- well, stop a minute.
14    Q.  Sure.
15    A.  I'm sure we sold gas-heated wash systems in
16 Massachusetts.
17    Q.  Prior to the sale to Hillside in approximately
18 September of 1992?
19    A.  I don't know the exact date.
20    Q.  Then at some point in time during your 20
21 years or so with the company, Viking Corporation sold
22 gas-fired equipment to a customer in Massachusetts?
23    A.  I believe numerous times.
24    Q.  As a result of the sale to Hillside, requests
25 were made to Viking Corporation for certification for

Page 63

1 the product or at least certain parts of the product?
2    A.  Yes.
3    Q.  Had similar type requests ever been made of
4 Viking Corporation by any other customers in
5 Massachusetts?
6    A.  No.
7    Q.  Had similar type requests been made of Viking
8 Corporation by any other customers anywhere?
9    A.  No.
10    Q.  Was the Viking Corporation water blaster spray
11 wash degreasing machines that were manufactured by
12 Viking Corporation at and before the sale to Hillside
13 Underwriters Laboratory approved?
14    A.  No.
15    Q.  Were they approved or certified by any
16 independent entity organization?
17    A.  No.
18    Q.  Since the sale to Hillside Automotive in
19 approximately September of 1992, up to the present time
20 and especially at least during the next six years that
21 you were associated with Viking Corporation, were Viking
22 Corporation's product line certified by any outside
23 entity or organization similar to Underwriters
24 Laboratory?
25    A.  Yes.

Page 64

1    Q.  When did that first take place?
2    A.  I would say in the last half of the 1990s
3 decade.
4    Q.  And why did it take place?
5    A.  We had a large customer at the time that was
6 going to purchase I believe about 100 units, but they
7 wanted a UL approval.  Not on the machine itself, but on
8 the electrical panel.  So maybe I misspoke.
9        Your question was did any of the machines have
10 a UL or other certification?  And the correct answer
11 would be no.
12    Q.  The whole machine was not certified?
13    A.  Correct.
14    Q.  Parts of the machine were?
15    A.  Correct.
16    Q.  The electrical components, including the
17 panel, at some point in time were certified?
18    A.  The electrical control panel was UL certified.
19    Q.  And that took place sometime mid 1990s or so?
20    A.  I believe so.
21    Q.  As a result of a large corporation placing a
22 large order?
23    A.  Special request, yes.
24    Q.  Were the gas burners that were installed on
25 Viking Corporation products certified or approved by any

Page 65

1 entity at any point in time that you're aware of?
2    A.  Yes.
3    Q.  And who were they certified or approved by?
4    A.  I don't recall.
5    Q.  And when did that take place?  Let me back up.
6 Let me try to answer my own question.
7        Did you buy the gas burners from a separate
8 entity or an outside entity?
9    A.  Yes, sir.
10    Q.  When you bought them from that separate
11 outside entity or vendor, did they come with a
12 certification or approval?
13    A.  My recollection is yes.
14    Q.  So the gas burners that were installed by
15 Viking were precertified or preapproved when the company
16 bought them?
17    A.  That is my recollection, yes.
18    Q.  All right.  Did the company still have to do
19 certain work to attach the gas burners to make it part
20 of the equipment sold by Viking Corporation?
21    A.  Yes.
22    Q.  Did Viking Corporation attach the gas burners
23 in such a way to make it explosive proof?
24    A.  I don't know.
25    Q.  The name, and I've used a couple of times

17 (Pages 62 to 65)

Page 66

1  water blaster, that applied to the spray wash degreasing
2  machine that was sold to Hillside?
3      A. Yes.
4      Q. As well as other models that were
5  manufactured?
6      A. Yes.
7      Q. Would it just be the models that might be the
8  different size or shapes or was it also other product
9  lines?
10     A. Other product lines.
11     Q. Like the conveyor belt system that you talked
12 about initially?
13     A. Yes, sir.
14     Q. So the conveyor belt would be a water blaster,
15 the rotary or the vertical washing machine would also be
16 water blasters?
17     A. Yes, sir.
18     Q. I think the term was spray shot, but there was
19 something else. Would that be a water blaster?
20     A. No. We also manufactured airless shot
21 blasting machines. The steel shot was thrown by
22 centrifugal force off a wheel. The impact or blast of
23 the shot removed rust and paint from a dry part.
24     Q. Just focusing in on the water blasters and not
25 the spray shot or the shots, did the water blasters have

Page 67

1  a hazard of being involved in explosions as used by the
2  customers?
3      A. Can you repeat the question?
4      Q. No, I'm going to try to rephrase it. Let me
5  strike the question.
6          I'm going to show you a document that was
7  faxed to me by Mr. Powers' office back in August of
8  2004. It's entitled Viking Corporation Operating
9  Manual, and it has a cover page of Model 3648R, Rotary
10 Jet Spray Washer.
11         I received that from Mr. Powers' associate
12 about a year ago. And is this a copy of an operating
13 manual that would have been used by Viking Corporation
14 at some point in time?
15     A. Yes.
16     Q. And would it be for the type of machine sold
17 by Viking Corporation to Hillside Automotive?
18     A. Yes.
19     Q. Do you know when this manual, at least with
20 the cover page -- I'll represent to you that since it
21 was faxed to me and it's been a year since I received
22 the fax, that I may have misplaced or missorted or
23 misfiled certain pages of it, and I apologize, but I
24 think it's the complete document. And if I did missort
25 or misplace or didn't receive the full document, I'll

Page 68

1  agree that the full document will be substituted.
2          What didn't I cover when I just said that?
3      A. I'm not sure what the question was. The dates
4  on the drawings in the manual you've handed me are from
5  June of 1997.
6      Q. There are schematic drawings in the manual,
7  and as part of the schematics in the bottom right-hand
8  corner or somewhere on the schematics there is an
9  original drawing date and then a revision date on the
10 drawings?
11     A. Yes, sir.
12     Q. So you can tell by looking at the revision
13 dates on the manual that's dated sometime at least on
14 one of them of roughly '96, '97, that the manual would
15 have had to have been after that date in order to have
16 those drawings in it?
17     A. Yes. There are other component part
18 installation instructions included in the package you've
19 given me that date back to 1987 and 1986.
20     Q. Those are the pages that appear to be Siemen's
21 as well as Wayne, some outside vendors that may have
22 supplied parts or components that would be used in the
23 manufacture of the water blasters?
24     A. Correct.
25     Q. That's the type of document that would make up

Page 69

1  part of an operator's manual that was used by the
2  company and that you referenced earlier as being in
3  addition to the three pages from the other operator's
4  manual that we looked at, it was I believe Exhibit 4
5  from Mr. Renzella's deposition?
6      A. Correct.
7      Q. Is it fair to say that that version or this
8  form of an operator's manual for a Viking Corporation
9  machine was used sometime after 1996?
10     A. Yes. This manual was used after 1996.
11     Q. I'll just grab the manual from you and just --
12 in the middle, and it's page 51 of the fax that I
13 received, and in the upper left-hand corner it says
14 installation, page two, and it starts with the words "At
15 this point you are ready to run the machine."
16         And I'm saying that, sir, just to draw a
17 reference so that counsel can find the page and will
18 also have a reference later on.
19         There is also information on the bottom of
20 that page, I think it starts off "Extremely important."
21 Once again, it talks about not using caustic agents or
22 caustic cleaning products.
23     A. Yes, sir.
24     Q. That's generically similar to the information
25 contained in the earlier operator's manual that we

Page 70

1 looked at?
2    A. Yes, sir.
3    Q. Turn to page 53 of the fax. It's Roman
4 numeral six, the machine operation.
5        The bottom half of the page, there are a
6 series of sentences or short paragraphs entitled
7 Extremely Important.
8    A. Yes, sir.
9    Q. All right. And one of the entries deals with
10 fire and/or explosion hazard.
11    A. Yes, sir.
12    Q. Could you read that please, sir?
13    A. "Never smoke or allow flames near this
14 machine. There is a fire and/or explosion hazard."
15    Q. What was the fire and/or explosion hazard that
16 existed as far as the Model 3648 rotary jet spray
17 washer?
18    A. There is the possibility of two fire or
19 explosion hazards. One would be related to a machine
20 with gas heat such as was present and sold to Hillside
21 Machine.
22        In the event there was a gas leak either in
23 the burner or in the plumbing system, it is possible
24 that there would be gas in the area, and you would not
25 want to smoke or allow flames anywhere in the area.

Page 71

1        The second hazard relates to the grease and
2 oil that were being removed from parts in the machine
3 and accumulated at the rear of the machine.
4        In some concentration grease or oil will burn
5 and is combustible. Even if there is a biodegradable
6 soap in it or on it or around it, there's the
7 possibility.
8    Q. And will you agree with me that the
9 information contained in that sentence in that section
10 of the manual entitled Extremely Important constituted a
11 warning?
12    A. Absolutely.
13    Q. Was there a similar type warning, either
14 exactly the same or generically the same, contained in
15 the earlier version of the operator's manual that we
16 looked at earlier that was used in the eighties, maybe
17 into the early 1990s, and that was part of Exhibit 4
18 from Mr. Renzella's deposition?
19    A. I don't recall. I'd have to look at it. I
20 would assume yes, but I don't recall.
21    Q. Okay. Let me show you another copy of
22 Exhibit 4 from Mr. Renzella's deposition and just ask if
23 you can point to me either a similar or identical
24 warning given with fire and/or explosion hazard.
25    A. I don't see such a warning. Maybe it's here.

Page 72

1 I'd have to read every page of it. I just don't see it.
2    Q. At least as you quickly peruse it, the first
3 three pages of Exhibit 4 from Mr. Renzella's deposition,
4 you don't see it now?
5    A. Correct.
6    Q. Recognizing you haven't seen a copy of that
7 document before today for a while, you're not able to
8 specifically point it out at this time?
9    A. Correct.
10    Q. All right. It's your memory and belief that a
11 similar warning dealing with the fire and/or explosion
12 hazard would have been contained within the operator
13 manual used during the eighties, perhaps into the early
14 nineties?
15    A. Would you ask your question again?
16    Q. Sure. Let me strike the question and try to
17 either repeat or rephrase it.
18        It's your memory and belief that a similar
19 warning containing language involved with fire and/or
20 explosion hazard would have been contained in the
21 operator's manual put out by Viking Corporation for the
22 water blaster machines that was used, the operator's
23 manual that was used during the 1980s, perhaps into the
24 early 1990s?
25    A. Yes; however, it may have been contained in

Page 73

1 the supplementary manual such as the operator's manual
2 from the gas burner manufacturer, either Wayne Burner or
3 Eclipse Home Burner.
4        We may have later picked up those cautions and
5 incorporated them into the machine manual for the second
6 version. In one fashion or not another, I believe they
7 were present.
8    Q. You made reference to a second manual. Is
9 this manual that's entitled the Operation Manual, Model
10 3648R Rotary Jet Spray Washer, is this the second
11 version of an operating manual of this machine?
12    A. Let's define it as that, yes.
13    Q. Is the one that was part of Exhibit 4 from
14 Mr. Renzella from the initial or original operator's
15 manual?
16    A. It would have been an earlier version, yes.
17    Q. Would it have been the only earlier version or
18 would there have been other earlier versions that's part
19 of that Exhibit 4?
20    A. I suspect there were earlier versions even
21 than this.
22    Q. Would you have prepared the operator's manual,
23 whether it's the earlier version that's part of
24 Exhibit 4 from Mr. Renzella or the second generation?
25    A. The so-called second generation I know I did

19 (Pages 70 to 73)

Page 74

1  not prepare by myself. I had some input into it, but we
2  had a team working on that.
3      The earlier version, honestly, I don't even
4  remember who put it together.
5      MR. DOYLE: Why don't we mark as the next
6  exhibit for today's deposition the operator's
7  manual that we're referring to.
8      (Enegren Exhibit No. 4 was marked for
9  identification.)
10 BY MR. DOYLE:
11     Q.  Shortly after the company sold the water
12 blaster to Hillside, did it receive a letter from a
13 lawyer writing on behalf of Hillside?
14     A.  Well, based on the document you've given me, I
15 would have to say yes.
16     MR. DOYLE: Let me mark this as the next
17 exhibit, and this will be the following one.
18     (Enegren Exhibit Nos. 5 and 6 were marked for
19 identification.)
20 BY MR. DOYLE:
21     Q.  I'll just ask you questions about the initial
22 letter from the lawyer to the company I believe in
23 October of 1992.
24     As a result of what was taking place at this
25 point in time, approximately September, October of 1992

Page 75

1  involving Hillside and Viking, did Viking make
2  arrangements to get certification so that Hillside could
3  use the machine, perhaps sent Howard out at about this
4  time to visit Hillside?
5      Did it attempt to address the concerns that
6  the customer, Hillside, had?
7      A.  Yes.
8      Q.  As part of good business practice, trying to
9  stay on good terms with Hillside, did you write and send
10 to Hillside a, basically a thank you letter thanking
11 them for purchasing the machine, seeing if there were
12 any other interests or anybody else that might be a
13 potential customer?
14     A.  Yes. You've marked that Exhibit 6.
15     Q.  Okay. Was Mr. Renzella basically a pain in
16 the neck?
17     MR. FLEMING: Objection.
18     THE WITNESS: Yes.
19 BY MR. DOYLE:
20     Q.  You got a number of calls to the company
21 following the delivery of the machine to Hillside?
22     A.  Yes. Well, from Hillside.
23     Q.  From Hillside. Generally Mr. Renzella calling
24 Viking because of issues or concerns or problems that he
25 was having with the machine that he had purchased?

Page 76

1      A.  Yes.
2      Q.  At some point in time did you start to
3  document the calls or the, what was taking place between
4  Hillside and Viking?
5      A.  Yes.
6      Q.  Do you remember when you first started to
7  document these calls?
8      A.  No.
9      Q.  Let me show you a collection of pages that
10 I'll have marked as the next exhibit, and it's a total
11 of six pages, and ask if you are generally familiar with
12 those documents, those six pages.
13     A.  Yes.
14     Q.  And what are those, sir?
15     A.  They appear to be day date time stamped with
16 an identifier using my initials and a memo of a phone
17 call. I don't recognize the form I'm seeing it here,
18 but it would be consistent with recording of my notes of
19 a telephone conversation I had with various people.
20     We used to contact management software.
21 Perhaps the software has been updated to a later version
22 and that may be the reason I don't recognize the format,
23 but it's consistent with the way I would type notes that
24 would record any given conversation with a client.
25     MR. DOYLE: Just before I lose track, if we

Page 77

1  could just have it marked as the next exhibit, I
2  believe 7.
3      (Enegren Exhibit No. 7 was marked for
4  identification.)
5  BY MR. DOYLE:
6      Q.  The earliest note that's part of Exhibit 7
7  appears to be July of '03, correct, sir? I just ask you
8  to look at the six pages. I'm sorry, July of '93?
9      A.  July 22nd, 1993, yes.
10     Q.  Do you remember if that's the first time you
11 started to document notes or conversations with Hillside
12 regarding their purchase of the water blaster?
13     A.  I do not recall.
14     Q.  Would you have documented all of your
15 conversations with Hillside of any substance other than
16 the hi, how are you, Merry Christmas type of
17 conversations?
18     If there was anything of any significant
19 substance, business issue, would you have documented it?
20     A.  As a general rule of thumb, whether I made the
21 call or any of our salespeople made the call, the call
22 would be recorded in our contact management software.
23 We used auto dialers tied into the software so we could
24 even record the time of the call and, if used properly,
25 we could even record the duration of the call.

Page 78

1    Q. And if the customer was making the call in to
2  the company, would that be recorded?
3    A. We had the ability to do that.
4    Q. And do you know if it was generally done?
5    A. Usually.
6    Q. At the time you left the company,
7  approximately the end of 1998, were the records, these
8  phone records, either calls coming in or calls going
9  out, still within the company's business records?
10   A. Yes.
11   Q. Going back to approximately 1992 when Hillside
12 bought the equipment?
13   A. Yes.
14   Q. Fair to say that since you've been gone from
15 the company for approximately six years, you're not sure
16 what the document retention policy is or practices are
17 regarding retaining those type business records or phone
18 records?
19   A. Correct.
20   Q. Okay. Was the evaporator an option that
21 customers could request when buying a water blaster?
22   A. Particularly at the time Hillside bought their
23 machine, I don't recall if it was an option or just a
24 standard feature that was included.
25   Q. Let me show you a copy of a document that was

Page 79

1  produced by a lawyer for Hillside Automotive, basically
2  at the beginning of this case, and ask if you recognize
3  at least of the first couple of pages of that document.
4    A. Yes.
5    Q. What is that? Specifically the first couple
6  of pages.
7    A. It's a price list on the washing machine that
8  was made by Viking at some point in the past.
9    Q. Can you tell the date that this type document
10 is being used? Is there any copyright date or --
11   A. I don't see any dates at all on this.
12   Q. If you look at the second page and read the
13 first couple of product descriptions and see whether or
14 not you could buy a water blaster without an evaporator.
15   A. Yes.
16   Q. And was it possible to buy a, at least at the
17 point in time that this document, this price list is
18 being used, a water blaster machine from Viking without
19 an evaporator?
20   A. Yes.
21   Q. And could you also buy it with the evaporator
22 for an additional cost?
23   A. Yes.
24       MR. DOYLE: Let's have this document marked as
25   the next exhibit.

Page 80

1        (Enegren Exhibit No. 8 was marked for
2  identification.)
3  BY MR. DOYLE:
4    Q. As part of the document that I've had marked
5  as Exhibit 8, there is a page that appears to be on
6  Viking Corporation stationery and it's, I think it's
7  entitled Degreaser Option List.
8    A. Correct.
9    Q. And degreaser is basically a washing machine
10 like the water blaster?
11   A. Yes, sir.
12   Q. All right.
13   A. They are the same.
14   Q. And one of the options was the environmental
15 package?
16   A. Yes.
17   Q. What's the environmental package?
18   A. It's a reservoir bottom slipped to the rear, a
19 sludge trap with a removal tool, a sludge evaporator
20 mounted in the exhaust tube of a gas burner.
21       I'm reading from the bottom here.
22   Q. What's shown in essence in --
23       MR. FLEMING: What page are you on?
24       MR. DOYLE: Near the back.
25

Page 81

1  BY MR. DOYLE:
2    Q. That's what's basically shown I think in
3  Exhibit 5 from Mr. Gorman's picture?
4    A. Yes.
5    Q. How would you dispose of the sludge if you
6  didn't have the environmental package? Would it just
7  settle to the bottom of the machine and you would have
8  to open up the washing chamber and get it out?
9    A. Scoop it out.
10   Q. Any idea why it was called environmental
11 package or ecology package?
12   A. It's called an ecology package because it
13 volumetrically reduces the amount of waste that has to
14 be disposed of by the operator.
15   Q. And the waste is put into the evaporator
16 chamber and reduced down as a result of the evaporation
17 process?
18   A. Yes.
19   Q. Okay. Is the evaporator chamber that door
20 that we looked at in one of these pictures earlier part
21 of the ecology package as well as the sludge sort of
22 opening that's shown in that Exhibit 5?
23   A. Yes. It's shown in Exhibit 3 of Paul
24 Renzella. I believe this is his deposition.
25   Q. Actually it's Mr. Gorman, Frederick Gorman.

Page 82

1    A. Yes, it's in photos marked Exhibit 3.
2    Q. So the cost of installing the door as well as
3  attaching what's shown in Exhibit 5 from Mr. Gorman, the
4  photograph, that basically, at least at the time this
5  option price list was created was $239?
6    A. Right.
7    Q. Did Viking Corporation authorize John Zanetti
8  to get involved in the certification process for the
9  water blaster that was sold to Hillside?
10   A. I don't recall.
11   Q. Let me show you this document that was marked
12  as Exhibit 11 at Mr. Renzella's deposition, and it
13  appears to be a copy of correspondence from Mr. Zanetti
14  to a department or agency for the Commonwealth of
15  Massachusetts.
16   A. Okay.
17   Q. Do you remember that Viking Corporation
18  authorized John Zanetti to get involved in the
19  certification process for the machine sold to Hillside?
20   A. Honestly, I don't recall it one way or the
21  other.
22   Q. Did Mr. Renzella continue to have issues with
23  the water blaster machine from '92 into '93?
24   A. Yes.
25   Q. At some point in time did a lawyer acting on

Page 83

1  behalf of Paul Renzella send to Viking Corporation a
2  letter with a proposed release?
3    A. Yes.
4    Q. And that's a copy of a document that was
5  marked as Exhibit 13 at Mr. Renzella's deposition?
6    A. Yes.
7    Q. The letter is anyways, the first page.
8    A. Yes.
9    Q. All right. Prior to the receipt of this
10  letter that's dated August 13, 1993, that's addressed to
11  you from an attorney by the name of Mark Favaloro, had
12  Viking Corporation sent to Hillside or to Mr. Renzella
13  any type of release document, indemnification agreement,
14  settlement proposal?
15   A. I do not recall whether Paul Renzella or
16  Hillside sent anything over prior to this or after this.
17   Q. What I was wondering is prior to this letter
18  that's dated approximately, I think August 13, 1993?
19   A. Yes.
20   Q. Whether Viking Corporation had sent to
21  Hillside any settlement proposal, settlement agreements,
22  settlement releases of any sort.
23   A. I don't recall by date if we had done that. I
24  know we discussions about it, but I don't recall the
25  dates and I don't recall if we prepared a document and

Page 84

1  sent it to them and that was their counter-proposal. I
2  just don't recall.
3    Q. Do you remember receiving this letter with a
4  proposed settlement release from an attorney Favaloro?
5    A. I know Viking obtained a written release from
6  Hillside Machine. I don't remember the attorney
7  involved or the dates, but I recall distinctly that
8  we -- I recall it distinctly, because in over 20 years
9  of running that business, it was the only opportunity or
10  occasion that I felt need or desire to have a release
11  from liability and an indemnity.
12   Q. At some point in time in this time period,
13  roughly August of 1993, were the discussions between
14  Viking Corporation and Hillside about repayment of
15  moneys from Viking to Hillside, execution of settlement
16  documents, release documents, in an attempt to resolve
17  closeout issues that existed at that time?
18   A. Yes.
19   Q. Was Diana Hutchison office manager for Viking
20  Corporation back in September of 1993?
21   A. Yes.
22   Q. Would you recognize her signature, do you
23  think?
24   A. Probably.
25   Q. Let me show you a copy of a letter that I'll

Page 85

1  have marked as the next exhibit, and do you recognize
2  that as Ms. Hutchison's signature?
3    A. Yes.
4    Q. Was Ms. Hutchison authorized to convey to
5  Hillside Automotive a check in the amount of $12,210.35
6  in an attempt to resolve issues that existed?
7    A. Yes.
8    Q. Was that basically the purchase price for the
9  water blaster that Hillside had bought?
10   A. That was the intention.
11   Q. Okay.
12   A. I don't recall the exact amount of the
13  purchase price and the checks back and forth, but
14  generally that was the intention.
15   Q. And that was the agreed-upon number?
16   A. Yes.
17   Q. To the best of your memory?
18   A. Yes.
19      MR. DOYLE: We have that marked as the next
20  exhibit, and we'll go off the record for a second.
21      (Enegren Exhibit No. 9 was marked for
22  identification.)
23      (Discussion held off the record.)
24      MR. DOYLE: Back on the record.
25

Page 86

1  BY MR. DOYLE:
2      Q.  So it's fair to say that Ms. Hutchison was
3  authorized to issue a check to Hillside Automotive?
4      A.  Yes, sir.
5      Q.  And at some point in time did Viking
6  Corporation receive this document that appears to be on
7  Hillside Automotive Machine, Inc. stationery that's
8  dated September 10, 1993, and is entitled Release?
9      A.  Yes.
10         MR. DOYLE:  Could we have that marked as the
11     next exhibit?
12         (Enegren Exhibit No. 10 was marked for
13     identification.)
14  BY MR. DOYLE:
15     Q.  Is this the only signed document that Viking
16  Corporation received from Hillside Automotive as part of
17  this business issue that existed back in August,
18  September of 1993?
19     A.  I think the answer is yes.  I only recall one
20  release.
21     Q.  Could you read the release?
22     A.  Aloud?
23     Q.  No, just to yourself.
24     A.  Yes, sir, I have.
25     Q.  All right.  Earlier today you used the term

Page 87

1  indemnification, correct?
2      A.  Uh huh.
3      Q.  That's a yes?
4      A.  I'm sorry, yes.
5      Q.  Is the word indemnification or any variation
6  of the word indemnification contained anywhere in that
7  document?
8      A.  No.
9      Q.  It's my understanding from some of your prior
10  answers that given the issues that existed that resulted
11  in the check of some $12,000 being paid by Viking to
12  Hillside, that a determination had been made that it was
13  time to get a release from all liability and
14  indemnification.
15     A.  Correct.
16     Q.  Okay.  Is there any document that you're aware
17  of that exists between Hillside and Viking Corporation
18  where Hillside Automotive either specifically or
19  generally agrees to indemnify Viking Corporation?
20     A.  I don't have those documents and I don't
21  recall what specific documents we might have.  I
22  suspicion this is the only document.
23     Q.  As you sit here today, September 9, 2005, the
24  only document that you are currently aware of is this
25  document, Exhibit 10 to your deposition, entitled

Page 88

1  Release?
2      A.  Yes, sir.
3      Q.  All right.  And there's a signature that
4  appears to be Paul Renzella's acting on behalf of
5  Hillside Automotive where he releases Viking Corporation
6  under the terms contained in that document.
7      A.  Yes, sir.
8      Q.  Are there any additional documents that you're
9  aware of at the present time where Hillside assumed any
10  additional responsibilities, liabilities, legal
11  obligations other than what's contained in that document
12  release, Exhibit 10?
13     A.  No, saying that I'm looking at Renzella
14  Exhibit 13 and wondering what's over here, but I don't
15  see a signed release that's any different.  So I would
16  assume this is the only document we have.
17     Q.  All right.  After the receipt of the signed
18  release, Exhibit 10 to your deposition, were there any
19  additional documents that were received by Viking
20  Corporation from Hillside Automotive or Paul Renzella
21  containing any additional promises, agreements,
22  understandings between the two companies?
23     A.  I have no recollection of that.
24     Q.  If there were any additional documents other
25  than the signed releases that are part of your

Page 89

1  deposition, would they be part of the records of Viking
2  Corporation, at least as of the time you left the
3  company in the last month of 1998?
4      A.  Yes.
5      Q.  Do you know what a friction brake is, at least
6  in a general sense?
7      A.  Generally, yes.
8      Q.  Generally, what's a friction brake?
9      A.  A friction brake, depending on the
10  application, would be a wheel pressing against a moving
11  part with the intention of stopping the moving part from
12  turning.
13     Q.  All right.  The letter from an attorney John
14  Todisco to Viking Corporation dated October 14, 1992,
15  that was marked as Exhibit 10 in Mr. Renzella's
16  deposition, the fourth paragraph in the middle of the
17  paragraph, the sentence starts, "Also, it will be
18  necessary to install a friction brake."
19         Do you know why or do you remember why or if
20  it was necessary to install a friction brake on the
21  water blaster that was sold to Hillside?
22     A.  I don't recall why it would be necessary and I
23  don't recall whether or not a friction brake was
24  installed.
25     Q.  Earlier when you were looking at the copies of

23 (Pages 86 to 89)