# Transcript of the Testimony of **DERON LOCK**

**Date:** December 6, 2005
**Volume:** I

**Case:** EDWARD STEFFEN and MARSHA STEFFEN v. VIKING CORPORATION

HARPER COURT REPORTING
316.265.1534

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

EDWARD STEFFEN and
MARSHA STEFFEN                    PLAINTIFFS

vs.                               C.A. NUMBER
                                  04-10592-RBC

VIKING CORPORATION                DEFENDANT

------------------------------------------------

D E P O S I T I O N

The Deposition of DERON LOCK was taken on behalf of the Plaintiffs pursuant to the Federal Rules of Civil Procedure before Norma Underwood, a Certified Shorthand Reporter of Kansas, at Wichita, Kansas, on the 6th day of December, 2005, at 8:45 o'clock a.m.

A P P E A R A N C E S

The Plaintiffs appeared by their attorney, Mr. William J. Doyle, Jr. of Leavis and Rest, P.C., Attorneys at Law, 83 Central Street, Boston, Massachusetts  02109.

HARPER COURT REPORTING
316.265.1534

---

The Defendant appeared by its attorney, Mr. Robert P. Powers, Esquire, of Melick, Porter & Shea, LLP, Attorneys at Law, 28 State Street, Boston, Massachusetts  02109.

Hillside Automotive appeared by its attorney, Mr. Kevin J. Fleming, of Davis, White & Sullivan, P.C., Attorneys at Law, One Longfellow Place, Suite 3609, Boston, Massachusetts  02114.

HARPER COURT REPORTING
316.265.1534

---

I N D E X

DERON LOCK

Direct Examination by Mr. Doyle         6
Cross Examination by Mr. Fleming       77
Redirect Examination by Mr. Doyle      83

SIGNATURE OF WITNESS                  101

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER   102

HARPER COURT REPORTING
316.265.1534

---

E X H I B I T S

LOCK DEPOSITION EXHIBIT 1
    Marked for Identification          17
LOCK DEPOSITION EXHIBIT 2
    Marked for Identification          20
LOCK DEPOSITION EXHIBIT 3
    Marked for Identification          27
LOCK DEPOSITION EXHIBIT 4
    Marked for Identification          38
LOCK DEPOSITION EXHIBIT 5
    Marked for Identification          38
LOCK DEPOSITION EXHIBIT 6
    Marked for Identification          39
LOCK DEPOSITION EXHIBIT 7
    Marked for Identification          62
LOCK DEPOSITION EXHIBIT 8
    Marked for Identification          66
LOCK DEPOSITION EXHIBIT 9
    Marked for Identification          73
LOCK DEPOSITION EXHIBIT 10
    Marked for Identification          79
LOCK DEPOSITION EXHIBIT 11
    Marked for Identification          81

HARPER COURT REPORTING
316.265.1534

```
1  LOCK DEPOSITION EXHIBIT 12
2      Marked for Identification          89
3  LOCK DEPOSITION EXHIBIT 13A, B, C, D, E
4      Marked for Identification         100
```

---

6

```
1              DERON LOCK,
2  of lawful age, having been first duly sworn on
3  oath to state the truth, the whole truth, and
4  nothing but the truth, deposes and says:
```

5      MR. DOYLE: Before we went on the
6  record, Counsel had agreed that Mr. Lock will
7  have the option of reading and signing the
8  deposition transcript, waiving any
9  requirement for the notary and signing under
10  the pains and penalties of perjury. Counsel
11  have also agreed to the usual stipulations,
12  which in Massachusetts all objections except
13  as to form and motions to strike will be
14  reserved until the time of trial. Can we
15  agree that an objection of one attorney is an
16  objection for any attorney?
17      MR. POWERS: Agreed.
18      MR. FLEMING: Agreed.
19      MR. DOYLE: All right, great.
20      DIRECT EXAMINATION
21  BY MR. DOYLE:
22  Q. Mr. Lock, my name is William Doyle, I
23     represent a husband and wife by the name of
24     Mr. and Mrs. Steffen. It's my understanding
25     you have been designated to appear here today

---

7

on behalf of Viking Corporation in the matter that is currently pending in the court system in Massachusetts. I'm going to be asking you some questions this morning. If at any time you want to take a break for any reason, you have to make a phone call, somebody has to talk to you about this, this, anything comes up for any reason at all, just let somebody know and we'll take a break and we'll do whatever we can to accommodate you. At any time you want to talk to your attorney, just let us know and we'll take a break so you can talk to your attorney. The only caveat with that would be if there's a question pending that is on the table, the attorneys would ask you to answer the question and then consult with your attorney. But any problems at all, just let us know. I know you have been deposed at least once on one other prior occasion several years ago, many years ago. The format will follow that same general format. In essence, I'll try to ask a verbal question; you're expected or you should give a verbal answer, nods of the head and hand gestures cannot always be accurately

---

8

recorded. If you don't hear the question, you don't understand the question, you're confused in any way by the question, if I happen to use an inappropriate term or terminology, recognizing you know a lot more about your business than I ever will, just let us know if there are any problems at all with the questions, otherwise we'll just try to get going and get you back to business.

A. Okay.
Q. What is your name, sir?
A. Deron J. Lock.
Q. Do you live in the greater Wichita area?
A. Yes, I do.
Q. Do you have any plans to move to Massachusetts?
A. No, I don't.
Q. Do you travel to Massachusetts at all for business purposes during the last, say, three years?
A. No.
Q. All right. Have you ever vacationed in Massachusetts?
A. Yes.
Q. Whereabouts?

## Page 9

```
 1  A.  Nantucket.
 2  Q.  Did you spend much time on Nantucket or just
 3      time during the summer months?
 4  A.  Two days.
 5  Q.  Do you have any plans to travel to
 6      Massachusetts at the present time in the
 7      foreseeable future?
 8  A.  No.
 9  Q.  How old are you today?
10  A.  Forty.
11  Q.  Are you married with children?
12  A.  Yes.
13  Q.  Did you go to Wichita State University?
14  A.  No.
15  Q.  Where did you go to school?
16  A.  Kansas State.
17  Q.  With the new football coach?
18  A.  Yes, with the new football coach, that's
19      correct.
20  Q.  I know the people in Virginia loved him, so
21      --
22  A.  Good.
23  Q.  -- hopefully everybody will be happy here.
24      Just briefly, could you tell us your
25      professional background, what you did before
```

HARPER COURT REPORTING
316.265.1534

## Page 10

```
 1      becoming involved with Viking Corporation?
 2  A.  Yeah, I worked for a privately held oil
 3      company called Koch Industries, K-O-C-H, at
 4      the time, the second largest privately owned
 5      company in America. They're just four or
 6      five miles down the road from us here. And I
 7      was the general manager of ore and mineral
 8      trading in Lexington, Kentucky. I was in
 9      Europe for a while and then Chicago for a
10      little while, and I have been here seven
11      years.
12  Q.  And Europe and Chicago was all working for
13      Koch --
14  A.  All working for Koch; I had been with Koch
15      almost 11 years.
16  Q.  And your degree from Kansas State?
17  A.  Agricultural economics.
18  Q.  And how do you make the transition from
19      agricultural economics and Koch Industries to
20      working for Viking Corp?
21  A.  Ag economics is basically a business oriented
22      degree; and at Koch I was involved in trading
23      and sales and management. And in my previous
24      job at Koch, I was the manager of three
25      distribution and manufacturing facilities,
```

HARPER COURT REPORTING
316.265.1534

## Page 11

```
 1      along with trucking operations. Viking is a
 2      business that has many similar functions to
 3      my previous job. It involved managing an
 4      overall self-contained business unit, as
 5      Viking is an overall self-contained business
 6      unit, so there are some similarities in the
 7      tasks, the jobs, and the knowledge that I had
 8      to have.
 9  Q.  What is your present position with Viking?
10  A.  President and general manager.
11  Q.  And have you always been president and
12      general manager since you became associated
13      with the company?
14  A.  Yes.
15  Q.  Were you involved in the purchase of Viking
16      Corporation from a gentleman named
17      Mr. Engren? E-N-G-R-E-N.
18  A.  Yes.
19  Q.  Would it be fair to say that at the time of
20      that transaction that -- strike that. Would
21      it be fair to say that the corporation has
22      continued from when Mr. Engren was involved
23      in it to the present time?
24  A.  Yes.
25  Q.  The company hasn't been re-incorporated?
```

HARPER COURT REPORTING
316.265.1534

## Page 12

```
 1  A.  No.
 2  Q.  All right. When you became involved with --
 3      I'll call it a purchase -- but when you
 4      became involved with the Viking Corporation,
 5      it wasn't a question of just purchasing the
 6      assets?
 7  A.  Correct, we purchased the corporation.
 8  Q.  Okay. The corporation has continued on at
 9      its same location from when Mr. Engren was
10      involved up to the present time?
11  A.  That's correct.
12  Q.  In general, what is the business at the
13      present time of Viking Corporation?
14  A.  We are a manufacturing company. We
15      manufacture industrial cleaning equipment,
16      the bulk of that being shotblasters.
17      Shotblasters are used for cleaning metal of
18      some sort, often in foundries, cylinder
19      refurbishing, aircraft, and other
20      manufacturing operations.
21  Q.  And at the time of the transfer from Mr.
22      Engren to yourself and the current owners of
23      the corporation, what was the business then?
24      Was it the same, was it different, has the
25      company expanded?
```

HARPER COURT REPORTING
316.265.1534

Page 13

1  A.  It's approximately the same in terms of the
2      markets that we serve, and it's approximately
3      the same in terms of revenue. At that time,
4      we are -- we probably have a larger market
5      segment in industrial than we used to have,
6      but it's still roughly the same business.
7  Q.  When you say industrial, does the company
8      also at least at the present time have a
9      market outside of the industrial area, say in
10     commercial or residential?
11 A.  No, we sell to -- we sell shotblast machines
12     to gas cylinder manufacturers, and gas
13     cylinder refurbishers, air gas, air products,
14     Praxair, people who distribute industrial
15     gases have to clean their cylinders. That's
16     a large part of our market, and I would call
17     that not industrial. That's a market that
18     was started for us back in the early '80s and
19     has matured, and so it's not as prolific as
20     it once was, so our focus has switched a
21     little bit more to industrial. That's kind
22     of what I meant by that.
23 Q.  When did you become president, approximately?
24 A.  January 1, '99.
25 Q.  And at that point in time, say the end of

HARPER COURT REPORTING
316.265.1534

Page 14

1      '98, the beginning of '99 when you became
2      involved, did Viking Corporation manufacture
3      and sell tumble washers, swedebrator basket
4      washers -- swedebrator is spelled
5      S-W-E-D-E-B-R-A-T-O-R, and rotary washers?
6  A.  Yes, we did.
7  Q.  And does the company still sell those three
8      types of washers?
9  A.  We still sell those three types of washers,
10     yes.
11 Q.  And does the company still manufacture those
12     types of washers?
13 A.  We don't manufacture the rotary washers; we
14     purchase those out, we subcontract those.
15 Q.  All right. So arrangements have been made in
16     the last five or six years to subcontract out
17     --
18 A.  In the last --
19 Q.  -- the rotary washers?
20 A.  Yeah, in the last year or two, we subcontract
21     out. The volume of those is quite small, and
22     we don't have the economist's scale to make
23     them as cost effectively as we once did, and
24     so we'll often, when we get an order for
25     those from our typical and historical

HARPER COURT REPORTING
316.265.1534

Page 15

1      markets, we'll subcontract those and have
2      those built elsewhere.
3  Q.  All right. So from a business analysis point
4      of view, a decision was made rather than
5      continue manufacturing the rotary washers to
6      subcontract it out to some other entity --
7  A.  Uh-huh.
8  Q.  -- who would make it, put the Viking name on
9      it, and it's then sold to the customer that
10     placed the order with Viking?
11 A.  That's correct.
12 Q.  Okay. Am I correct in my understanding that
13     Viking Corporation sold a rotary washer to
14     Hillside Machine sometime in the early
15     1990's?
16 A.  Yes.
17 Q.  And so that the type of machine that is
18     involved in this matter is a rotary washer
19     with an evaporator?
20 A.  Yes.
21 Q.  Okay. Does the company still sell any
22     machines with evaporator units?
23 A.  No.
24 Q.  In January of 1999, when you became involved,
25     actively involved in the corporation, did the

HARPER COURT REPORTING
316.265.1534

Page 16

1      company sell any machines under the Viking
2      label with evaporator units?
3  A.  No, we didn't, not since I've been around.
4      They're custom pieces that are by request,
5      and there hasn't been any request for them in
6      my tenure.
7  Q.  If requested, would the company
8      hypothetically -- I'm just trying to get a
9      general sense -- customer calls up, wants to
10     replace an old machine or buy a new machine,
11     an additional machine, and wants one with an
12     evaporator, will the company still
13     manufacture and sell them?
14 A.  I don't know. We would have to evaluate. I
15     don't know. I don't know enough about the
16     evaporators to know what the costs are to
17     produce, and -- or how they work
18     specifically, so I don't know. I would have
19     to evaluate it.
20 Q.  And the issue has never come up since January
21     1, 1999 when you became involved in the
22     company?
23 A.  No.
24 Q.  Am I correct in my understanding that you
25     have been designated to appear here today on

HARPER COURT REPORTING
316.265.1534

16

```
          behalf of the corporation in response to a
          Notice of Deposition?
 3  A.    Yes.
 4  Q.    All right. Did you designate yourself in
 5        essence?
 6  A.    Yes.
 7  Q.    Okay. We have marked as Exhibit 1 a
 8        Deposition Notice.
 9               (At this time, the Court Reporter
10           Marked Lock Deposition Exhibit Number 1
11           for Identification.)
12  Q.    In anticipation of appearing here today at
13        the deposition, did you review any documents,
14        any paperwork at all?
15  A.    Yes.
16  Q.    All right. What documents did you review in
17        anticipation of appearing here today?
18  A.    I reviewed the historical documents that you
19        have seen before relative to the sale and the
20        documents relative to the machine; I also
21        reviewed the summons and the other paperwork
22        that you have served on us, so that's the
23        bulk of it.
24  Q.    And when you say the historical documents,
25        those are documents that earlier on in this
```
HARPER COURT REPORTING
316.265.1534

19

```
          have something now that tracks some of that.
 2  Q.    When you became involved in the company
 3        January 1, 1999, did the company have some
 4        sort of system in place to record calls
 5        between itself and customers?
 6  A.    Not electronically. It was typed in by the
 7        sales rep into the contact, into that
 8        individual contact database.
 9  Q.    And were there computer records of some sort
10        kept involving Viking Corp and Hillside and
11        contact between the two companies back in the
12        early 1990's all on the sale of rotary
13        washers?
14  A.    Not to my knowledge.
15  Q.    All right, let me show you a copy of a
16        picture that I think I got off the Internet.
17        It's fair to say that Viking Corporation has
18        a Web site on the Internet?
19  A.    Yeah -- yes.
20  Q.    And it gives general background information
21        about the corporation, --
22  A.    Uh-huh.
23  Q.    -- about the products, services --
24  A.    Uh-huh.
25  Q.    -- associated with the corporation?
```
HARPER COURT REPORTING
316.265.1534

18

```
          case have been produced to counsel, and it's
 2        your understanding has been produced to the
 3        parties in the case?
 4  A.    That's correct, yes.
 5  Q.    That would include correspondence to and from
 6        Hillside Machine?
 7  A.    Yes.
 8  Q.    Okay. It would include order forms or
 9        purchase documents regarding the sale of a
10        rotary washer in the early '90s to Hillside
11        Machine?
12  A.    That's correct, yes.
13  Q.    Would it include telephone records, records
14        of calls between Viking and Hillside
15        involving their machine?
16  A.    No telephone records.
17  Q.    At the present time, does Viking Corporation
18        have some sort of a recordkeeping system
19        involving telephone calls where it will make
20        a record to document a call between a
21        customer and itself?
22  A.    We have a contact database where a sales
23        representative internally would type out
24        phone records currently, but it was not in
25        place at that time back in '92. But we do
```
HARPER COURT REPORTING
316.265.1534

20

```
 1  A.    Yes, that's correct.
 2  Q.    Would that be a copy of a photograph of a
 3        rotary washer similar to the one involved in
 4        this case?
 5  A.    Yes.
 6              MR. DOYLE: Okay. Could we have
 7        that marked as Exhibit 2?
 8              (At this time, the Court Reporter
 9          Marked Luck Deposition Exhibit Number 2
10          for Identification.)
11  Q.    Was a Web site set up for the corporation in
12        January 1, 1999 when you became involved in
13        the corporation?
14  A.    It was already in place, yes.
15  Q.    According to some identifying marks that the
16        printer made, this picture would have been
17        printed out January of 2004. Do you know if
18        the corporation, Viking Corp, updated its Web
19        site once you became involved in January of
20        1999?
21  A.    Yes, we have.
22  Q.    Would this type rotary washer still be listed
23        on the Web site as something that could be
24        purchased through Viking Corp, if you know?
25  A.    I'm not sure if that picture is still on the
```
HARPER COURT REPORTING
316.265.1534

**Page 21**

1  Web site.
2  Q.  Amongst the historical documents that you
3      reviewed today -- that you reviewed in
4      anticipation of being here today, was there a
5      copy of a sales order form that was marked as
6      Exhibit 15 in Mr. Engren's deposition between
7      Viking Corp and Hillside Automotive Machine?
8  A.  Yes, this looks like the same.
9  Q.  Was there also an operator's manual within
10     the historical documents that you reviewed?
11     And I'm showing you Exhibit 14 from Mr.
12     Engren's deposition, a three page document.
13 A.  Yes, I've seen this document.
14 Q.  If you know, was that format operator's
15     manual for a water blaster being used in
16     January of 1999 when you became president of
17     the corporation?
18 A.  No, it was not.
19 Q.  At some point in time, did the Viking
20     Corporation switch to a different style
21     operator's manual for the use with the rotary
22     washer or a water blaster?
23 A.  Yes, it's different.
24 Q.  Let me show you a document that was marked as
25     Exhibit 4 at Mr. Engren's deposition. Was

**Page 22**

1      that the type of style operating manual that
2      was being used when you became involved in
3      the company in January of 1999?
4  A.  I don't know.
5  Q.  At some point in time after you became
6      president in January of 1999, was that style
7      manual being used for rotary washers?
8  A.  This style of manual?
9  Q.  Yes.
10 A.  Something similar to this, I do recognize it
11     as having some similarity. I don't know
12     exactly what goes out.
13 Q.  Based on your having been associated with the
14     company for the last six years or so, is
15     there any way that you can determine when an
16     owner's manual first was put into use or
17     first became available? Is there an edition
18     date, some sort of a date that would tell you
19     that we started using this manual as early as
20     X date?
21 A.  Not to my knowledge. There are drawing
22     dates.
23 Q.  And the drawings within the manual that was
24     marked as Exhibit 4 at Mr. Engren's
25     deposition would have revision dates or

**Page 23**

1      origination dates on the drawings, correct?
2  A.  On the drawings.
3  Q.  But that doesn't indicate when the manual
4      went into effect --
5  A.  No.
6  Q.  -- or was first used?
7  A.  No, it doesn't.
8  Q.  Let me show you what was marked as Exhibit 7
9      at Mr. Engren's deposition, and across the
10     top page it's notes for Paul Rinzella of
11     Hillside Automotive Machine. Do you
12     recognize that as the type and style of phone
13     records that the company has for contacts
14     between itself and customers?
15 A.  Yes. Yes, it does.
16 Q.  Recognizing the company doesn't -- or has not
17     sold any -- strike that. Has the company
18     sold any rotary washers in the last six years
19     since you have been here?
20 A.  Yes.
21 Q.  Okay. Are you familiar, at least in a
22     general sense, with the design, the features
23     of the rotary washer that the company sold?
24 A.  Yes.
25 Q.  Showing you Exhibit 8 from Mr. Engren's

**Page 24**

1      deposition, on the second page is a Jet Spray
2      Degreaser Priceless. Are you familiar
3      with -- recognizing prices may have changed,
4      but are you familiar with that document, a
5      Jet Spray Degreaser Priceless?
6  A.  I'm familiar with this document, yes.
7  Q.  Okay. In looking at the first description
8      for a 24-by-34 Jet Spray Degreaser, the
9      middle of the page for that size washer has a
10     description of the features of the machine,
11     correct?
12 A.  Yes.
13 Q.  Right, that first paragraph.
14 A.  Yes.
15 Q.  It talks about a one-to-three horsepower
16     pump?
17 A.  It's actually one three-horsepower pump.
18 Q.  In the middle of that description, I believe
19     there's a term "safety switch use"?
20 A.  Uh-huh.
21 Q.  And that's correct?
22 A.  That's correct, yeah.
23 Q.  What is the safety switch?
24 A.  The safety switch is an interlock on the
25     door. So if the door to the front of the

HARPER COURT REPORTING
316.265.1534

25

1  washer is opened while it's running, it shuts
2  the pump down automatically.
3  Q. So as far as the washing unit, where the pots
4     are placed to be washed and degreased, --
5  A. Uh-huh.
6  Q. -- if that door is opened during the washing
7     cycle, there is an interlock that shuts down
8     the process?
9  A. Shuts down the pump.
10 Q. All right. So in either picture marked as
11    Exhibit 2 of your deposition --
12 A. Uh-huh.
13 Q. -- or, you know -- let me just stick with
14    that picture. In this picture with the door
15    opened, if it had been operational, if it had
16    been washing, the fact that the door has been
17    broken -- or has been opened up, the
18    interlock shuts down the operation?
19 A. That's correct.
20 Q. Okay. Is that the only safety switch on a
21    rotary washer under the present design
22    specifications?
23 A. Yes.
24 Q. At any point in time since you have become
25    associated with the company in January of

26

1     1999, has the company built a rotary washer
2     with additional safety switches other than
3     this interlock for the washing compartment?
4  A. Only one other. We did a vertical pneumatic
5     door with another safety interlock on the
6     front door.
7  Q. All right. Was it still a rotary washer?
8  A. Uh-huh.
9  Q. And you're going to have to back up, because
10    I lost you on your description of what you
11    were building.
12 A. This door swing open.
13 Q. Right.
14 A. We also made one with a door that raises up
15    vertically. You won't see one. There you
16    are.
17 Q. Let me show you --
18 A. That would be similar.
19 Q. Let me show you a picture of a tumble washer
20    that I found on the Internet back in January
21    of 2004, and it's entitled "Tumble Washer
22    Endless Belt 300, 600 and 1200." Is that a
23    rotary washer with a vertical door?
24 A. That's a tumble washer with a vertical door,
25    yeah; and there's a safety switch behind here

27

1     that locks out the doorway so we have
2     position.
3  Q. Okay. So a different type of washer serves
4     the same general purpose of degreasing
5     equipment?
6  A. Parts, yes, uh-huh.
7  Q. The tumble washer is not a rotary washer?
8  A. Not in industrial terminology that they're
9     used in, no.
10 Q. The tumble washer has a door that appears to
11    open up or slide up?
12 A. It goes up or it swings out like the rotary,
13    either way.
14 Q. Okay. And for the tumble washer, there was
15    also a safety switch, an interlock that will
16    shut down the operation if the door was
17    opened?
18 A. Yes, correct.
19         MR. DOYLE: Okay. Why don't we,
20    just so it's clear what we're talking about
21    or referring to, this is the next exhibit.
22         (At this time, the Court Reporter
23    Marked Lock Deposition Exhibit Number 3
24    for Identification.)
25 Q. Other than these two washers that we've

28

1     referred to in Exhibit 2 and Exhibit 3, do
2     you know during the six years or so you have
3     been associated with the corporation, have
4     they built any washers with other safety
5     switches?
6  A. Not to my knowledge.
7  Q. Okay. Putting aside washers, does the
8     company build other equipment with interlocks
9     or safety switches?
10 A. Yes.
11 Q. Okay. In general, can you tell me what other
12    equipment the company builds at the present
13    time that would have an interlock on it or a
14    safety switch on it?
15 A. Yeah, the shotblasters with doors that open
16    into a cabinet. This (indicating)
17    configuration could also be a shotblaster;
18    this (indicating) configuration could also be
19    a shotblaster.
20 Q. And just so the record is clear, you're
21    referring to the --
22 A. The tumble washer.
23 Q. And the rotary washer --
24 A. Rotary washer.
25 Q. -- that is shown in Exhibits 2 and 3 of your

**Page 29**

1  deposition?
2  A. Uh-huh. The same interlocks apply for
3     blasters as for washers.
4  Q. In reviewing -- strike that. Does the
5     company at the present time have plans or
6     designs for evaporator units in its
7     historical records?
8  A. We don't have -- we don't have CAD drawings
9     on such a device. The records that -- I mean
10    what you've already seen is all the
11    documentation we have relative to the
12    manufacture and design of those.
13 Q. And in reviewing all those documents, are
14    there documents maybe on graph paper that
15    give the general design of an evaporator
16    unit?
17 A. Nothing more than what we've already seen.
18 Q. Now, have you reviewed at any point in time,
19    either when getting ready to make the
20    transition into the company or during the six
21    years that you have been associated with the
22    company, plans, specifications, drawings,
23    descriptions of evaporator units that were
24    made or could be made by the company?
25 A. No.

HARPER COURT REPORTING
316.265.1534

**Page 31**

1  Q. At any point in time during the last six
2     years for any reason at all, have you
3     educated yourself about the use, the
4     feasibility of evaporator units on rotary
5     washers?
6  A. No.
7  Q. Are you aware of any competitors in the
8     business who sell washing equipment with
9     evaporator units?
10 A. No.
11 Q. Does Viking Corporation have a competitor
12    here in the Wichita area by the name of L S?
13 A. Yes, we do.
14 Q. All right. Do you know if L S sells any
15    equipment, washers, degreasers with
16    evaporator units?
17 A. I don't know.
18 Q. Do you know of a company out of, I believe,
19    Oklahoma, Goff's?
20 A. Yeah, I know them.
21 Q. Do you know if they sell washing, degreasing
22    equipment with an evaporator unit?
23 A. I don't know.
24         MR. DOYLE: Goff is G-O-F-F.
25 Q. Do you know what was involved in the original

HARPER COURT REPORTING
316.265.1534

**Page 30**

1  Q. Have you seen any equipment, Viking
2     Corporation equipment that had an evaporator
3     unit?
4  A. No.
5  Q. Have you seen pictures of the machine sold by
6     Viking Corporation to Hillside with the
7     evaporator unit that's part of the machine?
8  A. All I've seen are hand drawings.
9  Q. Do you know who made those hand drawings?
10 A. No.
11 Q. Do you know where they came from?
12 A. They came out of the files, and we don't have
13    any other records of that.
14 Q. When you say they came out of the files, are
15    you talking about Viking Corporation files?
16 A. Yeah.
17 Q. That there would have been hand drawings
18    within the Viking Corporation files that
19    included the evaporator unit for the rotary
20    washer that was sold to Hillside?
21 A. I don't recall the actual drawing of the
22    evaporator unit.
23 Q. You remember hand drawings for the rotary
24    washer that was sold to Hillside?
25 A. Yeah -- yes.

HARPER COURT REPORTING
316.265.1534

**Page 32**

1     design of the rotary washer when it was
2     initially sold by Viking Corporation?
3  A. With respect to how it was designed or who
4     designed it?
5  Q. Both actually.
6  A. I don't know who designed it. It is a -- the
7     design itself is a common industry design as
8     in Exhibit 2 here; and there are many, many
9     factories that do that, so I don't know where
10    the design came from. But it's probable that
11    it was in some form a copy or a knockoff of a
12    previous design by a previous company.
13 Q. Okay. And do you know when Viking
14    Corporation first started to sell rotary
15    units?
16 A. I don't know when, not exactly.
17 Q. Was Viking Corporation -- I'm trying to
18    remember what Mr. Engren said, but I think
19    it's -- was it '78 or '79?
20 A. '78.
21 Q. When the company was first established in
22    1978, do you know if the company sold rotary
23    washing units similar to the one that was
24    sold to Hillside in early 1990's?
25 A. I don't know when Viking began building

HARPER COURT REPORTING
316.265.1534

33

```
 1       rotary washers.
 2  Q.   Do you know when Viking Corporation -- well,
 3       strike it -- strike that. Do you understand
 4       that at some point in time Viking Corporation
 5       sold equipment with evaporator units as part
 6       of the unit?
 7  A.   Yes, I do.
 8  Q.   Do you know when Viking Corporation first
 9       started to sell equipment with evaporator
10       units?
11  A.   No, I don't.
12  Q.   Do you know how long Viking Corporation sold
13       equipment with evaporator units?
14  A.   No, I don't.
15  Q.   Do you know why the company stopped selling
16       equipment with evaporator units?
17  A.   No customer requests for those units.
18  Q.   Do you know how many pieces of equipment
19       Viking Corporation sold with evaporator
20       units?
21  A.   No, I don't.
22  Q.   Do you know if Viking Corporation has ever
23       had to service evaporator units on any of the
24       equipment it sold to any of its customers at
25       any point in time?
```

HARPER COURT REPORTING
316.265.1534

35

```
 1  Q.   All right. Other than that case, are you
 2       aware -- and this case itself, are you aware
 3       of any other claims by people against Viking
 4       Corporation for accidents involving its
 5       equipment?
 6  A.   Not involving washers. There was -- there's
 7       one other in the history that I'm aware of
 8       involving a blaster, a shotblaster.
 9  Q.   And that's also not the Georgia case, because
10       the Georgia case was a washer with propane
11       tanks?
12  A.   Right, right.
13  Q.   What is your general understanding regarding
14       the shotblaster and that claim?
15  A.   It was -- it was a shotblaster used for
16       cleaning truck rims. And maintenance went
17       into the machine, put a broom stick over the
18       safety switch, propped open the door, so it
19       had to override two safeties, got in the
20       machine and the door came down and it killed
21       him. This was at a Goodyear store probably
22       back in the '80s.
23  Q.   So the --
24  A.   Those are the three that I'm aware of in the
25       27 years.
```

HARPER COURT REPORTING
316.265.1534

34

```
 1  A.   No, I don't know.
 2  Q.   All right. During this past six years that
 3       you have been associated with the company,
 4       has Viking Corporation ever been called upon
 5       to service an evaporator unit on any of the
 6       equipment it sold at any point in time to any
 7       of its customers?
 8  A.   I don't know.
 9  Q.   Would it be fair to say that you have no
10       memory of Viking Corporation being called
11       upon to service evaporator units on any of
12       the equipment that it sold at any point in
13       time to any of its customers?
14  A.   Yes, it would be fair to say.
15  Q.   Are you aware of any accidents involving a
16       Viking Corporation piece of equipment that
17       had an evaporator unit that was involved in
18       an accident at any point in time, putting
19       aside this incident involving Mr. Steffen?
20  A.   None that I'm aware of.
21  Q.   You had to testify in another case, I think
22       probably in this same room at some point in
23       time, involving some people out of Georgia, I
24       believe?
25  A.   Yes, correct.
```

HARPER COURT REPORTING
316.265.1534

36

```
 1  Q.   And the shotblaster basically is designed to
 2       clean metal through a different process,
 3       different than the washers?
 4  A.   Yes, the shotblaster throws carbon steel
 5       abrasive at high velocity. It's like an
 6       industrial sandblaster.
 7  Q.   And your understanding is that they covered
 8       up the safety switch to bypass the safety
 9       switch on that?
10  A.   Uh-huh.
11  Q.   And that's a yes?
12  A.   Yes, sorry.
13  Q.   And that they propped the door open, they
14       used something to hold the door open?
15  A.   Yeah.
16  Q.   While they went into --
17  A.   Into the --
18  Q.   -- the working --
19  A.   -- into the cabinet, yes.
20  Q.   And while somebody was doing that, bypassing
21       the safety and propping the door open, was
22       the machine running?
23  A.   No.
24  Q.   So bypassing the safety probably didn't have
25       anything to do with the accident per se, did
```

HARPER COURT REPORTING
316.265.1534

## Page 37

```
 1      it?
 2  A.  I don't know.
 3  Q.  Propping the door open definitely had
 4      something to do with the accident?
 5  A.  (Witness indicates, but no audible answer).
 6  Q.  Correct?
 7  A.  Yes, of course.
 8  Q.  Because whatever happened, the door came
 9      slamming down, somebody seriously hurt and
10      killed?
11  A.  That's all I know. That was long before my
12      time.
13          MR. DOYLE: Why don't we just --
14      can we go off the record for a second?
15          (THEREUPON, a short recess was held
16      from 9:30 until 9:39 a.m.)
17  BY MR. DOYLE: (Continuing)
18  Q.  Why don't we go back on the record. Earlier
19      this morning, Mr. Lock, we were looking at
20      this document that was Exhibit 4 at Mr.
21      Engren's deposition that is entitled "Model
22      3648 Rotary Jet Spray Washer Operating
23      Manual," and I asked you some questions about
24      the dates or the time period when this would
25      have been used. Correct?
```

HARPER COURT REPORTING
316.265.1534

## Page 38

```
 1  A.  Yes.
 2          MR. DOYLE: Why don't we have that
 3      marked as the next exhibit today.
 4          (At this time, the Court Reporter
 5      Marked Lock Deposition Exhibit Number 4
 6      for Identification.)
 7  Q.  I also asked you some questions about the Jet
 8      Spray Degreaser Priceless and the entry that
 9      dealt with a safety switch.
10  A.  Yes.
11  Q.  And that was exhibit -- part of Exhibit 8
12      from Mr. Engren's deposition, correct?
13  A.  Yes.
14          MR. DOYLE: Why don't we mark that
15      as the next exhibit today.
16          (At this time, the Court Reporter
17      Marked Lock Deposition Exhibit Number 5
18      for Identification.)
19  Q.  Was one of the historical documents that you
20      reviewed at some point in time a copy of this
21      three page document, Exhibit 14 from Mr.
22      Engren's deposition, entitled "Operator's
23      Manual Water Blaster or Hot Water Jet Spray
24      Washers"?
25  A.  Yes.
```

HARPER COURT REPORTING
316.265.1534

## Page 39

```
 1  Q.  Do you know when that document would have
 2      been used as an operating manual for the
 3      water blaster?
 4  A.  No.
 5  Q.  Is the water blaster also a rotary jet spray
 6      washer?
 7  A.  Yes, it's the same.
 8  Q.  All right. Water blaster is the trademark
 9      name; rotary jet spray washer is the generic
10      description of the product?
11  A.  Yes.
12          MR. DOYLE: Why don't we have that
13      marked the next exhibit.
14          (At this time, the Court Reporter
15      Marked Lock Deposition Exhibit Number 6
16      for Identification.)
17  Q.  The third page of the operator's manual for
18      the water blaster, Exhibit 6 of your
19      deposition, Exhibit 4 from Mr. Engren's
20      deposition, has two sentences -- or one
21      sentence paragraphs that start off "never."
22      I ask you to take a look at the second one.
23  A.  Uh-huh.
24  Q.  That basically says never use caustic -- I
25      forget, caustic something?
```

HARPER COURT REPORTING
316.265.1534

## Page 40

```
 1  A.  Caustic detergents.
 2  Q.  Could you read that for a second and then
 3      I'll ask you a question. What is a caustic
 4      detergent?
 5  A.  It's a detergent that is of an aggressive or
 6      caustic nature that will cause accelerated
 7      wear in a washer.
 8  Q.  At the present time, does Viking Corporation
 9      make any recommendations regarding the use of
10      detergents for its washers?
11  A.  We recommend that customers talk to a local
12      chemical supplier for their industrial
13      detergents.
14  Q.  And that's at the present time?
15  A.  It's here too.
16  Q.  Right, I understand that, but --
17  A.  Yes, at the present time too, yes.
18  Q.  At the present time, does the company make
19      any recommendations regarding the use of a
20      caustic detergent recommendation one way or
21      the another, or is it silent on the point?
22  A.  We discourage use of caustic detergents.
23  Q.  And at the present time, how does the company
24      discourage the use of caustic detergents with
25      its equipment when operating its equipment?
```

HARPER COURT REPORTING
316.265.1534

### Page 41

1  A.  It's verbal, verbal recommendations.
2  Q.  At the present time, does the company include
3      any information regarding the use of caustic
4      detergents or recommendation not to use
5      caustic detergent in any of its written
6      documents?
7  A.  I don't know.
8  Q.  At the present time, does the operator's
9      manual for a rotary washer contain any
10     information regarding the use or nonuse of a
11     caustic detergent?
12 A.  I don't know.
13 Q.  The operating manual that was marked as
14     Exhibit 4 to your deposition, is that manual
15     still in use at the present time?
16 A.  I don't know.
17     Did somebody provide this to me --
18          MR. DOYLE:  Why don't we go off the
19     record a second.
20          (At this time, an off-the-record
21     discussion was held, after which the
22     following continued:)
23 A.  I don't -- I don't know when this was used.
24 Q.  Okay.
25 A.  I don't recognize when this would have been

HARPER COURT REPORTING
316.265.1534

### Page 42

1      used.
2  Q.  Let me just ask questions, because I
3      didn't -- while you were talking --
4  A.  Sorry.
5  Q.  Do you have a general understanding that
6      communications between yourself, the
7      corporation, and its attorneys are protected,
8      and doesn't have to be disclosed?
9  A.  Understood, sure.
10 Q.  Do you understand that if at any point in
11     time you want to talk with your counsel at
12     all about anything that, you know, just let
13     us know and we'll leave the room?
14 A.  Sure.
15 Q.  All right.
16 A.  Okay.
17 Q.  Getting back to Exhibit 4 from your
18     deposition, the operating manual that is
19     entitled "Model 3648-R Rotary Jet Spray
20     Washer," just to try to put into context what
21     you were saying as we were coming out of the
22     break, is it fair to say you don't know when
23     this operating manual would have been used or
24     if in fact it was ever used by the company?
25 A.  I don't know when it was used or if it was

HARPER COURT REPORTING
316.265.1534

### Page 43

1      ever used, that's true.
2  Q.  Would it be fair to say that among the
3      historical documents maintained by the
4      company, that this document, Exhibit 4 for
5      your deposition, is one of the documents that
6      has been located?
7  A.  Yes.
8  Q.  Looking at page 2 of Roman numeral Section IV
9      that's entitled "Installation," and then page
10     2, the last paragraph of that section -- I
11     believe it's the last paragraph -- yeah.
12     It's entitled "extremely important," correct?
13 A.  Uh-huh.
14 Q.  And would it be fair to say that that
15     paragraph includes a reference that this
16     machine is not for use with caustic soaps?
17 A.  Yes.
18 Q.  And that sentence, that short paragraph would
19     contain information similar to the entry on
20     page 3 of the Water Blaster Operating Manual
21     that's entitled "never use caustic
22     detergent"?
23 A.  Yes.
24 Q.  All right.  But at the present time, you're
25     not sure if the operating manual for washers

HARPER COURT REPORTING
316.265.1534

### Page 44

1      manufactured by Viking contain an entry that
2      deals with not using caustic detergent?
3  A.  No, I'm not sure.
4  Q.  All right.  But it's your understanding that
5      oral representations would be made by the
6      company to customers or people that inquire
7      that caustic detergents, caustic soaps should
8      not be used?
9  A.  Yes.
10 Q.  And is that because they have a corrosive
11     effect on metal that it comes in contact with
12     during the washing process?
13 A.  Yes, that's correct.
14 Q.  What are the alternatives for use in the
15     washing process if you're not going to use a
16     caustic detergent, solvents, or something
17     else?
18 A.  No, solvents are not permitted.  Industrial
19     detergents of various kinds.
20 Q.  Something a little stronger than the Tide
21     that I'll use at home to wash my own clothes?
22 A.  I don't know.  I don't know.  We're not --
23     we're not chemical sales people; we defer
24     that to people who sell chemicals for
25     industrial uses, so we're -- we're not expert

HARPER COURT REPORTING
316.265.1534

## Page 45

1  in that; we don't make significant
2  recommendations as to what people should use
3  or shouldn't use.
4  Q. You refer them to somebody who does deal with
5     detergents or cleaning agents?
6  A. Yes.
7  Q. Part of Exhibit 5 for your deposition
8     includes a page entitled "Degreaser Options
9     Priceless." Correct?
10 A. Yes.
11 Q. And I believe item 13 is something called
12    ecology package?
13 A. Yes.
14 Q. All right.
15 A. Yes.
16 Q. What is the ecology package?
17 A. Other than what I read here, I don't know. I
18    see here that it's a sludge drag or a sludge
19    trap, and it says sludge evaporator.
20 Q. And I believe on this document there's a
21    price for that degreaser option of $239?
22 A. Yeah, I see that.
23 Q. Does the company still offer an ecology
24    package as an option for use with degreasers
25    or washers?

## Page 46

1  A. No.
2  Q. Does it still offer various options for the
3     customer when buying a washer or a degreaser?
4  A. Yes.
5  Q. Would it still include a steam vent with
6     exhaust blower?
7  A. Yes.
8  Q. Automatic float valve with slave tank and
9     double safety switches?
10 A. No.
11 Q. Why is that no longer offered as an option?
12 A. There are some options that there was no
13    call in -- call for in the market; and
14    options that were not purchased on a regular
15    basis were deemed to be not desired by the
16    customer so they were dropped off the offer.
17    Not that they're not viable and still
18    potential options, we just don't offer them
19    in the current offering.
20 Q. A business analysis was made, and those that
21    were not economically feasible were
22    eliminated as potential options that a
23    customer could purchase?
24 A. Yes.
25 Q. Looking at that page, the degreaser options

## Page 47

1  priceless, what, if any, of the 13 options
2  listed on that page are still offered as
3  options by the company?
4  A. Number 3, the seven-day timer, manual timer.
5  Q. Number 6 and 7?
6  A. Yes. Number 6, not number 7. 9 has been
7     made standard; various horsepowers are
8     offered on some -- on some models as options,
9     which would be 11 and/or 12 periodically.
10    Those are the ones that are still offered
11    today on the current quote.
12 Q. Are there any additional options for a
13    degreaser or washer that are offered
14    currently as options that are not listed on
15    this page, the degreaser options priceless?
16 A. Yes.
17 Q. What are they?
18 A. There is a secondary basket. You saw the
19    picture with the lower basket and the middle
20    basket; that's an option. Stainless steel
21    nozzles are an option. Let's see, stainless
22    steel tank and stainless steel construction
23    is an option. Those are the only ones that I
24    can remember that are not on here
25    (indicating).

## Page 48

1  Q. Does the company only subcontract out the
2     construction of rotary washers to one outside
3     vender?
4  A. Right now it's just one.
5  Q. Okay, who is that?
6  A. A company called Peterson Machine Tool.
7  Q. Located where?
8  A. Council Grove, Kansas.
9  Q. And have you contracted with other vendors
10    other than Peterson in the past for the
11    manufacture of rotary washers?
12 A. One.
13 Q. And who is that?
14 A. Intercont Products in Springfield, Missouri,
15    but they're no longer in business.
16    I-N-T-E-R-C-O-N-T. We bought two washers
17    from them back in, I don't know, 2001, 2002,
18    something like that.
19 Q. And at the present time, how many rotary
20    washers, say, during this calendar year 2005
21    has the company sold?
22 A. I don't know. Somewhere approximately eight.
23 Q. And would the price of the rotary washers at
24    the present time vary, depending upon size,
25    options, whether it's gas or electric fired?

## Page 49

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Have you ever been to Hillside Machine? |
| 3 | A. | No. |
| 4 | Q. | Since you have been involved in the company, January 1 of 1999, do you know if anyone from Viking Corp has been to Hillside Machine? |
| 7 | A. | No one has been there. |
| 8 | Q. | Have you had any contact with Paul Rinzella? |
| 9 | A. | No. |
| 10 | Q. | We'll just skip that. |
| 11 | A. | You want the option section? |
| 12 | Q. | No, actually it's the manual. Under Roman Numeral Section 6 entitled "Machine Operation." |
| 15 | A. | Yes. |
| 16 | Q. | I believe number 3 is entitled -- or says, close and latch the cabinet door. |
| 18 | A. | Yes. |
| 19 | Q. | How do you latch the cabinet door on the rotary washer? |
| 21 | A. | There's a clamp that fits over the toggle like this (indicating), just two hooks. |
| 23 | Q. | When you say like this -- |
| 24 | A. | I know you can't -- |
| 25 | Q. | -- they can take the words down, but nobody |

HARPER COURT REPORTING
316.265.1534

## Page 50

| | | |
|---|---|---|
| 1 | | knows what it means. |
| 2 | A. | It's a latch that fits over two togs or dogs, and it's clamped down with a -- I guess it would be just a mechanical clamp. |
| 5 | Q. | And that closing the door and applying the latch would engage the interlock? |
| 7 | A. | Yes. |
| 8 | Q. | If you could turn a couple of pages to the next section, section 7 entitled "Machine and Wiring Diagrams." If you could skip the first page that has the control panel layout and go to the next page, -- |
| 13 | A. | Uh-huh. |
| 14 | Q. | -- that's the power schematic drawing. |
| 15 | A. | Uh-huh. |
| 16 | Q. | In the upper left-hand page of that -- strike that. In the upper left-hand corner of that page, the power schematic for the 220 volt machine, there's a dotted line that goes to the words "lockable safety disconnect switch parenthesis (by customer,) close parenthesis." |
| 23 | A. | Uh-huh. |
| 24 | Q. | What is that? |
| 25 | A. | Lockable safety disconnect switch. That's a |

HARPER COURT REPORTING
316.265.1534

## Page 51

| | | |
|---|---|---|
| 1 | | disconnect switch that is beyond the machine; it's between the power source in the building and the machine. |
| 4 | Q. | And this is information that apparently is within the operating manual, Exhibit 4 to your deposition? |
| 7 | A. | Uh-huh. |
| 8 | Q. | That is telling the customer or the person doing the installation work that if you want to install a safety disconnect switch, this is where you do it, between the power source and the actual power distribution block? |
| 13 | A. | Yes. |
| 14 | Q. | All right. Does the company at the present time make any recommendations regarding the use of a lockable safety disconnect switch when installing a washer? |
| 18 | A. | Yes, we recommend a licensed electrician do it as per local code. |
| 20 | Q. | Does it make any recommendation regarding the licensed electrician installing a lockable safety disconnect switch when installing a washer? |
| 24 | A. | No. |
| 25 | Q. | It's the customer's decision based on however |

HARPER COURT REPORTING
316.265.1534

## Page 52

| | | |
|---|---|---|
| 1 | | he decides or makes decisions? |
| 2 | A. | Yes. |
| 3 | Q. | If you could turn to, I think it's two pages later, it's the drawing RW-200 Rotary Washer Control Schematic. The middle of that diagram for the wash pump contactor, between rectangle 6 and 7 is a door limit switch. |
| 8 | A. | Uh-huh. |
| 9 | Q. | Do you see that entry? |
| 10 | A. | Yes, I do. |
| 11 | Q. | Is that the interlock that you talked about earlier? |
| 13 | A. | Yes. |
| 14 | Q. | So door limit switch is just another term -- |
| 15 | A. | Yes. |
| 16 | Q. | -- for the safety switch, another term for the interlock? |
| 18 | A. | The door limit switch interlocks, yes. |
| 19 | Q. | And that's the only interlock shown on the rotary washer control schematic drawing RW-200, correct? |
| 22 | A. | Yes, yes. |
| 23 | Q. | If you could turn two more pages to page 1 of 3 for the model 3648-R rotary washer, under the electric, there is -- this is a parts |

HARPER COURT REPORTING
316.265.1534

**Page 53**

1  list, in essence?
2  A.  Yes.
3  Q.  Middle of the parts list there is a Viking
4  number 30646, and it's a limit switch?
5  A.  Yes.
6  Q.  That's the same limit switch that is shown on
7  the electric schematic drawing and the same
8  switch that we referred to as the interlock
9  or the safety switch that is in the manuals?
10 A.  Yes.
11 Q.  At the end of the Viking portion of this
12 manual, there's also attached, I believe,
13 something called the Wayne Model P-265 gas
14 type -- strike that -- the Wayne Model P-265
15 power type gas burner, correct?
16 A.  Yes, yes.
17 Q.  The company attaches the manual for the gas
18 burner that is part of a washer to its own
19 manual, correct?
20 A.  That's correct.
21 Q.  All right. And there's an indication on the
22 Wayne cover page that it's AGA?
23 A.  Uh-huh.
24 Q.  And that's the American Gas Association --
25 A.  Yes.

HARPER COURT REPORTING
316.265.1534

**Page 54**

1  Q.  -- symbol indicating that the burner is AGA
2  approved?
3  A.  Yes.
4  Q.  Do you know how long Viking Corporation has
5  used a Wayne gas burner as part of its rotary
6  washers?
7  A.  No.
8  Q.  Do you know if the company used a Wayne gas
9  burner prior to your involvement in the
10 company in January of 1999?
11 A.  Yes.
12 Q.  All right. So any sales of rotary washers
13 prior to January 1, 1999, for some period of
14 time would have had a Wayne gas burner?
15 A.  Yes.
16 Q.  All right. Do you know for how long?
17 A.  No.
18 Q.  Do you know if the rotary washers sold by
19 Viking to Hillside had a Wayne gas burner as
20 part of that machine?
21 A.  I believe it did.
22 Q.  Okay. And do you know if the Wayne manual,
23 either the one that is shown that is part of
24 this document, Exhibit 4 of your deposition,
25 was provided to Hillside as part of that

HARPER COURT REPORTING
316.265.1534

**Page 55**

1  sale?
2  A.  I don't know.
3  Q.  Should the Wayne gas manual have been
4  provided to Hillside in the ordinary course
5  of business --
6  A.  Yes.
7  Q.  -- as you understand it on how business was
8  conducted back in the early 1990's,
9  recognizing you were still working for Koch
10 at the time?
11 A.  Yes.
12 Q.  Okay. Was there someone involved with Viking
13 Corporation back in the early 1990's whose
14 first name was Howard?
15 A.  Yes.
16 Q.  Who is Howard?
17 A.  Howard. Howard, I believe was the plant
18 manager.
19 Q.  And what did Howard do as plant manager in
20 general?
21 A.  Plant manager's duties. I don't know what he
22 did.
23 Q.  Was he still associated with the company when
24 you came on board in 1999?
25 A.  No. I don't even know when he left.

HARPER COURT REPORTING
316.265.1534

**Page 56**

1  Q.  Are you familiar with a Kansas Department of
2  Health and Environment Bureau of Waste
3  Management?
4  A.  No.
5  Q.  Are you aware that the State of Kansas has
6  rules and regulations dealing with evaporator
7  units?
8  A.  No.
9  Q.  Are you aware that the Environmental
10 Protection Agency of the federal government
11 has rules and regulations dealing with
12 evaporator units?
13 A.  No.
14 Q.  The evaporator units that were sold as part
15 of rotary equipment by Viking Corporation,
16 were they totally enclosed treatment systems?
17 A.  I don't know.
18 Q.  Do you know what a totally enclosed treatment
19 system is as defined in 40 Code of Federal
20 Regulations, part 260.10?
21 A.  No, I don't.
22 Q.  Do you know if the company, Viking
23 Corporation, has ever made a determination or
24 attempted to determine whether or not the
25 evaporation units sold by the company were

HARPER COURT REPORTING
316.265.1534

57

| | | |
|---|---|---|
| 1 | | totally enclosed treatment systems as defined |
| 2 | | in 40 Code of Federal Regulations, part |
| 3 | | 260.10? |
| 4 | A. | I don't know. |
| 5 | Q. | Does the company have any records of |
| 6 | | attempting to determine whether or not the |
| 7 | | evaporation units that it sold were totally |
| 8 | | enclosed treatment systems? |
| 9 | A. | I don't know. |
| 10 | Q. | From your work here at Viking Corporation and |
| 11 | | your previous work for Koch, or education, |
| 12 | | training and experience, are you familiar |
| 13 | | with the term "volatile organic emissions"? |
| 14 | A. | Volatile organic emissions? |
| 15 | Q. | Or VOCs? |
| 16 | A. | VOCs, yes. |
| 17 | Q. | Okay. What is a VOC? |
| 18 | A. | Volatile organic compound, I believe. |
| 19 | Q. | When did you first become familiar with VOCs? |
| 20 | | Would it have been in school at Kansas State |
| 21 | | or -- |
| 22 | A. | Probably would have been ten years ago, |
| 23 | | approximately. |
| 24 | Q. | As part of your work for Koch? |
| 25 | A. | Yeah -- yes. |

HARPER COURT REPORTING
316.265.1534

58

| | | |
|---|---|---|
| 1 | Q. | Let me just back up to your work at Koch for |
| 2 | | a second. Was that sort of the business end |
| 3 | | of Koch Industries, or were you involved in |
| 4 | | sort of any hands-on type operation? |
| 5 | A. | Sales and trading. |
| 6 | Q. | Why would the sales and trading -- strike |
| 7 | | that. What did you sell and trade? |
| 8 | A. | We sold -- we sold solid fuel to cement |
| 9 | | plants, to power stations, to any boiler |
| 10 | | applications. We also traded various kinds |
| 11 | | of raw materials like iron ore, coal, |
| 12 | | petroleum coke, which is a solid fuel; so |
| 13 | | they went to various industrial applications |
| 14 | | and some steel mills as well, so --- |
| 15 | Q. | Recognizing that that is the type of business |
| 16 | | that you were involved in with Koch |
| 17 | | Industries -- was it Koch Industries? |
| 18 | A. | Yep -- yes. |
| 19 | Q. | Did you have to familiarize yourself with |
| 20 | | issues that would have an impact on Koch as |
| 21 | | well as the people it did business with? |
| 22 | A. | Yes. |
| 23 | Q. | And is that how you came to become aware of |
| 24 | | the term VOCs? |
| 25 | A. | I only have a passing understanding of what |

HARPER COURT REPORTING
316.265.1534

59

| | | |
|---|---|---|
| 1 | | VOCs are or what their impact is. |
| 2 | Q. | What is your passing understanding, at least |
| 3 | | at the present time of what a VOC is and the |
| 4 | | significance in the industry or the business? |
| 5 | A. | Volatile organic compounds are, in our |
| 6 | | experience, most often are talked about |
| 7 | | relative to painting. People who run a paint |
| 8 | | operation have to be concerned about VOCs and |
| 9 | | the kind of paint that they're using. That's |
| 10 | | really about the limit of my understanding of |
| 11 | | VOCs. |
| 12 | Q. | You were born and raised in Kansas? |
| 13 | A. | For the most part. |
| 14 | Q. | You left Kansas while you were working for |
| 15 | | Koch Industries, correct? |
| 16 | A. | Yes. |
| 17 | Q. | You came back to Kansas after you became |
| 18 | | involved with Viking Corporation in January |
| 19 | | of '99? |
| 20 | A. | Yes. |
| 21 | Q. | So is it fair to say that you spent most of |
| 22 | | your life living, working, going to school in |
| 23 | | Kansas? |
| 24 | A. | Yes. |
| 25 | Q. | Okay. Are you aware that Kansas has a state |

HARPER COURT REPORTING
316.265.1534

60

| | | |
|---|---|---|
| 1 | | agency, the Department of Health and |
| 2 | | Environment? |
| 3 | A. | Yes. |
| 4 | Q. | Are you aware that the Kansas Department of |
| 5 | | Health and Environment has a Bureau of Waste |
| 6 | | Management located in Topeka, Kansas? |
| 7 | A. | No, just what you told me here. |
| 8 | Q. | Right. The purchase of Viking Corporation |
| 9 | | that became effective January 1, 1999, -- |
| 10 | A. | Uh-huh. |
| 11 | Q. | -- how long was the negotiations leading up |
| 12 | | to that final transfer that took effect |
| 13 | | 1/1/99? |
| 14 | A. | Probably 18 months. |
| 15 | Q. | And during that 18-month period, did you have |
| 16 | | an opportunity to review records and |
| 17 | | documents, conduct a due diligence |
| 18 | | investigation as to the business of Viking |
| 19 | | Corporation? |
| 20 | A. | Yes. |
| 21 | Q. | And in reviewing the records and documents as |
| 22 | | part of that due diligence investigation and |
| 23 | | during the past six years that you have been |
| 24 | | president of the corporation, have you had a |
| 25 | | chance to review historical documents and |

HARPER COURT REPORTING
316.265.1534

## Page 61

| | | |
|---|---|---|
| 1 | | records here at the company? |
| 2 | A. | Yes. |
| 3 | Q. | Are you aware of any contact with the Department of Health and Environment for the State of Kansas within the historical documents, within the records that you have reviewed for the due diligence during the past six years? |
| 9 | A. | No. |
| 10 | Q. | Are you aware of any contact that the company has had with the Department of Health and Environment? |
| 13 | A. | No. |
| 14 | Q. | Does the company sell nationwide at the present time? |
| 16 | A. | Yes, we do. |
| 17 | Q. | The largest percentage of any sales are concentrated in what area or region of the country? |
| 20 | A. | There's no specific region. Approximately 60 percent of our business is east of the Mississippi; 40 percent would be approximately west. Inside that percentage, maybe 20 percent would be in Canada, 2 or 3 percent potentially other, international. |

HARPER COURT REPORTING
316.265.1534

## Page 62

| | | |
|---|---|---|
| 1 | Q. | Does any one state have the largest percentage of sales? |
| 3 | A. | Not that I'm aware of. It's well distributed around the country. |
| 5 | Q. | Have you ever seen the Technical Guidance document HW-9503 dealing with the use of evaporation units on equipment published by the Kansas Department of Health and Environment Bureau of Waste Management? And I'll show you a copy. |
| 11 | A. | No. |
| 12 | | MR. DOYLE: All right, let's have this marked as the next exhibit. |
| 14 | | (At this time, the Court Reporter Marked Lock Deposition Exhibit Number 7 for Identification.) |
| 17 | Q. | You attended Kansas State University? |
| 18 | A. | Yeah. |
| 19 | Q. | While you were there, did it have a pollution prevention institute? |
| 21 | A. | Not that I'm aware of. |
| 22 | Q. | Are you aware at the present time that Kansas State University has a pollution prevention institute? |
| 25 | A. | No. |

HARPER COURT REPORTING
316.265.1534

## Page 63

| | | |
|---|---|---|
| 1 | Q. | Did you know a Sherry Davis? Sherry is S-H-E-R-R-Y; Davis D-A-V-I-S. |
| 3 | A. | Go ahead. |
| 4 | Q. | While you were either at Kansas State University or since you've left and graduated? |
| 7 | A. | No. |
| 8 | Q. | Have you attempted to -- strike that. When you were looking into the purchase of Viking Corporation back in the '97, '98 time period, did you attempt to educate yourself on the general business that Viking Corporation was involved in, the sale of washers, shotblasters, equipment that would be involved in, I guess cleaning equipment or degreasing equipment? |
| 17 | A. | Yes, I did. |
| 18 | Q. | As part of that education process as well as work in the business during the past six years since January 1, 1999, are you aware of any other businesses that sell equipment with evaporator units? |
| 23 | A. | No. |
| 24 | Q. | Are you aware that the pollution -- Pollution Prevention Institute at Kansas State |

HARPER COURT REPORTING
316.265.1534

## Page 64

| | | |
|---|---|---|
| 1 | | University reports that many hot soak pots washer cabinets are equipped with evaporator units, but evaporator units have not been approved for use by the Kansas Department of Health and Environment unless they are completely enclosed systems? |
| 7 | A. | No. |
| 8 | Q. | Do you know that the Kansas Department of Health and Environment's Bureau of Waste Management needs to approve evaporator units prior to their use? |
| 12 | A. | No. |
| 13 | Q. | All right. And it's fair to say that during the six years since January 1, 1999, that Viking Corporation has never contacted the Kansas Department of Health and Environment's Bureau of Waste Management to determine whether or not evaporator units were approved for sale? |
| 20 | A. | Yes. |
| 21 | Q. | That's a true statement? |
| 22 | A. | Yes, we have not contacted them, that's true. |
| 23 | Q. | And are you aware whether prior to January 1, 1999, Viking Corporation at any point in time contacted the Kansas Department of Health and |

HARPER COURT REPORTING
316.265.1534

```
 1        Environment's Bureau of Waste Management to
 2        determine whether or not the evaporator units
 3        that it did sell as part of its washers were
 4        approved for sale?
 5    A.  No, we never had any previous contact.
 6    Q.  And there were no records within the company
 7        to document approval of evaporator units for
 8        sale by Viking Corporation?
 9    A.  No, no.
10    Q.  That's a true statement?
11    A.  Yes.
12              MR. DOYLE:  Why don't we mark as
13        the next document that manual that I was
14        referring to and referencing when I asked
15        Mr. Lock the most recent series of questions
16        dealing with the Kansas Department of Health
17        and Environment and its Bureau of Waste
18        Management.  The manual is entitled
19        "Pollution Prevention for the Automotive
20        Maintenance and Repair Industry."  It also
21        has on its cover page "Kansas State
22        University" and also has a reference to the
23        "Pollution Prevention Institute."  My best
24        memory, having printed the document sometime
25        earlier this year, is I don't remember a date
```

```
 1        on this document.
 2              (At this time, the Court Reporter
 3        Marked Lock Deposition Exhibit Number 8
 4        for Identification.)
 5    Q.  Do you have access to the Internet here at
 6        the office?
 7    A.  Yes.
 8    Q.  Do you have access to the Internet at home?
 9    A.  Yes.
10    Q.  All right.  Are you familiar with the Federal
11        Registrar or an entity called the Federal
12        Registrar?
13    A.  No.
14    Q.  Are you familiar with the -- strike that.
15        Does the company sell equipment in the state
16        of Ohio?
17    A.  Yes.
18    Q.  And has the company sold equipment since
19        basically about the time of the beginning of
20        the company in 1978, 1979 time period in the
21        state of Ohio?
22    A.  Yes.
23    Q.  Do you know if the company ever attempted to
24        determine whether or not its evaporator units
25        were approved for sale by the Division of
```

```
 1        Solid and Hazardous Waste Management for the
 2        State of Ohio's Environmental Protection
 3        Agency?
 4    A.  I don't know.
 5    Q.  Do you know if -- has the company -- strike
 6        that.  Do you understand that you're
 7        appearing here today on behalf of the
 8        corporation, Viking Corporation, as a
 9        representative of the corporation designated
10        to appear and respond to questions under the
11        deposition notice?
12    A.  Yes.
13    Q.  So that when I ask you questions, I'm asking
14        the questions of the corporation, Viking
15        Corporation, for you to answer as its
16        representative.
17    A.  Yes.
18    Q.  Do you know if Viking Corporation has ever
19        had any contact prior to your involvement
20        with the corporation, January 1, 1999 as its
21        president, with the State of Ohio's
22        Environmental Protection Agency?
23    A.  I don't have any previous contact -- don't
24        know of any contact at all.
25    Q.  Does the corporation, Viking Corporation,
```

```
 1        have any records involving the Federal
 2        Registrar?  And I'll represent to you that
 3        it's a publication by the federal government
 4        that deals with various documents,
 5        information, publications that are put out by
 6        the federal government.
 7    A.  No.
 8    Q.  Is the corporation aware that as early as
 9        January 7th, 1987, there were published
10        reports within the Federal Registrar dealing
11        with evaporators and the requirement that
12        evaporators comply with 40 Code of Federal
13        Regulations 260.10 for the use of evaporators
14        in the market place?
15    A.  I'm not aware of that.
16    Q.  Does Viking Corporation have a copy of the
17        Code of Federal Regulations or any section of
18        the Federal Code of Regulations here or in
19        its possession, custody and control?
20    A.  No.
21    Q.  Do you know if Viking Corporation has ever
22        had a copy of the Code of Federal Regulations
23        or a portion of the Federal Code of
24        Regulations within its possession, custody or
25        control?
```

69

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | Do you know Larry Carley, C-A-R-L-E-Y? |
| 3 | A. | No. |
| 4 | Q. | Are you aware that you were quoted in an article by Larry Carley, called the "Aqueous Alternative" back in 1999? |
| 7 | A. | No. |
| 8 | Q. | Would you agree with the following: "The trend over the past eight to ten years has been to move away from solvents for degreasing"? |
| 12 | A. | Yes. |
| 13 | Q. | And this is in an article that appeared -- or is dated as of September 1999 -- |
| 15 | A. | Okay. |
| 16 | Q. | -- so the time period would have been during the 1990's. |
| 18 | A. | Uh-huh. |
| 19 | Q. | That the trend has been to move away from solvents for degreasing? |
| 21 | A. | Yes. |
| 22 | Q. | What do you move towards? |
| 23 | A. | Aqueous. |
| 24 | Q. | And what is the difference between a solvent and aqueous or aquaous? |

HARPER COURT REPORTING
316.265.1534

70

| | | |
|---|---|---|
| 1 | A. | Solvent is normally used in a vibratory type degreaser, typically in automotive, not in spray washers. Aqueous is aqueous chemistry with some sort of detergent and a rotary style or a water based jet washer. So solvent is used only for approved areas for vibratory cleaning. We also make vibratory cleaners as well. |
| 9 | Q. | All right. I'm probably comparing apples and oranges, and I'm going to show my ignorance again. But earlier the manual or the documents that we have had marked today reference caustic soaps or caustic detergents. Is caustic a solvent, is it aqueous, or am I mixing apples and oranges? |
| 16 | A. | Normally a caustic would be used in an aqueous solution. |
| 18 | Q. | And solvents, are they -- I don't know -- petroleum based or -- |
| 20 | A. | Yes. Mostly petroleum based, yes. |
| 21 | Q. | Would you agree also with a quotation in Mr. Carley's article, quote: "A vibratory equipment for cleaning CV shafts, alternators, starters, and A/C compressors used to use solvent but we've since changed |

HARPER COURT REPORTING
316.265.1534

71

| | | |
|---|---|---|
| 1 | | to aqueous"? |
| 2 | A. | Yes. |
| 3 | Q. | So earlier than, say, eight to ten years earlier, so back in the '80s, Viking Corporation used to use solvents? |
| 6 | A. | We didn't use any solvents. We sold vibratory shakers. Someone may have used solvent and they may have used water based chemistry; we don't really know, we didn't sell either one. We sold the equipment and they can use whatever. Now, what we have -- what we intend for folks to use is aqueous based chemistry. |
| 14 | Q. | And the vibratory, are they different than the rotary? |
| 16 | A. | Yes. |
| 17 | Q. | So this quotation that talks about a vibratory equipment for cleaning CV shafts, alternators, starters and A/C compressors, that's a different piece of equipment -- |
| 21 | A. | Yes. |
| 22 | Q. | -- than a rotary washer? |
| 23 | A. | Yes. |
| 24 | Q. | Do they still accomplish the same general purpose, which is to clean or degrease the |

HARPER COURT REPORTING
316.265.1534

72

| | | |
|---|---|---|
| 1 | | equipment that is placed inside the point of operation? |
| 3 | A. | Generally said, yes. |
| 4 | Q. | Is it fair to say in the rotary washers that the equipment is placed into a basket that is then rotated around in the point of operation? |
| 8 | A. | Yes. |
| 9 | Q. | And the rotary, is it more like a tumble, where they are tumbled about? |
| 11 | A. | A rotary sits in a basket and it rotates on a horizontal plane. Tumble, tumble parts go into a batch and they're tumbled like in a cement mixer on top of one another. And a vibratory piece of equipment, they would tend to tumble more like in a cement mixer, with a media that acts as a mechanical stripping where it basically scrapes the parts clean. And we use a solution to pull the contaminants away from the part. |
| 21 | Q. | You used the analogy of a cement mixer. Would it also be like a clothes dryer, that type operation, recognizing the clothes dryer has hot air, but it's still going around and things are tumbling? |

HARPER COURT REPORTING
316.265.1534

Page 73

```
1   A.   Uh-huh, yes.
2             MR. DOYLE:  Why don't we mark the
3   article we were referring to.  I saw you
4   looking at it and --
5             THE WITNESS:  I think it's a long
6   time ago.
7             MR. DOYLE:  Yeah.  Why don't we
8   mark this as the next exhibit.
9             (At this time, the Court Reporter
10            Marked Lock Deposition Exhibit Number 9
11            for Identification.)
12  Q.  At the present time, how many employees work
13      at Viking Corporation?
14  A.  About 24.
15  Q.  And in January of 1999, how many worked here,
16      approximately?
17  A.  Approximately 24.
18  Q.  The business has stayed generally the same,
19      some of the same products, the same market
20      place during the six years?
21  A.  Yes.
22  Q.  Has the volume of equipment, the items,
23      numbers sold stayed basically the same?
24  A.  On average, yes.
25  Q.  Companies had ups and downs over the years?
```

HARPER COURT REPORTING
316.265.1534

Page 74

```
1   A.  Correct.
2   Q.  Some years better than others?
3   A.  Yes.
4   Q.  At least one very bad year during the
5       six-year process?
6   A.  Yes.
7   Q.  Was Mr. Engren the sole shareholder of the
8       corporation back in 1998 when he was selling
9       out?
10  A.  Yes.
11  Q.  In the due diligence investigation and the
12      review of documents since you took over, can
13      you determine what was done as far as a
14      design process for equipment that was
15      manufactured by the company during the
16      initial 15 years of the company's operations,
17      so from roughly '78 up until the early '90s?
18  A.  No, I don't know.  I don't know what they
19      did.
20  Q.  Did they ever employ outside engineering --
21      engineers to get involved in the design of
22      machines or parts of machines?
23  A.  I don't know.
24  Q.  Does the company have any documents that
25      would document the use of outside engineers
```

HARPER COURT REPORTING
316.265.1534

Page 75

```
1       for the design of machines?
2   A.  Not to my knowledge.
3   Q.  And would you believe you would be the most
4       knowledgeable person at the corporation on
5       that point, historical transactional data
6       involving the design, manufacture, and sale
7       of equipment by Viking Corporation during the
8       first 15 years of the corporate existence?
9   A.  Yes.
10  Q.  Was Mr. Engren involved in the design of
11      equipment?
12  A.  I believe so.
13  Q.  Does the company use any type of interlock
14      device that uses the temperature as a factor
15      in the operation of the interlock?
16  A.  No.
17  Q.  Is it feasible at the present time to have an
18      interlock that is temperature based?
19  A.  I don't know.
20  Q.  Do you have a self-cleaning oven at home?
21  A.  Yes.
22  Q.  Have you ever used the self-cleaning
23      mechanism?
24  A.  I have not.
25  Q.  Are you generally aware that in the use of a
```

HARPER COURT REPORTING
316.265.1534

Page 76

```
1       self-cleaning oven that you somehow lock the
2       door around it so that you can engage the
3       mechanism to self clean the oven?
4   A.  Yes.
5   Q.  How is that generally set up, at least in a
6       general sense?
7   A.  I don't know.
8   Q.  Are you aware that as long as the temperature
9       within the oven remains above a certain level
10      that you can not disengage that locking
11      device?
12  A.  Yes.
13  Q.  Is it mechanically feasible to install a
14      device at the present time on a washer so
15      that as long as the temperature within a
16      washer is above a certain level that it can't
17      be opened?
18  A.  I don't know.
19  Q.  At the present time -- well, strike that.
20      During the past six years that you have been
21      president of the corporation, have you
22      engaged any engineers for design purposes?
23  A.  No.
24  Q.  Are you aware of the company ever engaging
25      engineers for design purposes?
```

HARPER COURT REPORTING
316.265.1534