# United States District Court
# District of Massachusetts

EDWARD STEFFEN AND
MARSHA STEFFEN,
        Plaintiffs,

        V.                                          CIVIL NO. 2004-10592-RBC

VIKING CORPORATION,
        Defendant, Third Party Plaintiff,

        V.

HILLSIDE MACHINE, INC.,
        Third Party Defendant.

## MEMORANDUM AND ORDER ON THIRD PARTY DEFENDANT, HILLSIDE MACHINE, INC.'S MOTION FOR SUMMARY JUDGMENT (#44)

COLLINGS, U.S.M.J.

### I. Introduction

On or about February 9, 2004, plaintiffs Edward and Marsha Steffen filed

their three-count complaint (#2) against defendant Viking Corporation (hereinafter "Viking") in the Superior Court for Middlesex County in Massachusetts. Approximately six weeks later, Viking removed the case to the United States District Court for the District of Massachusetts. (#1) Viking filed its answer to the complaint on March 26, 2004. (#7)

In early December, 2004, Viking initially moved for leave to file a third party complaint. (#22) That motion was denied for failure to comply with the local rules, but a similar motion was filed on February 22, 2005. (#29) This second motion for leave to file a third party complaint was ultimately allowed in part and denied in part[1]. Essentially, Viking was allowed to file and serve a third party claim against Hillside Machine, Inc. (hereinafter "Hillside"), alleging a claim of express or implied contractual indemnification. The third party complaint incorporating the contractual indemnity claim was filed on July 25, 2005 (#34), with Hillside filing its answer seventeen days thereafter. (#35)

Discovery was undertaken in the normal course and, in accordance with a Scheduling Order issued on March 8, 2006 (#43), Hillside submitted a motion for summary judgment (#44) together with a memorandum of law in support

---

[1] Viking was not permitted to pursue claims for common law indemnification and contribution, nor was it allowed to add claims against two individuals. *See* Electronic Order dated 07/15/2005.

and affidavit (#45) as well as a number of exhibits on May 3, 2006. (##47-61[2])

On May 25, 2006, Viking filed an opposition to the dispositive motion including

several exhibits. (#66[3])  The following day the plaintiffs, Edward and Marsha

Steffen, too, filed an opposition to Hillside's summary judgment motion (#64)

which basically adopted the arguments advanced by Viking.   With the

submission of Hillside's response (#65) on June 5, 2006, the record is complete

and the motion for summary judgment stands ready to be resolved.

## II. The Facts

The recitation of the facts shall be based upon the pleadings in the case,

most particularly the parties' respective statements of undisputed material facts.

To the extent that the parties' facts are not contested they shall be deemed

admitted and shall be reiterated herein verbatim, albeit without quotation

marks. *See* L.R. 56.1.[4]  Reference throughout shall be to the statements of fact

themselves rather than the supporting materials unless otherwise noted.

---

[2]

The exhibits were not filed electronically until May 18, 2006.

[3]

Document #62 and the main document in #63 are the same. Document #63 includes the exhibits while #62 does not. Document #66 filed June 5, 2006, is a corrected version of #63 and so is the filing which will be referenced throughout as the opposition.

[4]

Neither Viking nor the Steffens controverted Hillside's statement of undisputed facts. *See* #45 at 1-6. For its part, Hillside "clarified" the statement made in fact #12 of Viking's statement of additional material facts and denied fact #19.  *See* #66 at 2-4; #65 at 1-2.

First, to set the stage:  Plaintiffs Edward Steffen and Marsha Steffen are husband and wife. (#2 ¶1)   At all times relevant to the events in this case, Edward Steffen was an employee of third party defendant Hillside. (#45 ¶35)  On or about December 2, 2002, Edward Steffen allegedly was injured in an accident at work which occurred in the vicinity of a machine that Hillside had purchased from Viking.  (#2  ¶7[5])  Edward Steffen collected workers' compensation benefits as a result of the accident. (#45 ¶35)  The Steffens filed suit against Viking alleging claims of negligence, breach of warranty and loss of consortium. (#45)   Viking, in turn, filed the third party complaint against Hillside alleging a claim for contractual indemnification.  (#34)

Now, to the general factual background:  On or about May 11, 1992, Paul B. Renzella (hereinafter "Renzella"), the president and owner of Hillside, placed an order for a Washer with a sludge evaporator oven (hereinafter "the Oven") manufactured by Viking (hereinafter "the Washer") with John Zanetti ("Zanetti") of AMS Equipment Sales. (#45 ¶4)  Hillside had never previously purchased any product from Viking. (#45 ¶7) Prior to placing the order for the Washer, Hillside had no written or oral communication with anyone at Viking;

---

[5]

Viking denies this allegation. (#7 ¶7)

the order was placed after reviewing a Viking catalogue and consulting with Zanetti. (#45 ¶6)   Hillside relied entirely upon Viking to design and manufacture the Washer in accordance with the requested specifications. (#45 ¶5)

On June 1, 1992, approximately twenty days after placing the order, Hillside received a confirming facsimile from Gus Enegren (hereinafter "Enegren"), then the owner of Viking. (#45 ¶6)  As reflected in Viking Invoice #29783, the total purchase price for the Washer was $12,210.35. (#45 ¶9) Hillside paid an additional $1,251.64 charge for the crating and shipping of the Washer. (#45 ¶10)  In September of 1992, the Washer was delivered to Hillside fully assembled. (#45 ¶11)

The operating manual supplied by Viking with the Washer specified that no caustic cleaners were to be used in its operation. (#66 ¶1)  Viking insisted on the ban on caustic cleaners because their corrosive effect typically damaged the Washer, and, indeed, the company continues to recommend that caustic cleaners not be used in the washers it manufactures and/or distributes. (#65 ¶¶2,3)  Upon delivery of the Washer, Hillside noticed that the operating manual warned against using caustic cleaning solutions in the Washer. (#45 ¶12) Renzella of Hillside spoke with Enegren of Viking about the ban on caustic

cleaners within the first thirty to sixty days after the Washer was delivered. (#65 ¶4) Enegren told Renzella that the warning was there due to the potential danger to an operator of the Washer whose skin would be exposed to such a strong cleaning agent. (#45 ¶12) Renzella told Enegren that Hillside had used caustic solutions in the past without a problem, that it was unreasonable not to be able to use a caustic cleaner in the Washer and that Hillside intended to do so. (#45 ¶12; #65 ¶6[6])

Hillside hired a plumber and an electrician to assist with the installation of the Washer. (#45 ¶14) When the Washer was inspected by the Boston Gas Company after it had been installed, the Boston Gas Company advised Hillside that the Washer was not properly approved for use in Massachusetts. (#45 ¶15) Although additional work had to be done on the Washer in order for it to be operated legally in the Commonwealth, no modifications to the Oven were made before the accident. (#45 ¶16)

On October 14, 1992, Hillside's attorney, John J. Todisco, Esq., wrote a letter to Viking detailing the additional work needed to be done for the Washer to meet American Gas Association or Underwriters Laboratory approval. (#45

---

[6]

Enegren thought it likely that Hillside was in fact using a caustic cleaner when Renzella reported a leaking fire tube in the Washer. (#65 ¶5)

¶17)  Shortly thereafter Hillside received an October 19, 1992 letter from Enegren of Viking thanking Hillside for purchasing the Washer. (#45 ¶18)  On November 17, 1992, Zanetti submitted an application for approval of use of the Washer in Massachusetts. (#45 ¶19)

After the Washer had been approved in Massachusetts, Hillside continued to experience problems with it although none with the Oven. (#45 ¶20)  Renzella made a number of telephone calls to Enegren. (#45 ¶20; #66 ¶7)  Enegren took notes regarding the conversations he had with Renzella using a contact management software. (#45 ¶21)  Samples of those notes read as follows:  the July 22, 1993 Enegren telephone note states "'What can we do to get going again.'  I suggested we exchg m/c.  He will consider o'nite." (#45 ¶22); the July 28, 1993 Enegren telephone note states "(Cont) and cost me so much money in lost business and down time'.  We began asking for a complete list of defects so we could effect a correction last February but Paul was always "too busy'!" (#45 ¶23); the August 2, 1993 Enegren telephone note states "Called today and said got things going again and is considering now how to deal with machine.  Not sure if wants $ back, replacement, or repairs...W/C us."; and the August 11, 1993 Enegren telephone note states

Paul called bitching again about down time and costs

7

> etc. Said has t/t his atty who said "Kill him". Paul said
> he'd be happy just to get his $ back and would sign a
> release m liability for warranty or future damages.
> Told him to get me a (Cont) release fm his atty and I
> would consider the release and suggestion together."

Third Party Defendant's Memorandum #45 ¶25.

Viking sent Howard Whitetree (hereinafter "Whitetree") to Hillside to deal with the alleged problems with the Washer and to answer Hillside's questions about how the Washer was built, designed or used. (TR 66 ¶8)  Whitetree reported to Viking that he had observed Hillside using caustic cleaners in the Washer. (#66 ¶9) Hillside's use of caustic cleaning solutions in the Washer was one of the primary reasons Viking sought a release from Hillside. (#45 ¶27; #66 ¶10)

Viking received a letter from an attorney representing Hillside referencing modifications that Hillside made to the Washer with respect pipes in the manifold, a low water shut down, a water temperature gauge and a friction brake on the door. (#66 ¶11)  Three photos of the Washer reveal modifications from the original design of the Washer with respect to the door latch, timer water temperature gauge, temperature gauge and evaporator chamber door, although Hillside admits that the only modification to the Oven was the addition of a hasp and padlock to secure the Oven door after the Accident. (#65

8

at 1-2; #66 ¶12)  Although Viking was informed that Hillside would be making modifications to the Washer, Viking did not believe that Renzella had the experience to modify the Washer. (#66 ¶¶13, 14)  Viking did not believe that Hillside could use the Washer safely based on its use of caustic cleaning solutions and due to Renzella's inexperience in making modifications to the Washer. (#66 ¶15)

Renzella and Enegren conferred on the telephone regarding the options available to resolve Hillside's difficulties with the Washer. (#45 ¶26)  While Viking was prepared to refund the entire purchase price in exchange for the return of the Washer, Hillside wanted to retain the Washer and receive the full refund. (#66 ¶¶16, 17)  The parties ultimately agreed upon a refund of the purchase price of the Washer ($12,210.35) by Viking in exchange for a release

by Hillside.[7]

---

[7]

Viking states that its agreement was "conditioned on a full and complete release from any and all liabilities associated with the Washer" while Hillside states the agreement to be "a release of all claims of Hillside against Viking." *Compare* #66 ¶18 with #45 ¶26.

According to Enegren, he explained to Renzella that the scope of the release of Viking from all liabilities associated with the Washer included indemnification that protected Viking from claims brought by Hillside as well as any claims arising out of Hillside's continued use of the Washer. (#66 ¶19) Renzella denies that any such explanation was given. (#65 at 2)  Hillside instructed its attorney, Mark Favaloro, Esq., to draft a release of all Hillside's claims against Viking. (#45 ¶28)  Attorney Favaloro did so and, under cover of a letter dated August 12, 1993, forwarded the release to Enegren at Viking. (#45 ¶28)

The release drafted by Attorney Favaloro states as follows:

> For consideration received in the sum of $12,210.35, I, Paul B. Renzella, Hillside Automotive Machine, Inc., of 1302 Eastern Avenue, Malden, Massachusetts, hereby release Viking Corporation of 6501 W. Irving, Wichita, Kansas, from any and all claims including warranty claims, arising out of the purchase of a 36"

> x 72" Jet Washer with gas heat, 220 v/3ph 15HP,
> purchased by me from the said Viking Corporation on
> or about August 4, 1992.

Third Party Defendant's Memorandum #45 ¶33.

Enegren of Viking believed that the release as drafted by Hillside's attorney accurately reflected the scope of protection that Enegren allegedly had requested of Renzella. (#66 ¶20)  Enegren informed Renzella telephonically that the release, as drafted, was acceptable. (#45 ¶29)  By letter dated September 7, 1993, Hillside received a $12,210.35 check from Viking. (#45 ¶30)

The September 9, 1993 Enegren telephone note states "Asked if recd ck and sent release by fedex; Rcvd ck y'day.  Will fax release in am and mail original signature." (#45 ¶31)  On September 10, 1993, Renzella signed the release as drafted by Attorney Favaloro. (#45 ¶32)  Renzella understood the terms of the release only to release all claims that Hillside had against Viking due to the problems Hillside had experienced with the Washer, and nothing more. (#45 ¶34)  The release executed between Hillside and Viking was the only time in over twenty years of running Viking that Enegren felt the need or desire to have a release and indemnity agreement. (#66 ¶21)

Plaintiff Edward Steffen contends that the accident occurred when he

11

opened the door to the Oven on the Washer. (#45 ¶36) Renzella, who was at

Hillside at the time of the accident, heard an explosion-like boom and then saw

Edward Steffen on fire. (#44 ¶37)  Edward Steffen's liability expert will offer

the following opinion at trial:

> It is expected that D. Robert Holt will testify that the washer did not have an adequate interlock guard, which was feasible at the time of manufacture and sale. Evidence will be offered that Viking Corporation failed to identify the hazards associated with the use of the evaporator [Oven] on the washer. Among the hazards were thermal and/or fire.  Testing should have disclosed the existence of the hazards.  The hazards were present during the use of the evaporator to change sludge into a solid waste product which occurred by baking the sludge in a hot environment where there was a low oxygen environment.  The potential for fire and explosion were present.  Fire and explosion potentially result when opening the evaporator resulting in sudden exposure of air to the low oxygen environment.  The defendant, Viking Corporation, failed to eliminate the hazard during the design process of building the evaporator through the use of an interlock guard.  The defendant, Viking Corporation, failed to warn against the hazard in company literature, including the operator's manual, and/or on the machine.

Third Party Defendant's Memorandum #45 ¶38.

### III.  The Summary Judgment Standard

The purpose of summary judgment "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc.,* 332 F.3d 6, 12 (1 Cir., 2003) (citing *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1 Cir., 1990) (quoting Fed. R. Civ. P. 56 Advisory Committee's note)).  The party moving for summary judgment bears the initial burden of asserting the absence of a genuine issue of material fact and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.,* 335 F.3d 15, 19 (1 Cir., 2003).  After the moving party has met its burden, "the burden shifts to the summary judgment target [the non-moving party] to demonstrate that a trial-worthy issue exists." *Mulvihill,* 335 F.3d at 19 (citing *Suarez v. Pueblo Int'l, Inc.,* 229 F.3d 49, 53 (1 Cir., 2000)).

When considering whether to grant summary judgment, the Court must determine whether:

> ...the pleadings, depositions, answers to interrogatories, and admissions on file, together with

> the affidavits, if any, show that there is no genuine
> issue as to any material fact and that the moving party
> is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).

In making this assessment, the Court must "scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor." *Mulvihill,* 335 F.3d at 19 (citing *Morris v. Gov't Dev't. Bank,* 27 F.3d 746, 748 (1 Cir., 1994)); *see also Podiatrist Ass'n, Inc.,* 332 F.3d at 13; *Pure Distributors, Inc. v. Baker,* 285 F.3d 150, 152 (1 Cir., 2002); *New England Regional Council of Carpenters v. Kinton,* 284 F.3d 9, 19 (1 Cir., 2002) (citing *Dynamic Image Technologies., Inc. v. United States,* 221 F.3d 34, 39 (1 Cir., 2000)); *Kearney v. Town of Wareham,* 316 F.3d 18, 22 (1 Cir., 2002).

Despite this "notoriously liberal" standard, *Mulvihill,* 335 F.3d at 19, summary judgment cannot be construed as "a hollow threat." *Kearney,* 316 F.3d at 22. A factual dispute which is neither "genuine" nor "material" will not survive a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Thus, in deciding whether a factual dispute is "genuine," the Court must determine whether the evidence is such that a reasonable jury

could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248; *Kearney,* 316 F.3d at 22 (citing *United States v. One Parcel of Real Prop. (Great Harbor Neck, New Shoreham, R.I.),* 960 F.2d 200, 204 (1 Cir., 1992)*; Suarez,* 229 F.3d at 53 (citing *McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1 Cir., 1995)).  In circumstances where submitting the issue in dispute to the jury amounts to "nothing more than an invitation to speculate," summary judgment is appropriate. *Feliciano de la Cruz v. El Conquistador Resort and Country Club,* 218 F.3d 1, 9 (1 Cir., 2000) (quoting *Lattimore v. Polaroid Corp.,* 99 F.3d 456, 467-68 (1 Cir., 1996)).  In weighing whether a factual dispute is "material," the Court must examine the substantive law of the case, because "only disputes over the facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248; *Kearney,* 316 F.3d at 22.

The focus at the summary judgment phase "'should be on the ultimate issue: whether, viewing the aggregate package of proof offered by the plaintiff and taking all inferences in the plaintiff's favor, the plaintiff has raised a genuine issue of fact..'." *Rivas Rosado v. Radio Shack, Inc.,* 312 F.3d 532, 535 (1 Cir., 2002) (quoting *Dominguez-Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424,

430-31 (1 Cir., 2000)); *see also Leahy v. Raytheon Co.,* 315 F.3d 11, 16-17 (1 Cir., 2002); *Suarez,* 229 F.3d at 53. The party objecting to summary judgment may not merely rest upon the statements put forth in its own pleadings. *See Gillen v. Fallon Ambulance Service, Inc.,* 283 F.3d 11, 26 (1 Cir., 2002) (citing *Colantuoni v. Alfred Calcagni & Sons, Inc.,* 44 F.3d 1, 4-5 (1 Cir., 1994) (a party objecting to summary judgment fails to put forth a genuine issue of material fact merely by filing an affidavit contradicting unambiguous answers contained in a prior deposition)). Instead, Rule 56(c):

> mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## IV. Discussion

Massachusetts law on the issue of implied contractual indemnification can perhaps best be described as unsettled. While it may be true, as Hillside contends, that the courts in the Commonwealth have yet to permit a third party claim for implied contractual indemnification against an employer who has paid workers' compensation benefits to an injured employee, the door for such a

claim, in the appropriate factual circumstances, has certainly been left open. *See, e.g., Larkin v. Ralph O. Porter, Inc.*, 405 Mass. 179, 182, 539 N.E.2d 529, 531 (1989)("Assuming without deciding that we would recognize a right to indemnification from an employer based on an implied agreement, we conclude that there is no such implied agreement here."); *Decker v. Black and Decker Manufacturing Company*, 389 Mass. 35, 38, 449 N.E.2d 641, 643 (1983)("Turning to the case before us, and assuming without deciding that we would recognize a right to indemnification based on an implied contract to indemnify, we find no implied contract here."); *New Bedford Gas and Edison Light Company v. Maritime Terminal, Inc.*, 380 Mass. 734, 735, 405 N.E.2d 653, 654 (1980)("We have never decided whether we would follow the majority rule and permit a third-party tortfeasor to obtain indemnity from an employer who had expressly or impliedly contracted to indemnify the third party against liability for injury to the employer's employee. In those cases in which the issue was raised, we did not reach the question because the evidence did not warrant a finding that there was such an agreement....The same is true in this case." (citations and footnote omitted)); *Liberty Mutual Insurance Company v. Westerlind*, 374 Mass. 524, 526-527, 373 N.E.2d 957, 959 (1978)("The majority

position is that a third-party tortfeasor may recover indemnity from an employer only if the employer had expressly or impliedly contracted to indemnify the third party or if the employer and the third party stand in a relationship that carries with it the obligation to indemnify the third party. Assuming that in Massachusetts a third party may recover indemnification from an insured employer if the employer expressly or impliedly contracted to hold the third party harmless, there was no indication in the complaint or elsewhere that Brisk was under an express or implied contractual obligation to indemnify Westerlind. Assuming that a relationship giving rise to an obligation to indemnify would state a cause of action by a third party against an employer in Massachusetts, nothing in the record would support the existence of such a relationship between Brisk and Westerlind. In fact, it appears that Westerlind was a complete stranger to Brisk. Thus Westerlind has no right to indemnification from Brisk." (citations omitted)); *cf. Roy v. Star Chopper Co., Inc.*, 442 F. Supp. 1010, 1018, (D.R.I., 1977), *aff'd* 584 F.2d 1124 (1 Cir., 1978), *cert. denied* 440 U.S. 916 (1979) ("The overwhelming majority have held that the employer was immunized against non-contractual indemnity claims but could be held liable based on express or implied contracts to indemnify the third

party.... Consistent with majority rule, the Court concludes that the Massachusetts Act grants the employer immunity from indemnity claims based solely on a non-contractual relationship as tortfeasors. However, Third Party Defendant does not receive immunity against express or implied obligations to contract based on an independent contractual relationship.")

The long and short of it is that the potential viability of such a implied third party contractual indemnification claim against an employer has not been foreclosed.  Upon reviewing the relevant cases, it seems that the Massachusetts Supreme Judicial Court has yet to be faced with the factual circumstances that would squarely present this particular issue for decision.[8]

Given this state of the law, the question of whether the issue in the

---

[8]

An implied contractual right to indemnification has been recognized in other situations, for instance,

> if "special factors" exist to support an intention that one party indemnify the other. *See Fall River Housing Auth.*, 414 Mass. at 14, 604 N.E.2d 1310. The special factors result from the contract provisions as viewed against the relationship between the parties. *See Monadnock Display Fireworks, Inc. v. Andover*, 388 Mass. 153, 156, 445 N.E.2d 1053 (1983) (holding town liable under implied indemnification in contract for police protection for injury to spectator); *Araujo,* 693 F.2d at 2 (noting relationship between vendor and purchaser doesn't normally give rise to indemnification rights). Damages, however, must be fairly within the scope of forseeability to permit inclusion under an implied right of indemnification. *See Great Atlantic and Pacific Tea Co. v. Yanofsky*, 380 Mass. 326, 333, 403 N.E.2d 370 (1980).

*Samos Imex Corp. v. Nextel Communications, Inc.*, 20 F. Supp.2d 248, 251-2 (D. Mass., 1998).

19

present case should be certified to the SJC comes to the fore.  However, as noted, the issue is not one that can be decided in a factual vacuum.  Before any question of certification can be considered, the facts of this case must be decided.  Based on the record now before the Court, material facts in dispute.

The agreement at issue is not the initial sales transaction between Viking and Hillside for the Washer.  Rather, the focus in this case is on the agreement whereby Hillside was not only allowed to keep the Washer, but also was reimbursed by Viking for its full sales price in exchange for a release "from any and all claims including warranty claims, arising out of the purchase of a 36" x 72" Jet Washer with gas heat, 220 v/3ph 15HP."

According to Enegren, Viking reached this compromise due to its concerns regarding Hillside's prohibited use of caustic cleaning solutions in the Washer.  One such concern was that the corrosive cleaners could impact the integrity of the Washer.  Further, Enegren did not believe that Renzella had the requisite expertise to perform the modifications that he made to the Washer.  The combination of these two factors led Viking to question whether the Hillside Washer could be safely operated.  As a result, Viking was willing to make a deal, i.e., give Hillside both the Washer and the full purchase price in order to be shielded from any liability that could arise from the continued use of the

20

Washer by Hillside.

Hillside, on the other hand, takes the position that the agreement reached was only to compensate Hillside for the difficulties and downtime it had experienced since purchasing the Washer. Renzella denies having had a conversation with Enegren during which Enegren explained that the release was not only to cover all claims by Hillside against Viking, but also to indemnify Viking for any other claims that could arise in the future from Hillside's continued operation of the Washer. Hillside asserts that there simply are no facts that could establish special factors or a special relationship between itself and Viking that would support recovery under a theory of implied contractual indemnification.

These questions of fact are not amenable to decision in the context of a motion for summary judgment. It is for the jury to decide the facts of this matter at trial. Once the jury has performed that function, the Court will be able to determine how best to deal with the legal issue.

*V. Conclusion and Order*

For all the reasons stated, it is ORDERED that Third Party Defendant, Hillside Machine, Inc.'s Motion For Summary Judgment (#44) be, and the same hereby is, DENIED.

/s/ Robert B. Collings

ROBERT B. COLLINGS
July 6, 2006.          United States Magistrate Judge

22